## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE SATANIC TEMPLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01859-JMS-MG |
| | ) | |
| TODD ROKITA, in his capacity | ) | |
| as Attorney General of Indiana, | ) | |
| and RYAN MEARS, in his | ) | |
| capacity as Marion County | ) | |
| Prosecutor, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT

The Satanic Temple sued Governor Eric Holcomb and Attorney General Todd Rokita to attack the validity of an Indiana statute that curtails the circumstances under which an abortion provider may perform abortions. The Temple subsequently amended its complaint, abandoning Governor Holcomb as a defendant and instead directing its suit against Marion County Prosecutor Ryan Mears. The Court should dismiss this complaint because the Satanic Temple has not pled facts sufficient to confer standing, fails to distill any of its peculiar and novel constitutional theories into cognizable legal claims, and impermissibly seeks to pursue state-law claims against state officials in federal court.

## BACKGROUND

Shortly after the Supreme Court returned abortion regulation to the States, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2259 (2022), Indiana's

1

General Assembly acted upon that authority by passing Senate Bill 1 (S.B. 1), which prohibits most abortions. Ind. Code § 16-34-2-1(a). S.B. 1 permits abortion in only three circumstances: (1) where necessary to save the pregnant woman's life or to avert a serious health risk, (2) where the fetus is diagnosed with a lethal fetal anomaly, and (3) in cases of rape or incest. *Id.*

In its amended complaint, The Satanic Temple sues Indiana Attorney General Todd Rokita and Marion County Prosecutor Ryan Mears to challenge S.B. 1. ECF No. 21. The Satanic Temple claims to represent female "members residing in Indiana who are involuntarily pregnant." *Id.* ¶ 10. It defines involuntarily pregnant woman as women who are members of The Satanic Temple, reside in Indiana, are pregnant with a not-yet-viable unborn child, and became pregnant either through failure of birth control or without the legal ability to consent. *Id.* ¶ 12.  The Satanic Temple also alleges that it has "spent over $75,000 to establish and maintain an abortion clinic." *Id.* ¶ 19. The amended complaint does not specify where the clinic is located, to whom it provides abortions, under what circumstances it provides abortions, whether it is licensed to operate in Indiana, and whether any staff are licensed to practice medicine in Indiana.

The Satanic Temple asserts a plethora of reasons why it believes that Indiana's abortion law is unconstitutional. *Id.* ¶ 7. It alleges that S.B. 1:

1) Unlawfully takes a supposed property right of a pregnant woman to "exclude" an unborn child from her uterus in violation of the Fifth Amendment. *Id.* ¶¶ 72–73.

2) Forces involuntarily pregnant women into slavery in violation of the Thirteenth Amendment by requiring that they "provide the services necessary to sustain the life" of their unborn children. *Id*. ¶¶ 82–87.

3) Discriminates between women who become pregnant by accident and women who become pregnant by rape or incest in violation of the Fourteenth Amendment's Equal Protection Clause. *Id*. ¶¶ 93–98.

4) Prohibits The Satanic Temple's religious mission of distributing abortion-inducing drugs to Indiana citizens in violation of Indiana's Religious Freedom Restoration Act. *Id*. ¶¶ 103–107.

5) Interferes with the religious practice of "engaging in the Satanic Abortion Ritual" by members of The Satanic Temple in violation of Indiana's Religious Freedom Restoration Act. *Id*. ¶¶ 109–112.

The Satanic Temple seeks to enjoin Defendants from enforcing Indiana's abortion restrictions, which limit a provider's ability to perform abortions in Indiana. Am. Compl. at 15, ECF 21.

On May 8, 2023, defendants served discovery requests on The Satanic Temple for purposes of ascertaining facts relevant to Article III standing. *See* Exhibit 1. The Satanic Temple refused to provide responses before the deadline for filing a responsive pleading, and as of the filing of this response, defendants have not received a ruling on their motion for an extension of time. ECF 34; ECF 35.

## STANDARD OF REVIEW

A motion to dismiss for lack of standing is a challenge to a court's subject matter jurisdiction. *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). If the Court lacks subject matter jurisdiction, it should dismiss the case under Rule 12(b)(1) of the Federal Rules of Civil Procedure. As the party invoking the federal court's jurisdiction, a plaintiff has the burden of demonstrating that subject-matter jurisdiction exists. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). To do this, the plaintiff must establish the "irreducible constitutional minimum" of standing that is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If the factual basis for allegations of standing are challenged, jurisdictional discovery is proper. *See Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996). It is then the plaintiffs' burden to "advance 'proof to a reasonable probability" of the facts necessary to establish federal jurisdiction." *Id.* (citation omitted).

Additionally, a complaint must "state a claim to relief that is plausible on its face" to survive a motion to dismiss under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Two core principles underlie this standard. "First, although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Second, the plausibility standard calls for a

'context-specific' inquiry that requires the court to 'draw on its judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679). The complaint must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" if it is to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

## ARGUMENT

This Court should dismiss all claims for two reasons. First, The Satanic Temple lacks standing to bring its claims either in its own right or on behalf of its members. The Satanic Temple attempts to wrangle standing out of its newly established abortion clinic—in *New Mexico*. *See* Exhibit 2. But the "Samuel Alito's Mom's Satanic Abortion Clinic"[1] did not and could not provide abortions to Indiana women even before S.B. 1 was passed. The Satanic Temple also fails to establish associational standing because it does not plead facts showing that any of its members would have standing to sue in her own right. At a minimum, the Court should permit jurisdictional discovery sufficient to ascertain whether standing exists.

Second, even if The Satanic Temple had standing to bring this suit, the case must still be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. None of The Satanic Temple's counts have stated a claim for relief plausible on its face. Indiana's abortion laws are in no way a taking of a woman's uterus because a woman's ability to bear children is not a legally cognizable

---

[1] *See* Rebecca Seales, "*The Satanic Temple: Think you know about Satanists? Maybe you don't,*" BBC News (May 20, 2023), https://www.bbc.com/news/world-us-canada-65549975.

property right. Nor was that supposed property right taken by regulation. Indiana has not enslaved female members of The Satanic Temple by prohibiting abortion. There is no unconstitutional discrimination in Indiana's efforts to simultaneously prioritize childbirth and protect victims of rape and incest from the unique trauma attending those circumstances. Finally, The Satanic Temple's claims under the Indiana Religious Freedom Restoration Act must both fail because sovereign immunity prohibits a plaintiff from bringing a state-law claim against a state official in federal court.

## I.     The Satanic Temple lacks Article III standing to bring its claims.

Article III's case-or-controversy requirement demands that a plaintiff allege an (1) injury-in-fact that is "concrete and particularized," as well as "actual or imminent, not 'conjectural' or 'hypothetical,'" (2) a causal connection that renders the injury fairly traceable to the challenged action of the defendant, and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "'[A] plaintiff must demonstrate standing for each claim he seeks to press.'" *Johnson v. U.S. Off. of Pers. Mgmt*, 783 F3d. 655, 661 (7th Cir. 2015) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). These standing requirements, which are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," aim to ensure that the person bringing the lawsuit possesses "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

**A. The Satanic Temple has not demonstrated standing in its own right.**

The Satanic Temple has not demonstrated standing for purposes of Count 4, which alleges that S.B. 1 violates Indiana's Religious Freedom Restoration Act by preventing the Satanic Temple from "providing Medical Abortions to TST Members." Am. Compl. ¶ 25, ECF No. 21; *see id.* ¶¶ 99–107. Establishing standing requires the Satanic Temple to show all three elements of Article III standing: a "concrete and particularized" injury-in-fact that is "not 'conjectural' or 'hypothetical,'" a "fairly traceable" connection between the injury and the challenged action of the defendant, and a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61.

To establish injury, The Satanic Temple relies on its supposed creation of an abortion clinic. Am. Compl. ¶ 19, ECF No. 21. Although The Satanic Temple alleges an intent to "provide Medical Abortions to TST members in Indiana, provided it can do so lawfully," *Id.* ¶ 23, it does not allege facts sufficient to show such a clinic exists or is reasonably likely to exist in the near future. The complaint does not specify where the clinic is located, what services it performs, or where its providers are licensed. To be sure, the organization's website says that The Satanic Temple has an abortion clinic located in New Mexico, but that is insufficient to establish standing in this case. *See* Exhibit 2. Providing abortions in Indiana would require The Satanic Temple either to (1) open a clinic in Indiana, which it does not aver an intention to do, or (2) provide abortion-inducing drugs by mail, which it has not established is reasonably likely to occur.

Nor does The Satanic Temple show that, if it had a clinic capable of serving Indiana patients, anyone would use it to procure abortions that would be lawful but for S.B. 1. As discussed above, it does not specify how many female members in Indiana desire abortions, whether those abortions fall outside S.B. 1's exceptions, and whether those abortions would be sought for religious reasons. Nor does The Satanic Temple allege that any abortions sought by female members would be sought from The Satanic Temple's abortion clinic, as opposed to a local Indiana provider. The Satanic Temple's generic allegations of an intention to someday provide abortions to unspecified women in Indiana under unknown circumstances "do not support a finding of the 'actual or imminent' injury." *Lujan*, 504 U.S. at 564.

Additionally, The Satanic Temple does not show that any alleged injury is "fairly traceable to" S.B. 1's enforcement. Even before S.B. 1's enactment, both federal and state law would prohibit The Satanic Temple from providing abortion-inducing drugs by mail. *See* 18 U.S.C. § 1461 (prohibiting the interstate shipment of "[e]very article, instrument, substance, drug, medicine, or thing which is advertised to described in a manner calculated to lead another to use or apply it for producing abortion"); Ind. Code. § 16-34-2-1 (2021) (requiring physicians to "dispense the abortion inducing drug in person" and prohibiting "[t]elehealth and telemedicine" for providing abortions").

Similarly, even before S.B. 1, abortion clinics were required to seek licensure with Indiana authorities. *See* Ind. Code § 16-21-2-2.5 (2021); 410 IAC 26. The Satanic Temple has not alleged that it is licensed as an abortion clinic, that it sought

licensure, or that it is seeking licensure. Nor has the organization alleged that any providers at its clinic are licensed to practice medicine in Indiana, including through telehealth or telemedicine services. Its clinic thus could not legally provide abortions in Indiana regardless. Any obstacle to The Satanic Temple's New Mexico clinic providing abortion services across state lines to members in Indiana is not attributable to S.B. 1. The Satanic Temple's business model was illegal on multiple levels even before Senate Bill 1 was passed.

That the "creation of the TST Clinic has resulted in a diversion of TST resources from other programs and the corresponding reduction of TST's ability to promote the TST Tenets" cannot confer standing either. Am. Compl. ¶ 24, ECF No. 21. The Satanic Temple does not allege that it reallocated resources in New Mexico as a result of Indiana's abortion laws. And, as discussed above, The Satanic Temple's clinic—which existed before Indiana passed Senate Bill 1—did not and could not provide abortion-inducing drugs to Indiana residents before September 15, 2022. The challenged laws had no tangible impact on the clinic's operations, much less an impact traceable to the actions of Defendants Rokita and Mears. The Satanic Temple's budgeting decisions are not cognizable injuries or "fairly traceable" to the challenged statute. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Finally, The Satanic Temple has not established the redressability element of Article III standing because telehealth abortions were already illegal in Indiana prior to the passage of Senate Bill 1. *See* Ind. Code. § 16-34-2-1 (2021); 18 U.S.C. § 1461. Even if this Court granted the relief The Satanic Temple seeks—an injunction and

declaration against S.B. 1, *see* Am. Compl. pp. 15–16, ECF No. 21—it would still be unable to ship mail-order abortions into Indiana from its virtual clinic outside the State.

**B. The Satanic Temple has not demonstrated associational standing.**

In Counts 1, 2, 3, and 5, The Satanic Temple invokes not its own injury, but the injuries of its members alleged to be "[i]nvoluntarily [p]regnant." Am. Compl. ¶ 10, ECF No. 21. Associational standing doctrine allows an organization to bring a lawsuit on behalf of its members *only* if the organization establishes (1) at least one of the members would have standing to sue in his or her own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claims nor requested relief requires participation of the individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The presence of these requirements for a group seeking to sue on behalf of its members "guarantees the satisfaction of [Article III's] elements by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). And both the Supreme Court and the Seventh Circuit have rejected attempts by organizations to plead standing without identifying the members who have standing by themselves. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (rejecting as a basis for standing "a statistical probability that some of those members are threatened with concrete injury," and calling that idea a

"mockery of our prior cases"); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (finding an affidavit stating that two licenses had been revoked to be insufficient to establish standing in a challenge to a city licensure ordinance because it "fail[ed] to identify the individuals whose licenses were revoked."); *Prairie Rivers Network v. Dynegy Midwest Generation*, LLC, 2 F.4th 1002, 1010 (7th Cir. 2021) ("At the pleading stage, [a plaintiff] must . . . provide some way of showing that *at least one* individual member has standing to sue on their own." (emphasis in original)).

The Satanic Temple has not identified any member who would have standing to sue in her own right. To start, the Temple has not alleged sufficient facts that any member suffered a concrete and particularized injury. It vaguely alleges that it "brings this action as the representative of female TST members residing in Indiana who are involuntarily pregnant," Am. Compl. ¶ 10, ECF No. 21—the same allegation made in its original complaint filed 9 months ago, Compl. ¶¶ 5–6, ECF No. 1. But the Temple does not specify how many female members are pregnant, whether the members who were pregnant 9 months ago are still pregnant despite the passage of time, whether the women can take advantage of S.B. 1's exceptions, and whether the women still need relief given that a state court enjoined S.B. 1. It only vaguely asserts that involuntarily pregnant women (perhaps different ones?) "can and do," get abortions when they are legal. Am. Compl. ¶¶ 15–16, ECF No. 21.

The Satanic Temple's failure to identify members poses a particular problem to its Religious Freedom Restoration Act claim.  Ordinarily, individual participation is required in a case involving religious free exercise claims. *Harris v. McRae*, 448

U.S. 297, 321 (1980) (holding that a diversity of religious views foreclosed associational standing of church organization). RFRA claims, like the ones in counts four and five, require individualized evaluation. *See Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (approving the "feasibility of case-by-case consideration of religious exceptions to generally applicable rules"). To prevail on a Religious Freedom Restoration Act (RFRA) claim requires a sincere religious belief and a substantial burden imposed by the government. *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022); *see* Ind. Code § 34-13-9-8. Courts cannot assess those beliefs and burdens without individual participation.

The Satanic Temple alleges that all "involuntarily pregnant women" would get an abortion if given the opportunity. Am. Compl. ¶ 14, ECF No. 21. But that allegation does not allow a court to determine whether they would get an abortion for religious or other reasons. Determining whether the reason for seeking an abortion is a sincere, religious reason requires individualized participation. *See Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) ("Checking for sincerity and religiosity is important to weed out sham claims."). Similarly, determining whether the alleged burden is material requires examining individual beliefs and circumstances. *See Harris*, 448 U.S. at 321. "[T]he participation of individual members" is "essential to a proper understanding and resolution of [members'] free exercise claims," precluding associational standing. *Id.*

The Satanic Temple has failed to show that any of its members would have standing to bring this lawsuit in her own right. Without any facts supporting the

vague and ambiguous allegations in its complaint, The Satanic Temple cannot claim associational standing as a representative of its pregnant members.

### C. At a minimum, the Court should permit jurisdictional discovery.

The Satanic Temple's allegations are not sufficient to establish standing even if taken at face value. To the extent the Court disagrees, however, it should permit jurisdictional discovery as to whether The Satanic Temple has standing. A court "may allow discovery . . . order a further hearing to be held before ruling on [a] Rule 12(b)(1) motion." 5B C. Wright & A. Miller, *Federal Practice & Procedure* § 1350 (3d ed.); *see Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996). And here discovery would be appropriate. The factual basis for standing is tenuous at best. There is no point in proceeding past the complaint stage to full discovery when early focused discovery would show whether jurisdiction exists.

### II.    The Satanic Temple's constitutional claims fail to state a plausible claim for relief.

Even if The Satanic Temple was a proper plaintiff to bring this challenge, its suit must still be dismissed because none of its counts states a plausible claim for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### A. Indiana's Abortion laws are not a Fifth Amendment taking of private property.

Count one fails because The Satanic Temple has not shown the existence of a cognizable property right and because Indiana's regulation of abortion providers is not a taking under the Fifth Amendment.

A claim of an unconstitutional Fifth Amendment taking must show, first, that a legally recognized property right exists. *Northwest Louisiana Fish and Game Preserve Comm'n v. U.S.,* 574 F.3d 1386, 1390 (Fed. Cir. 2009) (citing *U.S. v. Willow River Power Co.*, 324 U.S. 499, 503 (1945)). "Not all property interests are legally protected property rights." *Id.* "[O]nly those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." *Willow River Power Co.*, 324 U.S. at 502.

The Satanic Temple argues that a woman's uterus is an object over which she has property rights, and that those rights include an *unlimited* right to remove an unborn child from her uterus. Specifically, it claims that a woman has property rights in her uterus that include the right to: "A. Have her uterus removed for any purpose, including changing her sex; or B. Rent it out to intended parents as a gestational carrier; or C. Exclude any blastocyst, embryo, or nonviable fetus from her uterus." Am. Compl. ¶ 72, ECF No. 21. These are not legally cognizable property rights. As the Supreme Court made clear, "[t]he Constitution makes no reference to abortion, and no such right is implicitly protected by *any constitutional provision*." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (emphasis added).

The Satanic Temple attempts to invent a property right by pointing to the potential economic interest a woman could have in a surrogacy contract. Am. Compl. ¶ 74, ECF No. 21. This argument is flawed for many reasons. First, surrogacy contracts are unenforceable in Indiana, and therefore fail as a basis for a legally

cognizable property right. Ind. Code § 31-20-1-1 *et seq.* Second, The Satanic Temple has failed to allege any facts indicating that the State of Indiana has interfered with any existing surrogacy contract or that any woman has been unable to enter into one, and therefore the Temple has no factual basis on which to base such a claim.

Finally, even if The Satanic Temple could show that a woman who wanted to be a surrogate was prevented by her own pregnancy from doing so, a taking still would not have occurred. Not every exercise of government power violates the Fifth Amendment. "Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211 (1986). Every theory under which the Supreme Court has found a regulation to have effected a Fifth Amendment taking "aim[s] to identify regulatory actions that are functionally equivalent to a direct appropriation of or ouster from private property." *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 529 (2005).

Abortion restrictions, which existed long before the adoption of the Fifth Amendment and have continued long after, have never been understood to constitute a direct appropriation of a woman's private property. The State, of course, in no way commands any woman to become pregnant.  It merely, for the sake of the life she carries once she becomes pregnant, precludes the woman from aborting her fetus in most cases. That is protection of life, not procurement of property.

**B. Count two fails because the biological support a mother provides to an unborn child does not amount to involuntary servitude.**

In count two, The Satanic Temple equates pregnancy and childbirth with slavery, alleging that being unable to obtain an abortion violates the Thirteenth Amendment. Am. Compl. ¶¶ 81, 87, ECF No. 21. That claim is implausible.

The Thirteenth Amendment does not "implicitly protect[]" abortion. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022). It instead bans slavery: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States." U.S. Const. amend. XIII, § 1. Pregnancy is not slavery or involuntary servitude, but a natural process (and an outcome that many women desire and regard as a blessing). The argument that prohibition against elective abortions amounted to involuntary servitude "totally lacks merit" and "strains credulity." *Jane L. v. Bangerter*, 794 F.Supp. 1537, 1548–49 (D. Utah 1992).

History confirms that the Thirteenth Amendment's text does not protect abortion. At the time of ratification, 21 of the 27 ratifying states had statutes prohibiting abortion. *Id.* It is implausible to think that the Thirteenth Amendment was "intended to introduce any novel doctrine" regarding state regulation of abortion. *Id.* (quoting *Robertson v. Baldwin*, 165 U.S. 275, 282 (1897)). If it had States would be unable to regulate abortion any at point in pregnancy. Even when the Supreme Court recognized a federal abortion right, however, it made clear that States *may* restrict abortion. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992) ("subsequent to viability, the State in promoting its interest in

16

the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion…" (quoting *Roe v. Wade*, 410 U.S. 113, 164–65 (1973)).

The Thirteenth Amendment's ban on slavery cannot be construed more than 150 years after ratification to reach abortion. As the Supreme Court recently held, "the Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision." *Dobbs*, 142 S. Ct. at 2242.

## C. Exceptions for victims of rape or incest do not violate the Equal Protection Clause.

In count three, The Satanic Temple alleges a violation of the Equal Protection Clause of the Fourteenth Amendment because Indiana permits abortions for women who are pregnant as a result of rape or incest but not those who are pregnant as a result of lawful sexual relations (even if by accident). Am. Compl. ¶¶ 88–98. But victims of rape and incest are not similarly situated to women who engage in consensual sex, even without the purpose of becoming pregnant, and the statute is rationally related to a legitimate governmental purpose. Indeed, protecting "a living being and potential human life," is a purpose that is "both valid and compelling." *Cheaney v. State*, 285 N.E.2d 265, 270 (Ind. 1972).

Legislation is generally "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 437 U.S. 432, 440 (1985). Only if a law targets a fundamental right or a suspect class are subject to the higher standard of strict scrutiny. *Id*. A suspect class is characterized by "an immutable characteristic determined solely by the accident of birth" or else is "saddled with such disabilities,

or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 638 (7th Cir. 2007) (internal quotation marks omitted). Suspect classes include race, alienage, national origin, and gender. *See City of Cleburne*, 437 U.S. at 440.

Here, Plaintiff does not identify a recognized fundamental right or suspect class. To begin with, The Satanic Temple does not, and could not, assert that women who use contraception and engage in sex for reasons other than procreation are a suspect class. Instead, it attempts to frame count three as involving a "fundamental right" to engage in sex without the intention of becoming pregnant. Am. Compl. ¶ 89, ECF No. 21. Despite the Temple's attempt to assert—without citation to legal authority—a different "fundamental right," the crux of count three is the difference in the availability of *abortion* between women who are "pregnant by accident and women who are pregnant by rape or incest." *Id.* ¶ 77. Indiana's abortion laws do not prohibit women from engaging in consensual sexual relations. They prohibit abortion. And *Dobbs* has made clear that abortion is not a fundamental right. *Dobbs*, 142 S. Ct. at 2242.

Because count three does not involve a fundamental right or a suspect class, rational basis analysis applies. *See Discovery House, Inc. v. Consolidated City of Indianapolis,* 319 F.3d 277, 282 (7th Cir. 2003). Under the rational basis test, "the applicable government regulation will be upheld if there is a rational relationship

between the disparity of treatment and *some* legitimate governmental purpose." *Council 31 of the American Federation of State, County and Municipal Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 886 (7th Cir. 2012) (quotation marks omitted). The legitimate purpose here is the protection of human life. *See* Ind. Code § 16-34-1-1 (preferring childbirth over abortion). That is met here: As the Supreme Court held, "respect for and preservation of prenatal life at all stages of development" and to preserve the integrity of the medical profession are legitimate state interests advanced by prohibitions on abortion. *Dobbs*, 142 S. Ct. at 2284.

That Indiana does not prohibit all abortions but makes limited exceptions to promote other important interests does not deprive it of a rational basis. *See Hope v. Comm'r of Ind. Dep't of Corr.*, 66 F.4th 647, 651 (7th Cir. 2023). In *Dobbs*, the Supreme Court upheld an abortion restriction with similar exceptions. *See* 142 S. Ct. at 2284. Besides, victims of rape and incest are not similarly situated to women who engage in consensual sex, because rape and incest are serious criminal acts. *See* Ind. Code § 35-42-1 (rape as a Level 1 or Level 3 felony); Ind. Code § 35-46-1-3 (incest as a Level 5 or Level 4 felony); Ind. Code §§ 35-50-2-4, -5.5 (two years imprisonment minimum penalty for Level 4 felony, 50 years maximum for Level 1 felony). The Supreme Court has called rape "highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established." *Coker v. Georgia*, 433 U.S. 584, 597 (1977). The Court observed "[s]hort of homicide, it is the 'ultimate violation of self,'" and that "[r]ape is very often

accompanied by physical injury to the female and can also inflict mental and psychological damage." *Id.* at 597–98 (footnote omitted). Equal protection permits Indiana to distinguish between victims of rape and persons who are pregnant from engaging in voluntary sex.

### III.   The Satanic Temple's RFRA claims are barred by the Eleventh Amendment and meritless.

Counts four and five should be dismissed because they are barred by the Eleventh Amendment independently of the other three counts. Both counts assert violations of Indiana's Religious Freedom Restoration Act. Am. Compl. ¶¶ 104, 109, ECF No. 21. Under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), however, federal courts do not have jurisdiction over those claims. Generally, the "Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Id.* at 101 (citation omitted). Although there is an exception to this general rule for suits "challenging the constitutionality of a state official's action," that exception does not permit suits against state officials for violations of *state* law. *Id.* at 102, 106. For a federal court to "instruct[] state officials on how to conform their conduct to state law" would violate the Eleventh Amendment and conflict with "principles of federalism." *Id.* at 106.

The Satanic Temple, moreover, overlooks that Indiana's Religious Freedom Restoration Act permits state laws that burden religion where necessary to further a "compelling governmental interest." Ind. Code § 34-13-9-8(b). S.B. 1 is necessary to further such an interest. The Indiana Supreme Court has recognized that restricting abortion to protect "a living being and potential human life" serves a "valid and

20

compelling" interest. *Cheaney v. State*, 285 N.E.2d 265, 270 (Ind. 1972). That conclusion is consistent with the fact that Anglo-American law has prohibited abortion as a criminal act for centuries. *See Dobbs v. Jackson Women's Health Org.,* 142 S. Ct. 2228, 2248–49 (2022).

**CONCLUSION**

The Defendants ask that the Court dismiss the first amended complaint because the Court lacks subject matter jurisdiction and Plaintiff has failed to state a claim upon which relief may be granted.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

Date: <u>May 22, 2023</u>     By:    Aaron M. Ridlen
Deputy Attorney General
Attorney No. 31481-49

Christopher M. Anderson
Deputy Attorney General
Attorney No. 31870-49

Rebekah P. Durham
Deputy Attorney General
Attorney No. 37840-49

Thomas M. Fisher
Solicitor General
Attorney No. 17949-49

James Barta
Deputy Solicitor General
Attorney No. 31589-49

Rebecca Holmes
Deputy Attorney General
Attorney No. 36851-79

21

OFFICE OF INDIANA ATTORNEY GENERAL TODD ROKITA
302 West Washington Street – IGCS – 5th Floor
Indianapolis, IN  46204-2770
Telephone:  (317) 232-2826
Facsimile:  (317) 232-7979
E-mail:  Aaron.Ridlen@atg.in.gov