**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

_____

THE SATANIC TEMPLE, INC.

        Plaintiff

    v.

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

        Defendants

_____

Case No. 1:22-cv-1859-JMS-MG


**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
*Attorney for Plaintiff The Satanic Temple, Inc.*

# TABLE OF CONTENTS

I.    Introduction.................................................................................................... 1

II.   TST Has Standing to Bring This Action................................................... 3

   A.   TST Has Standing as a Provider of Abortifacients Used in the Satanic Abortion Ritual... 3

   B.   TST Has Standing as a Provider of Abortions..................................... 4

   C.   TST Does Not Need to Currently Provide Lawful Abortions in Indiana to Have
   Standing. ................................................................................................... 5

   D.   TST Has Standing Because It Diverted Resources to Respond to the Indiana
   Abortion Ban............................................................................................ 7

   E.   TST Has Standing as a Representative of TST Members. ................. 10

   F.   TST Does Not Have to Identify of Its Members By Name. ............... 13

III.  The Court Should Apply 21st Century Reality and Law.......................... 15

   A.   18th and 19th Century Views of Prenatal Life Are Based on Ignorance........... 15

   B.   *Dobbs* Did Not Eliminate a Woman's Fundamental Right to Decide When to Become
   Pregnant. ................................................................................................. 16

   C.   Being Pregnant Does Not Mean a Woman Consents to Be Pregnant. ........... 18

IV.   The Indiana Abortion Ban Causes the Unconstitutional Taking of a Woman's Property
Right to Exclude a Prenatal Person from Her Uterus. .................................. 20

   A.   The Use and Occupancy of a Uterus is a Property Interest. ............. 20

   B.   The Costs of the Indiana Abortion Ban Should Be Borne by the State........... 26

   C.   The Right to Exclude a Prenatal Person from the Uterus is a Property Interest.......... 27

   D.   The Indiana Abortion Ban Takes a Woman's Property Right To Exclude a Prenatal
   Person From Her Uterus. ........................................................................ 28

V.    The Indiana Abortion Ban Forces Involuntarily Pregnant Women into Involuntary
Servitude. ...................................................................................................... 29

VI.   Count Three States a Claim for Violation of the Equal Protection Clause.......... 31

VII.  TST Respectfully Requests Leave to Replead Counts Four and Five as Violations of the
Free Exercise Clause...................................................................................... 33

VIII. Conclusion. ............................................................................................... 33

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021)..................................................... 10

*Ameritech Corp. v. McCann*, 297 F.3d 582 (7th Cir. 2002). ........................................................... 2

*Anderson v. Morrow*, 371 F.3d 1027 (9th Cir. 2004)....................................................................... 16

*Anonymous Plaintiff #1 et al v. The Individual Members of The Medical Licensing Board of Indiana, et al.*, Dkt. No. 49D01-2209-PL-031056..................................................................... 12

*Armstrong v. State*, 296 Mont. 361 (1999) ...................................................................................... 21

*Bailey v. Alabama*, 219 U.S. 219 (1911) ................................................................................... 29, 30

*Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014)................................................................... 11

*Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 720 (2014)................................................... 12

*Carey v. Population Services International*, 431 U.S. 678, 684 (1977)......................................... 7

*Catholic League v. City of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) ........................ 11

*Cedar Point Nursery v. Hassid*, 594 U.S. ___, 141 S. Ct. 2063 (2021) ................................ 27, 28

*Cheaney v. State*, 259 Ind. 138 (1972)...................................................................................... 1, 15

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................................................................. 8, 9

*Crawford v. Marion County Election Bd.*, 472 F.3d 949 (7th Cir. 2007)....................................... 8

*Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012)................................................ 4

*Denning v. Star Publishing Co.*, 94 Ind. App. 300 (Ct. App. 1932)............................................. 21

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ____, 142 S. Ct. 2228 (2022).. passim

*Doe v. Bolton*, 410 U.S. 179 (1973)................................................................................................. 4

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ....................................................................................... 31

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ......................................................................... 7, 17, 18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2021) .............................................................. 3, 7

*First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987).........................................................................................26

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ....................................14

*Griswold v. Connecticut*, 381 U.S. 479 (1965).........................................16, 17

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) ..............8, 9

*Horne v. Dept. of Agriculture* , 576 U.S. 350 (2015) ......................................27

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977).......10, 11

*Ind. State Conference of the Nat'l Ass'n for the Advancement of Colored People (NAACP) v. Lawson*, 326 F. Supp. 3d 646 (S.D. Ind. 2018) .........................................8

*Johnson v. City of Shelby*, 574 U.S. 10, 135 S.Ct. 346 (2014) ....................33

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .........................................................18

*Knick v. Twp. Of Scott, Pa*., 139 S. Ct. 2162 (2019) .....................................11

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014)....................................................15

*Lawrence v. Texas*, 539 U.S. 558 (2003) ...................................................16, 17

*Lingle v. Chevron U. S. A.*, 544 U.S. 528 (2005)...................................25, 27, 28

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)...............22, 23, 27, 28

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)................28

*Maria v. Surbaugh*, 23 Va. 228, 237, 1824 WL 1192 (Va. 1824)................29

*McCormack v. Hiedeman,* 900 F. Supp.  2d 1128 (D. Idaho 2013), aff'd sub nom, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015 ..........................................................5

*Minnesota Mining Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001)....................22

*Moore v. East Cleveland*, 431 U.S. 494 (1977)..............................................28

*NAACP v. Alabama*, 357 U.S. 449 (1958)........................................................14

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015): ......13

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003)................................................. 10

*Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358 (Fed. Cir. 2012) .................................... 26

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) .......................................... 25

*Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193 (5th Cir. 1984) ...................................... 4

*Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998)................................................. 22

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ............................... 4

*Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52 (1976)............................................... 4

*Plyler v. Doe*, 457 U.S. 202 (1982).................................................................................. 31

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021) ....... 13

*Roe v. Wade* 410 U.S. 113 (1973)................................................................................... 10

*San Antonio School District v. Rodriguez*, 411 U.S. 1 (1973)...................................... 31

*San Diego Gas Electric Co. v. San Diego*, 450 U.S. 621 (1981)........................................... 25, 28

*Seeboth v. Allenby*, 789 F.3d 1099 (9th Cir. 2015)......................................................... 32

*Skinner v. Switzer*, 562 U.S. 521 (2011) ................................................................... 33

*Spokeo, Inc. v. Robins*, 538 U.S. 330, 136 S.Ct. 1540 (2016) ..................................... 11

*Steffel v. Thompson*, 415 U.S. 452 (1974) ........................................................................ 3

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ...................................................... 13

*Thayer v. Chiczewski*, 705 F.3d 237 (7th Cir. 2012) ..................................................... 31

*Tyler v. Hennepin Cnty., Minn.*, No. 22-166 (May 25, 2023) WL 3632754 ....................... 20, 25

*U.S. v. Daniels*, 902 F.2d 1238 (7th Cir. 1990) .................................................................. 17

*U.S. v. Feekes*, 879 F.2d 1562 (7th Cir. 1989)............................................................... 18

*U.S. v. Seidman*, 156 F.3d 542 (4th Cir. 1998)................................................................ 18

*Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891), .................................................... 21

*United States of America v. State of Idaho*, Case No. 22-cv-328 DIH, slip op., August 24, 2022. 2

*United States v. Garber*, 607 F.2d 92 (5th Cir. 1979) .................................................................. 20

*United States v. Kozminski*, 487 U.S. 931 (1988) ....................................................................... 30

*United States v. Page*, 302 F.2d 81 (9th Cir. 1962) ..................................................................... 18

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013) ............................................................... 19

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464 (1982)………………………………………………..…………………... 3

*Voelker v. Tyndall*, 226 Ind. 43 (1947) ....................................................................................... 21

*Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963 (9th Cir. 2011) .................................... 19

*Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994) ........................ 7

## Other Authorities

Bridget J. Crawford, Taxation, Pregnancy, and Privacy, 16 Wm. & Mary J. Women & L. 327 (2010) ........................................................................................................................................... 19

Herbert Becker, Subdividing the Air - A New Method of Acquiring Air Rights, 6 Chi.-Kent Rev. 6 (1927). ..................................................................................................................................... 24

John Locke in Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698) .. 21

## Rules

Fed. R. Civ. Pro. 12(b)(6) .............................................................................................................. 2

## Constitutional Provisions

Fourteenth Amendment ......................................................................................................... passim

Thirteenth Amendment .......................................................................................................... passim

### I.      Introduction

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. __, 142 S. Ct. 2228 (2022)

("*Dobbs*") said in its opening paragraph:

> Abortion presents a profound moral issue on which Americans hold sharply
> conflicting views.  Some believe fervently that a human person comes into being
> at conception and that abortion ends an innocent life.  Others feel just as strongly
> that any regulation of abortion invades a woman's right to control her own body
> and prevents women from achieving full equality.  Still others in a third group
> think that abortion should be allowed under some but not all circumstances, and
> those within this group hold a variety of views about the particular restrictions
> that should be imposed.

*Dobbs* made clear the decision to "return the issue of abortion to the people's elected

representatives" did not sanction any of these beliefs. *Id.* at 2261 ("Our opinion is not based on

any view about if and when prenatal life is entitled to any of the rights enjoyed after birth.").

The State of Indiana chose the side of those who "believe fervently that a human person

comes into being at conception and that abortion ends an innocent life."  The Indiana Abortion

Ban[1] creates an "unborn child" (a "Prenatal Person") protected by the full power and majesty of

the State of Indiana from destruction, subject to a few limited exceptions.[2]  The Indiana Abortion

Ban codifies the long-standing view of the Indiana Supreme Court that an "unborn child" is a

"living being" with the legal right to exist separate and apart from its mother. *Cheaney v. State*,

259 Ind. 138, 147 (1972) ("*Cheaney*").  Defendants have consistently argued in state court that a

Prenatal Person is a "human being" with a legal right to continued existence regardless of the

---

[1] Capitalized terms have the same meaning as in the First Amended Complaint (the "Complaint")
except as otherwise noted.

[2] The exceptions are rape, incest, lethal fetal anomaly, a serious health risk to the mother or to
save her life.

wishes of the mother.  See Declaration of W. James Mac Naughton dated June 20, 2023 (the "Mac Naughton Declaration") at Exhibits A and B.

*Dobbs* did not exalt the rights of an "unborn child" over the rights of the mother.  *Dobbs* did not exempt the legal protections the State of Indiana has conferred on a Prenatal Person from the limitations on the state's power found in the Takings Clause, the Involuntary Servitude Clause or the Equal Protection Clause.  *United States of America v. State of Idaho*, Case No. 22-cv-328 DIH, slip op., August 24, 2022, at p. 37 ("*Dobbs* did not overrule the Supremacy Clause.").

The First Amended Complaint (the "Complaint") alleges the creation of a Prenatal Person by the Indiana Abortion Ban is unconstitutional as applied to an Involuntarily Pregnant Woman because 1) the Prenatal Person takes her property– the use of her uterus – without compensation in violation of the Takings Clause; 2) an Involuntarily Pregnant Woman must remain pregnant and give birth to a Prenatal Person in violation of the Thirteenth Amendment; and 3) an Involuntarily Pregnant Woman is subject to the Indiana Abortion Ban while a woman who is pregnant by rape or incest is not in violation of the Equal Protection Clause.[3]  In deciding whether the Complaint states a claim for relief for purposes of Fed.  R. Civ. Pro.  12(b)(6), the Court must construe the Complaint in the light most favorable to TST and accept all well-pleaded factual allegations as true.  *Ameritech Corp. v. McCann*, 297 F.3d 582, 585 (7th Cir. 2002).

---

[3] The Complaint also alleges in Count Four and Five the Indiana Abortion Ban precludes TST and its members from freely exercising their religious beliefs.

2

## II.    TST Has Standing to Bring This Action.

TST has standing to bring this action because 1) it has suffered both actual and threatened injury as a result of the Indiana Abortion Ban; 2) the injury is fairly traceable to the Indiana Abortion Ban; and 3) TST's injury is likely to be redressed by a favorable decision by this Court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). See also *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2021) ("*Ezell*") ("Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiffs favor would redress the injury.").

### A.    TST Has Standing as a Provider of Abortifacients Used in the Satanic Abortion Ritual.

The Indiana Abortion Ban makes it a crime for TST to provide the Abortifacients necessary to engage in the Satanic Abortion Ritual in Indiana, subject to exceptions not germane to this case.  Indiana Code § 16-34-2-7(a).  The very existence of this penalty injures TST for purposes of standing.  *Ezell*, 651 F.3d at 695-96 ("The very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as injury for the purpose of standing." [internal citations and quotations omitted]).  TST is not required to first expose itself to actual arrest or prosecution to have standing to challenge the Indiana Abortion Ban.[4]  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

TST does not prescribe Abortifacients for its Indiana members because it does not want to run afoul of the Indiana Abortion Ban.  See Declaration of Erin Helian dated June 16, 2023 (the "Helian Declaration") at ¶26.  This sensible, self-imposed limitation does not cause TST to

---

[4] Defendant Rokita has already threatened to take legal action against Walgreens for delivering mifeprestone by mail in Indiana.  Mac Naughton Declaration at Ex. D.

forfeit Article III standing.  Rather, it is the very essence of an injury that establishes standing, particularly since TST is self-censoring its ability to promote the Satanic Abortion Ritual by the distribution of Abortifacients in Indiana. *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (Self-censorship is a distinct "harm that can be realized even without an actual prosecution," citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)).

TST members use Abortifacients as part of the Satanic Abortion Ritual.  This religious use of Abortifacients gives TST standing to challenge the Indiana Abortion Ban that criminalize their use.  *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 199 (5th Cir. 1984) ("The Church has a personal stake in the constitutionality of the Texas statute [banning peyote] because enforcement of that statute will directly affect the freedom with which its members may fulfill their professed religious commitment.").

### B.  TST Has Standing as a Provider of Abortions.

Qualified medical professionals who state a clear intention to perform abortions for their patients allege "a sufficiently concrete and imminent injury—possible prosecution and imprisonment" to challenge statutes that regulate abortion providers.  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916-17 (9th Cir. 2004), *cert. den.* 544 U.S. 948 (2005).  The failure to actually provide a medical abortion to avoid the criminal penalties imposed by the Indiana Abortion Ban concretely affects TST's liberty interests, even if TST does not express a specific intent to violate the statute.  *Id.* at 917.  "The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions.  The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment." *Doe v. Bolton*, 410 U.S. 179, 188 (1973). See also *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 62 (1976) ("The physician is the one against

whom [an abortion ban] directly operate[s] in the event he procures an abortion that does not

meet the statutory exceptions and conditions."). Nothing in *Dobbs* even remotely suggests

medical professionals subject to criminal prosecution for providing abortions have lost their

standing to challenge those laws.  See also *McCormack v. Hiedeman,* 900 F. Supp.  2d 1128,

1142-43 (D. Idaho 2013), aff'd sub nom, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015).

("Given that [the physician] faces the threat of prosecution for performing medical abortions, it

makes little sense to suggest that [he] must first comply with those laws before he has standing

to challenge them.").

## C.  TST Does Not Need to Currently Provide Lawful Abortions in Indiana to Have Standing.

The TST Clinic is the first telehealth clinic in the U.S. providing free religious Medical

Abortions. Patients only pay for their medications from a pharmacy, which typically costs

around $90.  Helian Declaration at ¶22.

The TST Clinic provides abortions using Advanced Practice Registered Nurses

("APRN's"), telemedicine, and the U.S. Mail to deliver Abortifacients (the "Telemedicine

Model").[5]  The Telemedicine Model is uniquely suited to delivering a Medical Abortion to TST

members with a minimal amount of time and expense. TST members can receive Abortifacients

by overnight mail.  Helian Declaration at ¶23.

The Telemedicine Model is illegal under the Indiana Abortion Ban.  An abortion in

Indiana must be provided by a physician in a hospital at which he or she has admission

privileges.  Indiana Code §§ 16-34-2-1(a)(1)(B) and 16-34-2-4.5.  Both the consultation with

---

[5] The APRN's who prescribe Abortifacients for the TST Clinic comply with the risk mitigations and evaluation strategies ("RMS") of the Food and Drug Administration.  Helian Declaration at ¶23.

physician and the delivery of Abortifacients to the patient must be in-person. Indiana Code §§ 16-34-2-1(a)(1)(E) and 16-34-2-1(e). The patient must sign an "informed consent" form and then wait at least eighteen (18) hours before getting an abortion. Indiana Code § 16-34-2-1.1. As a general proposition, getting an abortion in Indiana takes longer and costs more than using TST's Telemedicine Model. See Declaration of Dr. J.D. dated June 14, 2023, (the "Dr. J.D. Declaration") at ¶18.[6] Compliance with Indiana requirements would dramatically increase the burden for TST to fulfill its mission of providing efficient, low-cost Medical Abortions to its members for use in the Satanic Abortion Ritual. See Helian Declaration at ¶27.

Defendants argue TST has not met the causation and redressability prongs of standing because "the Satanic Temple's business model was illegal on multiple levels even before Senate Bill 1 was passed."[7] See Memorandum in Support of Motion To Dismiss Plaintiff's First Amended Complaint, ECF No. 37 (Defendants' Memo") at p. 9. This argument misses the point because it assumes TST is seeking only to have Senate Bill 1 invalidated.

TST seeks the invalidation of the Indiana Abortion Ban in its entirety because it violates the Takings Clause, Involuntary Servitude Clause, and Equal Protection Clause. Striking down

---

[6] The original of the Dr. J.D. Declaration is being filed separately under seal.

[7] Defendants misleading suggest the TST Clinic violates 18 U.S.C. § 1461 (the "Comstock Act"). Defendants' Memo at p. 8. The Comstock Act applies only if the mailed delivery of Abortifacients is illegal under state law. See Memorandum Opinion for The General Counsel United States Postal Service, December 23, 2022, annexed as Exhibit E to the Mac Naughton Declaration. TST would not be violating the Comstock Act if the Indiana Abortion Ban is struck down.

only Senate Bill 1 would still leave the TST Clinic subject to criminal and civil penalties for using the Telemedicine Model.[8]

TST is seeking "an order permanently enjoining Defendants from enforcing the Indiana Abortion Ban against TST for the provision of Medical Abortions in Indiana," which includes Medical Abortions delivered by the Telemedicine Model.   This is the quintessential relief sought by the vendors of goods and services who have standing to challenge the constitutionality of a state law that bars the delivery of their goods and services.  *Ezell*, 651 F.3d at 696 (Supplier of firing range facilities has standing to challenge laws that limit access to firing ranges); *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir. 1994) (Manufacturer of arcade games has standing to challenge a ban on arcade games.). See also *Carey v. Population Services International*, 431 U.S. 678, 684 (1977) and *Eisenstadt v. Baird*, 405 U.S. 438, 455 (1972) ("*Eisenstadt*") (Distributors of contraceptives have standing to challenge bans on contraceptives).[9]

### D.  TST Has Standing Because It Diverted Resources to Respond to the Indiana Abortion Ban.

The TST Clinic was created at significant expense in response to *Dobbs* and the many abortion bans that followed, including the Indiana Abortion Ban. Helian Declaration at ¶21. TST has standing because the Indiana Abortion Ban frustrates TST's mission in Indiana of

---

[8] In addition to criminal penalties, the Indiana Abortion Ban subjects TST to civil liability, and the medical professionals it employs to disciplinary sanctions if TST provides abortions in Indiana using the Telemedicine Model.  Indiana Code §§ 16-34-2-2, 16-34-2-8, 16-34-2-10 and 16-34-2-11.

[9] Defendants argue such vendors of goods and services must show they have identified customers within the state to have Article III standing.  See Defendants' Memo at p. 8.  They cite no authority to support their argument because there is none.

promoting The Satanic Tenets in general and the Satanic Abortion Ritual in particular.  TST has, in response, had to divert its resources to promote its mission.  Helian Declaration at ¶30.

Prior to *Dobbs*, TST could rely on the availability of legal abortion in Indiana and other states and thus devote its resources to servicing members who wanted to engage in the Satanic Abortion Ritual through a variety of educational and advocacy programs.   Within weeks of the *Dobbs* decision, abortion clinics nationwide were shutting down.  TST responded to this crisis by opening the TST Clinic to continue its mission of enabling TST members to freely engage in the Satanic Abortion Ritual.  Helian Declaration at ¶¶21 to 23.

TST has spent a substantial amount of money to open and maintain the TST Clinic.  The TST Clinic currently prescribes Abortifacients to its New Mexico members and would readily expand its services into Indiana if it could lawfully do so. Helian Declaration at ¶¶19, 23 and 26.

Prior to opening the TST Clinic, TST's programs were focused on education and advocacy, not the practice of medicine.  The money spent on the TST Clinic was diverted from those other programs.  Helian Declaration at ¶¶5, 6 and 30.   This diversion of TST's resources gives TST standing to challenge the Indiana Abortion Ban.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) ("*Havens*"); *Crawford v. Marion County Election Bd*., 472 F.3d 949, 951 (7th Cir. 2007); *Ind. State Conference of the Nat'l Ass'n for the Advancement of Colored People (NAACP) v. Lawson*, 326 F. Supp. 3d 646, 660-61 (S.D. Ind. 2018) ("Plaintiffs have presented evidence that they already have been compelled to divert its resources to address SEA 442 and that their collective mission focus has been affected. They have shown that injury is

imminent after SEA 442 is implemented. This diversion of resources has been determined sufficient to confer standing upon organizations.").[10]

Citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) ("*Clapper*"), Defendants argue "[t]he Satanic Temple's budgeting decisions are not cognizable injuries or 'fairly traceable' to the challenged statute." Defendants' Memo at p. 9. Defendants' reliance on *Clapper* is misplaced.

The issue before the U.S. Supreme Court in *Clapper* was whether the Respondents, consisting of individuals and organizations that might be subject to surveillance pursuant to the Foreign Intelligence Service Act ("FISA"), had standing to challenge the constitutionality of the statute. Respondents argued they had standing because they spent money to protect the confidentiality of their communications due to their subjective fear of FISA surveillance, even though they could not identify any specific instance of FISA surveillance.

The U.S. Supreme Court rejected the argument saying "[b]ecause respondents do not face a threat of *certainly impending* interception under [FISA], the costs that they have incurred to avoid surveillance are simply the product of their fear of surveillance, and . . . such a fear is insufficient to create standing." [emphasis added] *Id* at 418.

Unlike the Respondents in *Clapper*, TST's fear of losing its ability to promote the Satanic Tenets and the Satanic Abortion Ritual in Indiana is real, imminent, and caused by the Indiana Abortion Ban. *Dobbs* was decided in June 2022. Senate Bill 1 was signed on August 5, 2022, and went into effect on September 15, 2022. TST began spending money to create the TST

---

[10] There is nothing in the authorities recognizing standing based on a diversion of resources that requires the money to be spent in the state where the challenged conduct occurs.

Clinic starting September 12, 2023.[11]  The money was spent because there was a clear and imminent threat that TST members throughout the country, including Indiana, were going to have their access to Abortifacients and ability to engage in the Satanic Abortion Ritual significantly curtailed.  Helian Declaration at ¶21.

TST's "budgeting decisions" were made to protect the availability of the Satanic Abortion Ritual, which has been effectively banned in Indiana.  TST resources that would have gone to education and advocacy now go towards the delivery of Abortifacients.  *Clapper* simply does not apply.  *Havens* does. 455 U.S. at 379 (Impairment of organization's counseling services "with the consequent drain on the organization's resources" to counteract that impairment is injury in fact for Article III standing.).

### E.  TST Has Standing as a Representative of TST Members.

TST has standing to bring this suit on behalf of its members because 1) its members would otherwise have standing to sue in their own right, 2) the interests TST seeks to protect are germane to its purpose; and 3) neither the claims asserted, nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("*Hunt*").[12]  TST members in Indiana have standing to sue in their own right because they are either 1) Involuntarily Pregnant Women or 2) have suffered

---

[11] TST answered all of Defendants' outstanding discovery requests on June 8, 2023. That discovery shows the earliest debt incurred by TST to create the TST Clinic was September 12, 2023.

[12] TST "is the functional equivalent of a voluntary membership organization" *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003).  TST is funded by its members and "sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021); *Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1362 (D.C. Cir. 2020) ("[S]tructure of the organization enables [] members to have direct input, and member input guides the organization's activity."). Helian Declaration at ¶¶7 and 8.

10

stigmatic injury because the Indiana Abortion Ban criminalizes conduct based on the TST
Tenets.[13]

An individual women who is not pregnant does not have standing on her own to
challenge an abortion ban because all of the factors that lead to pregnancy "may not take place
and all may not combine." *Roe v. Wade* 410 U.S. 113, 128 (1973) ("*Roe*"). TST represents five
thousand six hundred fifty (5,650) women of child-bearing age in Indiana.  Ninety-four (94) of
them become Involuntarily Pregnant Women each year.  Dr. J.D. Declaration at ¶12.   Each of
these women individually has standing because the Indiana Abortion Ban takes their property –
the use of their uterus – without compensation and forces them into involuntary servitude to
incubate and deliver a Prenatal Person. *Knick v. Twp. Of Scott, Pa*., 139 S. Ct. 2162, 2171 (2019)
("*Knick*") ("[A] property owner has a claim for a violation of the Takings Clause as soon as a
government takes his property for public use without paying for it.").  Like a rape victim, an
Involuntarily Pregnant Woman did not consent to being pregnant.  Unlike a rape victim, she is
required to carry the Prenatal Person to term in violation of the Equal Protection Clause.  At least
one (1) Involuntarily Pregnant Woman in Indiana is pregnant to a reasonable degree of medical
certainty at any given point in time during the course of a year.  Dr. J.D. Declaration at ¶12.

The Indiana Abortion Ban causes all 11,300 TST members in Indiana to suffer the stigma
of being evil people for believing in TST Tenet III – one's own body is inviolable and subject to
one's own will alone.  Intangible injuries, such as stigmatic injury, can be sufficiently concrete
and particularized to constitute "injury in fact" for purposes of Article III standing.  *Spokeo, Inc.
v. Robins*, 538 U.S. 330, 136 S.Ct. 1540, 1545 (2016).  Stigmatic injury is inflicted when state

---

[13] Defendants do not contest that TST's representation of its members is germane to its purpose.
Nor do Defendants assert the relief requested in Counts One, Two or Three requires the
participation of any individual TST member.

action communicates to the affected citizen that his or her religious beliefs are explicitly disfavored by the state. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (Stigmatic injury caused by state law prohibiting same-sex marriage.); *Catholic League v. City of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) ("[A]dherents to a religion have standing to challenge an official condemnation by their government of their religious views.").

Members of TST hold the religious belief their bodies are inviolable and subject to their will alone. As a corollary, they believe the organism defined by the State of Indiana as an "unborn child" is not a separate and distinct human being but rather a part of the woman's body that can be removed on demand and without guilt at any time and for any reason prior to viability. Members of TST do not believe a human being comes into existence until the fetus is viable, i.e., independently capable of life outside the womb. These beliefs are sincerely held by both men and women and without regard to whether one is pregnant. Helian Declaration at ¶¶12 to 15.

The statutory creation of a Prenatal Person is the expression of a religious belief held by some Christians that a human being comes into existence at conception. *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 720 (2014) ("*Hobby Lobby*").[14] This state sanctioned moral imperative purports to legitimize the conscription of a woman's uterus to incubate and give birth to an

---

[14] The Marion County Superior Court has ruled "the question of when life begins is a religious one that the State may not answer legislatively or as a factual matter" citing *Hobby Lobby. Anonymous Plaintiff #1 et al v. The Individual Members of The Medical Licensing Board of Indiana*, *et al.*, Dkt. No. 49D01-2209-PL-031056 (Slip Op. at ¶34), attached as Exhibit C to the Mac Naughton Declaration.

unwanted Prenatal Person.[15]  These concepts are deeply offensive to members of TST and communicate – unequivocally – that their religious beliefs are unacceptable in the State of Indiana.  This stigmatic injury gives each TST member in Indiana standing to challenge the validity of the Indiana Abortion Ban.  Striking down the Indiana Abortion Ban reassures TST members they are part of the body politic and not heretics.

### F.  TST Does Not Have to Identify of Its Members By Name.

TST needs to plead and prove at least one member has suffered the requisite harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("*Summers*").  However, no authority requires that identity be made by name - anonymously or otherwise.[16]  As the Court said in *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015):

> Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

See also *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) ("[T]he requirement for an individual member to have standing still allows for the member on whose behalf the suit is filed to remain unnamed by the organization." [internal citations and quotations omitted]).

---

[15] Defendant Rokita has argued to the Indiana Supreme Court "science shows [the Prenatal Person] to be a distinct 'living human being' with the capacity to think, feel, hear, move, and direct *its own* development." [emphasis in original]. See Mac Naughton Declaration at Ex. A, p. 57.  Defendant Rokita has argued to the Indiana Court of Appeals "human fetuses are human beings is a scientific fact, not a theological claim." See Mac Naughton Declaration at Ex. B, p. 48.

[16] One of the reasons TST will not name any individual member as an anonymous party is the fact that neither the Court nor Defendants can guarantee their identity will remain secret.  See Mac Naughton Declaration at ¶¶8 to 10.

The Dr. J.D. Declaration provides the requisite proof that ninety-four (94) Involuntarily Pregnant Women will each be individually harmed by the Indiana Abortion Ban every year and at least one (1) of them is pregnant at any given point in time.  Defendants are more than welcome to present the testimony of their own expert that Dr. J.D.'s assumptions and methodology are flawed and that the existence of at least one (1) Involuntarily Pregnant Woman in Indiana during the pendency of this action is pure speculation.

11,300 TST members in Indiana will suffer stigmatic injury because the State of Indiana has criminalized their belief that their bodies are inviolable and subject to their will alone.  These facts show it is "relatively clear" and "not speculative" that at least one TST member is actually suffering and will suffer injury as a result of Indiana Abortion Ban.

Citing *Summers* and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990), Defendants argue TST has to "identify[] the members who have standing by themselves."  Defendants' Memo at pp. 10 and 11.  The sworn declarations of Dr. J.D. and Erin Helian have done that. There is no authority that requires TST to go further and identify any of the ninety-four (94) Involuntarily Pregnant Women or eleven thousand three hundred (11,300) TST members by name (actually or anonymously).  Each TST member has a First Amendment right to keep his or her membership in TST a secret.  *NAACP v. Alabama*, 357 U.S. 449, 459 (1958).

**III.    The Court Should Apply 21st Century Reality and Law.**

**A.  18th and 19th Century Views of Prenatal Life Are Based on Ignorance.**

Defendants rely heavily on *Dobbs.*  See Defendants' Memo at pp. 1, 14 to 19 and 21. *Dobbs* decided only one narrow legal issue pertaining to abortion – whether the privacy interest a woman has in deciding to terminate her pregnancy is a fundamental liberty interest under the Due Process Clause of the Fourteenth Amendment.  *Dobbs* did not address any of the other Constitutional rights asserted in this case.

*Dobbs* reviewed the history of abortion in the 18th and 19th Centuries and concluded a woman's privacy interest in deciding whether to terminate her pregnancy was not so "deeply rooted in our history and tradition" as to rise to the level of a fundamental liberty interest. *Dobbs*, 142 S.Ct. at 2253.  *Dobbs* gave substantial deference to the 19th century bans on abortion – a century in which a zygote was believed to be part of a woman's body, at least prior to "quickening."  19th Century women did not have widespread access to birth control. They could not vote, most could not own property in their own name and wives could be legally raped by their husbands. *Latta v. Otter*, 771 F.3d 456, 488 (9th Cir. 2014).  19th Century women did not hold any government offices, such as legislator or federal judge.  The 19th Century "history and tradition" relied on by *Dobbs* is as obsolete today as the whalebone corset.

The Complaint details the process of how babies are created and grow once sexual intercourse is concluded.  See Complaint at ¶¶37 to 56.  That process was a complete mystery in the 18th and 19th Centuries.  Dr. J.D. Declaration at ¶4   Up until "quickening" - the first felt movement of the fetus in the womb – an "unborn child" in the 19th Century was regarded as part of the mother's body. *Roe,* 410 U.S. at 134. "[M]any States in the late 18th and early 19th century did not criminalize pre-quickening abortions". *Dobbs*, 142 S.Ct. at 2236.  Scientific proof that a

zygote (in a sea urchin) is created by the fusion of an egg and sperm cell did not exist until 1876.[17]

There is no scientific or legal basis from the 19th Century (much less the 18th Century) to support the determination by the State of Indiana that a human being comes into existence at conception.[18]  The Indiana Supreme Court made clear in *Cheaney* that a zygote is an "independent life" based on facts learned in the 20th Century. 259 Ind. at 145 ("[M]edical science has made great strides since that time and quickening can no longer be considered the point at which independent life begins. It is now established that some sort of independent life begins at conception.").

**B.   *Dobbs* Did Not Eliminate a Woman's Fundamental Right to Decide When to Become Pregnant.**

*Dobbs* did not address the development of reproduction technology since *Roe* or the freedom that technology gives women over their sexual and reproductive lives in the 21st Century.  That technology includes the invention of in vitro fertilization ("IVF"), gestational surrogacy, and the widespread use of a variety of birth control methods.  Unlike the 19th Century, women in the 21st Century readily control when they get pregnant.  They also can and do rent out their bodies to third parties as gestational surrogates.  In Indiana, a gestational surrogate can get a substantial amount of money to grant the use of her uterus to a third party to incubate a fetus to term.  See Dr. J.D. Declaration at ¶¶13 and 14.

---

[17]https://www.bbvaopenmind.com/en/science/leading-figures/oscar-hertwig-the-first-man-to-observe-sexual-reproduction/, last visited December 23, 2022.

[18] The theological belief that a human being comes into existence at conception is likewise of recent vintage.  Prior to the late 19th century, Catholic dogma permitted the abortion of a fetus prior to "ensoulment" which occurred at "quickening." https://www.irishtimes.com/news/social-affairs/religion-and-beliefs/catholic-church-teaching-on-abortion-dates-from-1869-1.1449517, last visited June 9, 2023.

Unlike the 19th Century, American women in the 21st Century have unrestricted access to contraception, a fundamental privacy right. *Eisenstadt* and *Griswold v. Connecticut*, 381 U.S. 479 (1965) ("*Griswold*"). As a consequence, women using contraception can and do engage in sex just for the pleasure and intimacy it brings and without any purpose or intent to become pregnant ("Protected Sex").

*Dobbs* may have ended the fundamental privacy right to decide whether to terminate a pregnancy granted by *Roe*.  But the right to engage in Protected Sex remains deeply woven into the Constitutional fabric as a fundamental right.  *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) ("*Lawrence*") ("'[I]ndividual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of liberty protected by the Due Process Clause.  Moreover, this protection extends to intimate choices by unmarried as well as married persons."); *Anderson v. Morrow*, 371 F.3d 1027, 1032 (9th Cir. 2004) ("The *Lawrence* Court held that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private sexual conduct.").

*Dobbs* did not terminate the fundamental right to engage in Protected Sex.

> Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion.  We have also explained why that is so: rights regarding contraception and same-sex relationships are inherently different from the right to abortion because the latter (as we have stressed) uniquely involves what *Roe* and *Casey* termed "potential life." [internal citations omitted]

> *Dobbs*, 142 S.Ct. at 2280

Nor did *Dobbs* terminate a woman's fundamental right to choose when to become pregnant in the first instance. As the U.S. Supreme Court said in *Eisenstadt,* 405 U.S. at 453*:*

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so

17

fundamentally affecting a person as the decision whether to . . . beget a child.
[emphasis in original]

The Involuntarily Pregnant Women represented by TST engaged in Protected Sex.  By using contraception, they made the affirmative choice to not become pregnant by that encounter, thus exercising the fundamental rights guaranteed by *Eisenstadt, Griswold* and *Lawrence*.  Their birth control failed.  But that does not mean they consented to the use of their uteruses to carry and birth the Prenatal Person protected by the Indiana Abortion Ban.

### C.  Being Pregnant Does Not Mean a Woman Consents to Be Pregnant.

There is an inherent risk that a woman who engages in Protected Sex gets pregnant.  See Dr. J. D. Declaration at ¶8.  However, assuming that risk is not consent.  As the Court said in *U.S. v. Daniels*, 902 F.2d 1238, 1245 (7th Cir. 1990):

> [K]nowledge and consent are not synonyms.  Taking a risk is not the same thing
> as consenting to the consequences if the risk materializes.  A person who walks
> by himself late at night in a dangerous neighborhood takes a risk of being robbed;
> he does not consent to being robbed.

See also *U.S. v. Feekes*, 879 F.2d 1562, 1565 (7th Cir. 1989) ("To take a risk is not the same thing as to consent.").

*Dobbs* did not eviscerate a woman's fundamental right to engage in Protected Sex. *Dobbs* certainly did not strip a woman of her right to decide when to become pregnant in the first instance, guaranteed by *Eisenstadt*.

These are fundamental constitutional rights that cannot be surrendered by accident.  They can only be waived by an act of free will by the woman herself.  *U.S. v. Seidman*, 156 F.3d 542, 550 n.10 (4th Cir. 1998) ("Voluntary consent is the quintessential act of free will.").  As the U.S. Supreme Court held in *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938):

> [C]courts indulge every reasonable presumption against waiver of fundamental
> constitutional rights and that we do not presume acquiescence in the loss of

fundamental rights.  A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.  The determination of whether there has been an intelligent waiver of the [fundamental constitutional] right must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the [one who holds the right].

In *United States v. Page*, 302 F.2d 81, 83-84 (9th Cir. 1962), the Ninth Circuit said consent to waive a fundamental Constitutional right must be "unequivocal and specific and freely and intelligently given."

There must be convincing evidence that defendant has waived his rights.  There must be clear and positive testimony.  Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights.  [internal quotations omitted]

Thus, a woman who engages in Protected Sex, by definition, does not waive her fundamental Constitutional right to determine when she will become pregnant in the first instance.[19]  *United States v. Thomas*, 724 F.3d 632, 643 (5th Cir. 2013) ("Courts indulge every reasonable presumption against waiver of fundamental constitutional rights and do not presume acquiescence in the loss of fundamental rights." [internal citations and quotations omitted]); *Walls v. Cent.  Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) ("[A] wavier of [fundamental Constitutional rights] should not be implied and should not be lightly found.  Waiver of a constitutional right must be knowing and voluntary." [internal citations and quotations omitted]).

Simply put, an Involuntarily Pregnant Woman does not consent to the use or occupancy of her body by a Prenatal Person for any purpose whatsoever.  In the absence of her consent, the occupancy of a woman's uterus by a Prenatal Person takes her

---

[19] There is also a profound Constitutional question of whether a woman who engages in sex without Birth Control thereby consents to the creation of a Prenatal Person in her body.  TST is not raising that issue in this case.

19

property in violation of the Takings Clause.  The work and services she must provide to incubate and deliver the Prenatal Person is involuntary servitude in violation of the Thirteenth Amendment.

### IV.   The Indiana Abortion Ban Causes the Unconstitutional Taking of a Woman's Property Right to Exclude a Prenatal Person from Her Uterus.

#### A.  The Use and Occupancy of a Uterus is a Property Interest.

The advent of IVF and gestational surrogacy demonstrate the inarguable fact that the use of a woman's uterus to incubate and deliver a Prenatal Person has tangible, economic value. Bridget J. Crawford, Taxation, Pregnancy, and Privacy, 16 Wm. & Mary J. Women & L. 327 (2010), https://scholarship.law.wm.edu/wmjowl/vol16/iss2/4, last visited December 27, 2022. ("A surrogate receives money for carrying and bearing a child.  This payment is income by any definition, even if the surrogacy contract recites that it is a 'reimbursement.'").  See *United States v. Garber*, 607 F.2d 92, 97 (5th Cir. 1979) ("[B]lood plasma, like a chicken's eggs, a sheep's wool, or like any salable part of the human body, is tangible property which in this case commanded a selling price dependent on its value.").

Gestational surrogacy is common throughout the United States, including Indiana.  Dr. J.D. DeWitt Declaration at ¶13.  Gestational surrogacy establishes the use of a woman's uterus to incubate a zygote as "property" in every sense of the word. The Indiana Abortion Ban commandeers the use of a woman's uterus, i.e., takes her property, but provides nothing in return.

Property interests are not created by the Constitution.  Rather, they are created, and their dimensions are defined by "existing rules or understandings" that stem from an independent source. *Tyler v. Hennepin Cnty., Minn*., No. 22-166 (May 25, 2023) WL 3632754 at *4 ("*Tyler*"). State law is one such source, but not the exclusive source because "[o]therwise, a State

could sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." *Id*. Other sources include the laws of other states, the common law, and precedents of the U.S. Supreme Court. *Id.*

Citing *Dobbs*, Defendants argue the right to exclude a zygote from the uterus is not a "legally cognizable property right[] [because] the Constitution makes no reference to abortion, and no such right is implicitly protected by *any constitutional provision."* [emphasis in original]. Defendants' Memo at p. 14. This sophistry conflates the property right to exclude a zygote from the uterus with the exercise of the power to actually make that exclusion by way of abortion. Abortion is the act of physically removing a zygote from the uterus. An abortion is not itself a property interest. The *power* to exclude an unwanted Prenatal Person from the uterus is the property interest. Making the exercise of that power illegal destroys that property interest, i.e., causes a taking of the property. It does not mean the property interest never existed in the first instance.

Under *Dobbs*, the decision to exercise the power to exclude an unwanted Prenatal Person by getting an abortion is no longer a woman's fundamental liberty right under the Due Process Clause of the 14th Amendment. But *Dobbs* is silent on whether and to what extent the Constitutional limits of the Takings Clause, Involuntary Servitude Clause or Equal Protection Clause apply when the government makes abortion – the actual exercise of the power to exclude a zygote – a crime.

Under common law, individuals have a property interest in the use of their own bodies. In *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251-252 (1891), the U.S. Supreme Court said:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person,

21

free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . .To compel any one, and especially a woman, to lay bare the body, or to submit it to the touch of a stranger, without lawful authority, is an indignity, an assault and a trespass.

Indiana looks to natural law in matters pertaining to bodily autonomy and family relationships. *Voelker v. Tyndall*, 226 Ind. 43, 44-45 (1947) (right of privacy); *Denning v. Star Publishing Co.*, 94 Ind. App. 300, 308 (Ct. App. 1932) (parental duty to support offspring). As explained by John Locke in Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698) and the Montana Supreme Court in *Armstrong v. State*, 296 Mont. 361, 371-72 (1999), natural law means:

> [T]he laws of nature require that each individual has an inherent property interest in his own person and has the capacity for and the right of rational self-determination which must be promoted and protected by civil society and political institutions.

An Indiana woman can dispose of her uterus by hysterectomy[20] or anatomical gift. Indiana. Code § 29-2-16.1-1 et seq.  "[T]he fundamental maxim of property law [is] that the owner of a property interest may dispose of all or part of that interest as he sees fit." *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167 (1998).

An Indiana woman can refuse the use of her uterus by her own zygote by abstaining from sex or using birth control.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("*Loretto*") ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.") If she becomes pregnant involuntarily due to a failure of her birth control, she does not thereby forfeit the *power* to remove the unwanted zygote. She is just pregnant without her consent.  See discussion *infra* in

---

[20] By the age of 60, more than one-third of all women have had a hysterectomy. https://nwhn.org/hysterectomy/, last visited April 26, 2023.

Section III. C.  An Indiana woman can still lawfully exercise the power to exclude a zygote from her uterus by simply going to another state where abortion is legal.[21]

An Indiana woman can lease out the use of her uterus to a third party as a gestational surrogate.  "Within the bundle of rights commonly characterized as ownership of property also lies the right to transfer ownership. That stick in the bundle is no less essential than the right to exclude others" *Minnesota Mining Co. v. Pribyl*, 259 F.3d 587, 610 n.8 (7th Cir. 2001).  Thus, the uterus of an Indiana woman is imbued with the complete bundle of rights commonly understood to be "property" – the power by its owner to use it, dispose of it, assign its use to a third party and/or exclude a third party from using it.  *Loretto*, 458 U.S. at 435.

Defendants argue "surrogacy contracts are unenforceable in Indiana, and therefore fail as a basis for a legally cognizable property right."  Defendants' Memo at pp. 14-15. Defendants grossly overstate the scope of the pertinent statute, Indiana Code § 31-20-1-1 which provides:

> The general assembly declares that it is against public policy to enforce any term of a surrogate agreement that requires a surrogate to do any of the following:
>
> (1) Provide a gamete to conceive a child.
> (2) Become pregnant.
> (3) Consent to undergo or undergo an abortion.
> (4) Undergo medical or psychological treatment or examination.
> (5) Use a substance or engage in activity only in accordance with the demands of another person.
> (6) Waive parental rights or duties to a child.
> (7) Terminate care, custody, or control of a child.
> (8) Consent to a stepparent adoption under IC 31-19.

---

[21] For fifty (50) years, prior to *Dobbs*, a pregnant woman could lawfully exercise the power to exclude a zygote from her uterus for any reason by getting an abortion in any state in the Union. She still retains that right in most states.

23

Conspicuously missing from this list of unenforceable contract terms is any reference to a gestational surrogate receiving compensation for leasing out her uterus to incubate another couple's child.[22]  As a consequence, an Indiana woman who volunteers to become a gestational carrier can lawfully accept payment for her services.  Given the widespread advertising for gestational carriers in Indiana offering up to $60,000, it is reasonable to assume some do.  Dr. J.D. Declaration at ¶14.

Defendants argue "[a]bortion restrictions, which existed long before the adoption of the Fifth Amendment and have continued long after, have never been understood to constitute a direct appropriation of a woman's private property."  Defendants' Memo at p. 15.  That is because abortion restrictions – prior to *Roe* – were not premised on the legal fiction that the fusion of a human ova and sperm creates a "human being" who enjoys virtually the same panoply of rights as all other human beings.  Having legally separated a Prenatal Person from an Involuntarily Pregnant Women, the State of Indiana (and the Court) must now contend with the Constitutional limits of forcing an Involuntarily Pregnant Woman to incubate and give birth to that separate Prenatal Person.

At common law – and for most of this country's history - a woman and her zygote were considered to be one and the same, at least prior to quickening.  But advances in technology in the past forty (40) years have rendered that view obsolete.  A gestational carrier is unquestionably a separate and distinct biological entity from the zygote she carries for another couple.[23]  The relationship between the gestational carrier, the couple whose zygote she carries

---

[22] Michigan, for example, explicitly bars a "surrogate parentage contract for compensation." Mich. Comp. Laws § 722.859

[23] The first reported birth attributable to gestational surrogacy occurred in 1985. https://people.com/archive/and-baby-makes-four-for-the-first-time-a-surrogate-bears-a-child-genetically-not-her-own-vol-27-no-18/,  last visited June 8, 2023.

24

and the zygote itself demonstrates there is a property interest in the use of a uterus that did not exist before *Roe* – transferability for compensation.

In the 19th Century, the idea that a woman's uterus was her "property" which could be occupied by a someone else's zygote was as alien as "air rights."  The concept of "air rights" – the use of space over the surface of land – did not exist in the 19th Century because no one actually used such space. But that rapidly changed in the 20th Century with the advent of elevators, steel girders and high-rise buildings.

By the 1920's, Chicago developers were dividing up real property into separate, defeasible estates for the use and development of the space above the surface by companies that did not own the surface, i.e., "air rights."  Herbert Becker, Subdividing the Air - A New Method of Acquiring Air Rights, 6 Chi.-Kent Rev. 6 (1927). By 1978, the U.S. Supreme Court ruled in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 143 n.5 (1978) "the 'air rights' over an area of land are 'property' for purposes of the Fifth Amendment."

TST is not asking the Court to spin a property interest in the use of a woman's uterus out of whole cloth.  Rather, TST asks the Court to recognize the reality that we no longer live in the 19th Century.  For the past thirty-eight (38) years, private parties using modern IVF technology have freely and voluntarily created a commercial use for the uterus that heretofore did not exist – the incubation and birthing of a zygote.   It is, in the words of *Tyler*, an "existing understanding" based on contract law and equity.  And it is widespread throughout the U.S.

If women can be lawfully compensated for voluntarily incubating the zygotes of third parties, they should also be compensated for involuntarily incubating zygotes the State of Indiana have deemed to be Prenatal Persons.  Recognizing the use of a uterus to incubate and deliver a

Prenatal Person as a property interest protected by the Takings Clause achieves that parity.  It also comports with contemporary scientific and commercial reality.

### B.  The Costs of the Indiana Abortion Ban Should Be Borne by the State.

The cost of compelling an Involuntarily Pregnant Woman to carry a Prenatal Person is paid for <u>solely</u> by the Involuntarily Pregnant Woman.  As the U.S. Supreme Court said in *San Diego Gas Electric Co. v. San Diego*, 450 U.S. 621, 656 (1981) ("*San Diego Gas*"):

> When one person is asked to assume more than a fair share of the public burden, the payment of just compensation operates to redistribute that economic cost from the individual to the public at large.

See also, *Lingle v. Chevron U. S. A.*, 544 U.S. 528, 537 (2005) ("*Lingle*").

Gestational surrogacy establishes the economic value for the use of a woman's uterus to incubate and birth a Prenatal Person.  *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1363-64 (Fed. Cir. 2012) ("Once a taking has been classified as either temporary or permanent, the court applies the appropriate method of determining just compensation.  The usual measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking." Citing *Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 7 (1949)).  The fair market rental value for the occupancy of a woman's uterus to voluntarily incubate and birth a Prenatal Person can run into the high five figures.  Dr. J.D. Declaration at ¶14.  If the people of the State of Indiana want a Prenatal Person created without the consent of the mother to be carried to term, then they should pay the Involuntarily Pregnant Woman the going rate for the use of her uterus.[24]

The Fifth Amendment does not bar the State of Indiana from making the value judgment to protect all Prenatal Persons, even those created by accident, by enacting the Indiana Abortion

---

[24] There is obviously a range of values based on many different variables.  The Court need not concern itself in this action with the amount of just compensation for each Involuntarily Pregnant Woman.

Ban.  The Fifth Amendment does, however, require the State of Indiana to pay for the property it takes to achieve that end.  *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 315 (1987).  (The Fifth Amendment "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." [emphasis in original]).

### C.  The Right to Exclude a Prenatal Person from the Uterus is a Property Interest.

The legal effect of the Indiana Abortion Ban is that the exercise of the power to exclude a Prenatal Person from a uterus by way of abortion is a criminal act.  The practical effect is that a Prenatal Person attaches to and physically occupies the uterus of an Involuntarily Pregnant Woman against her will and cannot be lawfully excluded. As the U.S. Supreme Court said in *Loretto*:

> Property rights in a physical thing have been described as the rights to possess, use and dispose of it. To the extent that the government permanently occupies physical property, it effectively destroys each of these rights.  First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space.  The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.  [internal citations and quotations omitted]

458 U.S. at 435

The fact that the space occupied by a Prenatal Person is measured in microns is irrelevant.  See, *Loretto*, 458 U.S. at 436 ("[C]onstitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied.").  The fact that the space occupied by a Prenatal Person is a woman's uterus is likewise irrelevant.  *Horne v. Dept. of Agriculture*, 576 U.S. 350, 358 (2015) ("[P]ersonal property [is not] any less protected against physical appropriation than real property").

27

**D.  The Indiana Abortion Ban Takes a Woman's Property Right
To Exclude a Prenatal Person From Her Uterus.**

There are two kinds of regulatory actions generally deemed to be a *per se* taking for Fifth

Amendment purposes.  *Lingle,* 544 U.S. at 538.  The first is government action that requires the

owner of the *res* to suffer a physical invasion, however minor.  *Loretto*.  The invasion can be

temporary. *Cedar Point Nursery v. Hassid*, 594 U.S. __, 141 S. Ct. 2063, 2074 (2021) ("*Cedar

Point Nursery*") ("[A] physical appropriation is a taking whether it is permanent or temporary.").

The Indiana Abortion Ban eliminates the power of a woman to exclude a Prenatal Person

from her uterus by making its removal a crime.  It criminalizes a medical professional's access to

the woman's uterus – voluntarily given by the woman – to remove a Protected Person.  By

operation of law, the Prenatal Person continues to occupy a uterus without the woman's consent

until it is born.  That is the very essence of a *per se* taking by state sanctioned occupancy under

*Loretto* and *Cedar Point Nursery*.[25]  See also, *Moore v. East Cleveland*, 431 U.S. 494, 520

(1977) (Stevens, J., concurring) (Taking occurs when the state terminates the "fundamental right

normally associated with the ownership of residential property — that of an owner to decide who

may reside on his or her property").

The other kind of *per se* taking occurs when the state imposes such onerous regulations

on a property owner that there is no economic use for the *res*. *Lingle*, 544 U.S. at 537

("[G]overnment regulation of private property may, in some instances, be so onerous that its

effect is tantamount to a direct appropriation or ouster — and that such 'regulatory takings' may

be compensable under the Fifth Amendment").

---

[25] The taking in Indiana can last as short as the 18 hour waiting period required by Indiana Code
§ 16-34-2-1.1 or as long as the full term of the pregnancy.

28

A "regulatory taking" occurs when the state's regulation completely deprives an owner of "*all* economically beneficial us[e]" of her tangible property." [emphasis in the original] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Under the Indiana Abortion Ban, a woman is stripped of the only economically beneficial use she can make of her uterus – to rent it out as a gestational carrier. She cannot be a gestational carrier if she is already pregnant. See Dr. J.D. Declaration at ¶3.

The total deprivation of this sole economic use of a uterus is a *per se* taking, just as much as the physical occupation of the uterus by a Protected Person. The woman's property right to transfer the use of her uterus to a third party as a gestational surrogate is terminated. It does not matter that the economic loss is for nine months. Regulatory takings can be temporary. *San Diego Gas,* 450 U.S. at 657 ("This Court more than once has recognized that temporary reversible 'takings' should be analyzed according to the same constitutional framework applied to permanent irreversible 'takings.'").

**V.    The Indiana Abortion Ban Forces Involuntarily Pregnant Women into Involuntary Servitude.**

In the antebellum South, slave women were chattel whose bodies were used to produce new slaves. If the baby was a girl, she too would eventually be compelled to produce more new slaves. *See e.g. Maria v. Surbaugh*, 23 Va. 228, 237, 1824 WL 1192, at *5 (Va. 1824) ("It was enacted, that all children born in this country shall be held bond or free, according to the condition of the mother.")

The Indiana Abortion Ban, by criminalizing medically safe abortions, forces Involuntarily Pregnant Women into the state of involuntary servitude inflicted on antebellum slave women. They are forced – without their consent – to incubate a zygote into a viable baby. Their bodies are used as factories to provide all of the labor, hormones, nutrients, oxygen, and

safety necessary to complete a pregnancy.  Their daughters will likewise be forced to incubate

and produce babies without their consent.  That is involuntary servitude, prohibited by the

Thirteenth Amendment.[26]  The only way they can throw off the yoke of coerced pregnancy is to

flee to a state where abortion is legal.  It is particularly egregious because 21st Century women

have the technological means at their disposal to safely terminate unwanted pregnancies in their

own homes.

There is no dispute that being pregnant and delivering a baby requires an extraordinary

amount of work.  The experience of gestational surrogates shows that incubating a zygote into a

viable baby and giving it birth is a richly compensated service in a free market economy.

The Indiana Abortion Ban compels an Involuntarily Pregnant Woman to provide the

same services and labor for the benefit of a Prenatal Person as a paid gestational surrogate but

without the compensation.  The Indiana Abortion Ban are the very essence of involuntary

servitude outlawed by the Thirteenth Amendment.  *United States v. Kozminski*, 487 U.S. 931,

952 (1988) ("'[I]nvoluntary servitude' necessarily means a condition of servitude in which the

victim is forced" to work for the defendant by the use or threat of physical restaint or physical

injury, or by the use or threat of coercion through law or the legal process.").  See *Bailey*, 219

U.S. at 241 ("The plain intention was to abolish slavery of whatever name and form and all its

badges and incidents; to render impossible any state of bondage; to make labor free, by

prohibiting that control by which the personal service of one man is disposed of or coerced for

another's benefit which is the essence of involuntary servitude.").

---

[26] The Thirteenth Amendment is self-executing.  *Bailey v. Alabama*, 219 U.S. 219, 241 (1911)
("*Bailey*").

Noting that many states banned abortion when the Thirteenth Amendment was adopted, Defendants argue "[i]t is implausible to think that the Thirteenth Amendment was intended to introduce any novel doctrine regarding state regulation of abortion."  Defendants' Memo at p. 16. Lawmakers in the 19th Century considered a pregnant woman and the zygote she carried to be a single person.  So, the idea that one could be in servitude to the other was as implausible as the creation and sale of "air rights." But they did understand – all too well – that forcing one human being to work for another is involuntary servitude.

By basing the Indiana Abortion Ban on the legal fiction that a Prenatal Person is a "human being," the State of Indiana has created two human beings out of one.  If Defendants want to stand firm on their moral certainty that a zygote is a human being and therefore protected by law, then they should coherently explain why forcing one human being (an Involuntarily Pregnant Woman) to give birth to another human being (a Prenatal Person) is not involuntary servitude, as that term is understood in the Thirteenth Amendment.

**VI.    Count Three States a Claim for Violation of the Equal Protection Clause.**

Classifications that impinge on a fundamental right are subject to strict scrutiny when challenged as a violation of equal protection. *Dunn v. Blumstein*, 405 U.S. 330, 337-39 (1972). See also, *Thayer v. Chiczewski*, 705 F.3d 237, 254 n.5 (7th Cir. 2012) ("[U]nequal treatment on the basis of a fundamental right triggers heightened scrutiny.").  "Moreover, quite apart from the Equal Protection Clause, a state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid, whether or not the law's purpose or effect is to create any classifications." *San Antonio School District v. Rodriguez*, 411 U.S. 1, 61 (1973) (Stewart, J. concurring).  See also *Plyler v. Doe*, 457 U.S. 202, 232 (1982) (Harlan, J. concurring) ("Classifications infringing substantive constitutional rights necessarily

will be invalid, if not by force of the Equal Protection Clause, then through operation of other provisions of the Constitution.").

Rape victims are exempt from the Indiana Abortion Ban, but Involuntarily Pregnant Women are not.  The only difference between the two groups of women is that Involuntarily Women consented to sex while rape victims did not.[27]  Both groups are pregnant against their will.  The Indiana Abortion Ban thus imposes the obligation on Involuntarily Pregnant Women to carry an unwanted Prenatal Person to term – an obligation rape victims do not share.  This places a burden on Involuntarily Pregnant Women *solely* because they consented to sex while the rape victim did not.  The application of the Indiana Abortion Ban to an Involuntarily Pregnant Woman is therefore analyzed under the strict scrutiny standard because it burdens the exercise of their fundamental right to engage in Protected Sex.

Defendants argue the purpose of the rape exception is to protect "a living being and potential human life." Defendants' Memo at p. 17.  TST does not take issue with the power of the State of Indiana to protect either living beings or potential human life.  However, TST does take issue with the exercise of that power in a manner that is not tailored as precisely as possible to achieve the stated purpose without infringing on the fundamental right of Involuntarily Pregnant Women to engage in Protected Sex. *Carroll v. Princess Anne*, 393 U.S. 175, 184 (1968); ("[T]he order must be tailored as precisely as possible to the exact needs of the case."); *Seeboth v. Allenby*, 789 F.3d 1099, 1104 (9th Cir. 2015) ("If the classification . . . burdens the exercise of a fundamental right, we apply strict scrutiny and ask whether the statute is narrowly tailored to serve a compelling governmental interest").

---

[27] Defendants argue TST "does not identify a recognized fundamental right." Defendants' Memo at p. 18.  The Complaint explicitly alleges the fundamental right to engage in Protected Sex at ¶89.  That is a long-standing fundamental liberty interest.  See discussion *infra* in Section III. B.

If the sole purpose of the Indiana Abortion Ban is to protect Prenatal Persons, then it would apply to all women regardless of how or why they got pregnant.  If the purpose of the exemption is to protect rape victims, then that purpose can be achieved without infringing on the fundamental right to engage in Protected Sex by increasing the criminal penalties on rapists who get their victims pregnant while exempting Involuntarily Pregnant Women from the Indiana Abortion Ban.

## VII.    TST Respectfully Requests Leave to Replead Counts Four and Five as Violations of the Free Exercise Clause.

In light of Defendants' jurisdictional objections to the Court adjudicating claims arising under Indiana Code § 34-13-9-1 et seq. ("RFRA"), TST respectfully requests leave to withdraw its RFRA claims without prejudice and plead instead violations of the Free Exercise Clause based on the facts alleged in Counts Four and Five.  TST has pleaded the facts necessary to support such claims.  *Johnson v. City of Shelby*, 574 U.S. 10 (2014) ("[I]t is unnecessary to set out a legal theory for the plaintiff's claim for relief.") and *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("*Skinner*") ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiffs claim for relief to a precise legal theory."). But in fairness to Defendants, their violation of the Free Exercise Clause should be explicitly alleged so they can respond in the manner they deem appropriate.

## VIII.    Conclusion.

*Dobbs* reframed the debate on abortion.  One of the issues that must be addressed and resolved post-*Dobbs* is who pays the costs for a ban on abortion when a woman becomes pregnant by accident.  The solution posited by the State of Indiana is the woman pays that cost alone because a Prenatal Person is a precious and unique life whose needs take total and absolute precedence over everyone else. That solution strips an Involuntarily Pregnant Woman of

33

compensation for the use of her uterus in violation of the Takings Clause of the Fifth

Amendment and coerces her services and labor to incubate and deliver a Prenatal Person in

violation of the ban on involuntary servitude in the Thirteenth Amendment.  Our Constitutional

form of government requires the Court to protect these rights, even in the face of legislative

edicts that embrace the theology that a human being comes into existence at conception.

        For the reasons set forth above, TST respectfully requests the Motion be denied.

June 20, 2023

*W. James Mac Naughton*
W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
*Attorney for Plaintiff The Satanic Temple, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the date of this pleading, I electronically filed it with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

BRIAN V. CHURCH
Deputy Attorney General
brian.church@ag.idaho.gov

DAYTON P. REED
Deputy Attorney General
dayton.reed@ag.idaho.gov


*/s/ W. James Mac Naughton*