**EXHIBIT A**

IN THE

# Indiana Supreme Court

No. 22S-PL-00338

| | |
|---|---|
| MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, et al., | Interlocutory Appeal from the Monroe County Circuit Court, |
| Appellants, | Trial Court Case No. 53C06-2208-PL-001756, |
| v. | The Honorable Kelsey Hanlon, Special Judge. |
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAI'I, ALASKA, INDIANA, KENTUCKY, INC., et al., | |
| Appellees. | |

## CORRECTED BRIEF OF APPELLANTS

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
Deputy Attorney General

*Counsel for Appellants*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... 4

STATEMENT OF SUPREME COURT JURISDICTION ........................................ 12

STATEMENT OF THE ISSUES ....................................................................... 12

STATEMENT OF THE CASE ........................................................................... 12

STATEMENT OF FACTS ............................................................................... 13

I.    Factual Background ........................................................................... 14

II.   Statutory and Regulatory Background .......................................... 15

      A.    Indiana prohibits abortion from its earliest days until federal
            law requires it to tolerate abortion .......................................... 15

      B.    After *Roe*, Indiana continues to heavily restrict abortion ........... 17

      C.    Indiana reenacts an abortion ban after *Roe* is overruled ............. 19

III.  Procedural Background .................................................................. 20

SUMMARY OF THE ARGUMENT ................................................................ 22

ARGUMENT ............................................................................................... 26

I.    Plaintiffs Lack Standing To Assert an Article 1, § 1 Claim ............... 27

      A.    Plaintiffs do not allege personal, direct injury from a violation
            of their own rights ................................................................ 27

      B.    The Court should not embrace federal third-party standing .......... 29

      C.    The plaintiffs cannot satisfy the usual requirements for
            third-party standing regardless ............................................... 32

II.   Article 1, § 1 of the Indiana Constitution Does Not Confer Judicially
      Enforceable Rights ........................................................................ 34

      A.    The constitutional text, structure, and debates demonstrate
            that § 1 is not judicially enforceable ....................................... 35

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

  B. The overruled decisions cited by the trial court provide no persuasive reason for holding that § 1 is enforceable ........................... 40

III. Any Rights Secured by Article 1. § 1 of the Indiana Constitution Do Not Include a Right to Abortion .................................................... 42

  A. To the extent that § 1 secures any rights, it protects only rights with textual and historical support ............................................. 42

  B. No text or history supports a right to abortion ..................................... 44

  C. The trial court's unprecedented rationale for recognizing a novel right to abortion upends the judicial role .................................... 48

  D. Generic statements about liberty and autonomy cannot support a right to abortion ................................................................................ 51

  E. S.B. 1 is a permissible exercise of police power ..................................... 57

IV. The Lack of Irreparable Harm and the State's Significant Interest in Protecting Unborn Children Preclude a Preliminary Injunction .................. 58

  A. No irreparable harm will occur absent a preliminary injunction ......... 59

  B. The compelling public interest in protecting unborn children from destruction militates against injunctive relief ............................. 60

CONCLUSION ................................................................................................. 62

CERTIFICATE OF WORD COUNT ........................................................................ 63

CERTIFICATE OF SERVICE .................................................................................. 64

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## TABLE OF AUTHORITIES

CASES

*Adams v. State,*
  48 Ind. 212 (1874) ............................................................ 17, 47

*Adler v. State,*
  248 Ind. 193, 225 N.E.2d 171 (1967) ...................................... 28, 30, 31

*Apple Glen Crossing, LLC v. Trademark Retail, Inc.,*
  784 N.E.2d 484 (Ind. 2003) ...................................................... 59

*Avemco Ins. Co. v. State ex rel. McCarty,*
  812 N.E.2d 108 (Ind. Ct. App. 2004) ........................................... 62

*Basset v. State,*
  41 Ind. 303 (1872) ............................................................ 17, 47

*Bd. of Comm'rs of Union Cty. v. McGuinness,*
  80 N.E.3d 164 (Ind. 2017) ..................................................... 27, 28, 30

*Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson,*
  459 N.E.2d 715 (Ind. 1984) .................................................... 27, 48

*Beebe v. State,*
  6 Ind. 501 (1855) ............................................................ 40, 41, 45, 53

*Box v. Planned Parenthood of Ind. & Ky., Inc.,*
  139 S. Ct. 1780 (2019) ....................................................... 18, 50

*Brewington v. Lowe,*
  1 Ind. 21 (1848) ............................................................. 30, 31

*Bunker v. Nat'l Gypsum Co.,*
  441 N.E.2d 8 (Ind. 1982) ..................................................... 49, 61

*Carter v. State,*
  2 Ind. 617 (1851) ............................................................ 17, 47

*Cent. Ind. Podiatry, P.C. v. Krueger,*
  882 N.E.2d 723 (Ind. 2008) .................................................... 58

*Chavez v. Martinez,*
  538 U.S. 760 (2003) .......................................................... 44

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### CASES [CONT'D]

*Cheaney v. State*,
  259 Ind. 138, 285 N.E.2d 265 (1972) ............................................................*passim*

*Churchman v. Martin*,
  54 Ind. 380 (1876) ...................................................................... 26, 41, 48

*City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*,
  744 N.E.2d 443 (Ind. 2001) ............................................................ 26, 43

*City of Gary v. Nicholson*,
  190 N.E.3d 349 (Ind. 2022) ........................................................ 27, 28, 30

*City of Indianapolis v. Ind. State Bd. of Tax Comm'rs*,
  261 Ind. 635, 308 N.E.2d 868 (1974) .................................................... 28

*Clinic for Women, Inc. v. Brizzi*,
  837 N.E.2d 973 (Ind. 2005) .......................................................... 19, 47, 55

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
  48 F.3d 618 (1st Cir. 1995) ...................................................................... 59

*Diamond v. Charles*,
  476 U.S. 54 (1986) .................................................................................... 33

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ....................................................................*passim*

*Doe v. Methodist Hosp.*,
  690 N.E.2d 681 (Ind. 1997) .................................................................... 52

*Doe v. O'Connor*,
  790 N.E.2d 985 (Ind. 2003) .................................................................... 39

*Doe v. Town of Plainfield*,
  893 N.E.2d 1124 (Ind. Ct. App. 2008)................................... 43, 47, 51, 53

*Driskill v. State*,
  7 Ind. 338 (1855)...................................................................................... 38

*Elk Grove Unified Sch. Dist. v. Newdow*,
  542 U.S. 1 (2004) ...................................................................................... 33

*EMW Women's Surgical Ctr., P.S.C. v. Cameron*,
  No. 2022-SC-0326-I, 2022 WL 3641196 (Ky. Aug. 18, 2022) ................ 57

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Finney v. Johnson*,
    242 Ind. 465, 179 N.E.2d 718 (1962) ........................................................ 26, 42, 48

*Hedderich v. State*,
    101 Ind. 564, 1 N.E. 47 (1885) ........................................................ 39

*Herman v. State*,
    8 Ind. 545 (1855)........................................................ 40, 41, 45, 53

*Hoagland v. Franklin Twp. Cmty. Sch. Corp.*,
    27 N.E.3d 737 (Ind. 2015) ........................................................ 56

*Holcomb v. Bray*,
    187 N.E.3d 1268 (Ind. 2022) ........................................................ 28, 38

*Horner v. Curry*,
    125 N.E.3d 584 (Ind. 2019) ........................................................ 27, 30, 31

*Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*,
    266 Ind. 491, 365 N.E.2d 752 (1977) ........................................................ 28, 31

*Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*,
    769 N.E.2d 158 (Ind. 2002) ........................................................ 59

*Judy v. State*,
    275 Ind. 145, 416 N.E.2d 95 (1981) ........................................................ 38

*Kerry v. Din*,
    576 U.S. 86 (2015) ........................................................ 44

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ........................................................ 31, 33, 34

*In re Lawrance*,
    579 N.E.2d 32 (Ind. 1991) ........................................................ 53

*Ledgerwood v. State*,
    134 Ind. 81, 33 N.E. 631 (1893) ........................................................ 16

*Leonard v. State*,
    249 Ind. 361, 232 N.E.2d 882 (1968) ........................................................ 28, 31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................ 30

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Mahaffey v. Att'y Gen.*,
    564 N.W.2d 104 (Mich. Ct. App. 1997) ................................................. 56

*Mich. Coal. of State Emp. Unions v. Mich. Civ. Serv. Comm'n*,
    634 N.W.2d 692 (Mich. 2001) ............................................................... 60

*Miller v. Albright*,
    523 U.S. 420 (1998) ............................................................................... 34

*Moore v. Consol. Edison Co. of New York*,
    409 F.3d 506 (2d Cir. 2005) ................................................................... 59

*O'Brien v. State*,
    422 N.E.2d 1266 (Ind. Ct. App. 1981) ................................................... 42

*Osmulski v. Becze*,
    638 N.E.2d 828 (Ind. Ct. App. 1994) ............................................... 29, 32

*Pence v. State*,
    652 N.E.2d 486 (Ind. 1995) ............................................................. 28, 30

*Pirtle v. State*,
    263 Ind. 16, 323 N.E.2d 634 (1975) ...................................................... 54

*Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*,
    975 N.W.2d 710 (Iowa 2022) ........................................................... 56, 57

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of*
    *Health*,
    265 F. Supp. 3d 859 (S.D. Ind. 2017) .................................................... 18

*Planned Parenthood of Indiana v. Carter*,
    854 N.E.2d 853 (Ind. Ct. App. 2006) ..................................................... 29

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ................................................................. 18, 19, 52

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ............................................................................... 31

*Powers v. Ohio*,
    449 U.S. 400 (1991) ......................................................................... 29, 32

*Price v. State*,
    622 N.E.2d 954 (Ind. 1993) ...........................................................*passim*

7

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CASES [CONT'D]

*Rice v. State*,
　7 Ind. 332 (1855) ................................................................. 38

*Ritchie v. State*,
　809 N.E.2d 258 (Ind. 2004) ............................................... 38

*Roe v. Wade*,
　410 U.S. 113 (1973) ....................................................... *passim*

*Rosa v. Prather*,
　103 Ind. 191, 2 N.E. 575 (1885) ........................................ 50

*Sanchez v. State*,
　749 N.E.2d 509 (Ind. 2001) ............................................... 42

*Schmitt v. F. W. Cook Brewing Co.*,
　187 Ind. 623, 120 N.E. 19 (1918) ................................. *passim*

*Sepe v. Daneker*,
　68 A.2d 101 (R.I. 1949) ...................................................... 56

*Shields v. Gerhart*,
　658 A.2d 924 (Vt. 1995) ......................................... 37, 39, 56

*Sidle v. Majors*,
　264 Ind. 206, 341 N.E.2d 763 (1976) .......................... 49, 62

*Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*,
　182 N.E.3d 212 (Ind. 2022) ......................................... 27, 28

*State v. Econ. Freedom Fund*,
　959 N.E.2d 794 (Ind. 2011) .................................. 35, 58, 60

*State v. Katz*,
　179 N.E.3d 431 (Ind. 2022) ....................................... *passim*

*State v. Williams*,
　728 N.E.2d 342 (Ohio 2000) .................................. 37, 40, 56

*Union Twp. Sch. Corp. v. State ex rel. Joyce*,
　706 N.E.2d 183 (Ind. Ct. App. 1998) ............................... 59

*Warth v. Seldin*,
　422 U.S. 490 (1975) ............................................................ 31

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...................................................................................... 44

*Welsh v. State,*
    126 Ind. 71, 25 N.E. 883 (1890) .............................................................. 40

*Whittington v. State,*
    669 N.E.2d 1363 (Ind. 1996) ............................................................. 43, 51

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016) ........................................................................... 32

*Wiesenberger v. State,*
    202 Ind. 424, 175 N.E. 238 (1931) ........................................................ 41

*Willey v. State,*
    52 Ind. 421 (1876) ........................................................................... 17, 47

CONSTITUIONAL PROVISIONS

Ind. Const. art. 1, § 1 ......................................................................*passim*

Ind. Const. art. 1, § 2 .............................................................................. 37

Ind. Const. art. 1, § 3 .............................................................................. 37

Ind. Const. art. 1, § 4 .............................................................................. 37

Ind. Const. art. 1, § 9 ......................................................................... 31, 51

Ind. Const. art. 1, § 10 ............................................................................ 37

Ind. Const. art. 1, § 14 ............................................................................ 31

Ind. Const. art. 1, § 18 ............................................................................ 38

Ind. Const. art. 1, § 23 ................................................................. 13, 20, 22

Ind. Const. art. 2, § 5 .............................................................................. 50

Ind. Const. art. 4, § 9 .............................................................................. 38

Ind. Const. art. 16, § 1 ............................................................................ 38

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CODIFIED STATUTES

Ind. Code § 9-19-10-2 ................................................................. 50

Ind. Code § 16-18-2-327.9 ........................................................ 19

Ind. Code § 16-34-2-1(a) .......................................................... 19

Ind. Code § 16-34-2-1(a)(1) ................................................. 19, 61

Ind. Code § 16-34-2-1(a)(1)(B) ............................................ 19, 33

Ind. Code § 16-34-2-1(a)(2) ..................................................... 20

Ind. Code § 16-34-2-1(a)(2)(C) ................................................ 20

Ind. Code § 16-34-2-1(a)(3) ............................................... 20, 61

Ind. Code § 16-34-2-1(a)(3)(C) ................................................ 33

Ind. Code § 16-34-2-1(a)(3)(C)–(D) ......................................... 20

Ind. Code § 16-34-2-3 .............................................................. 20

Ind. Code § 16-34-2-3(a) .......................................................... 20

Ind. Code § 16-34-2-3(b) .......................................................... 20

Ind. Code § 16-34-2-3(c)–(d) ................................................... 20

Ind. Code § 34-13-9-8 .............................................................. 34

Ind. Code § 35-42-1-2.5 ........................................................... 50

Ind. Code § 35-48-4-7 .............................................................. 50

Ind. Rev. Stat., pt. 1, ch. 61, §§ 1-2 (1852) ........................... 16

Ind. Rev. Stat., pt. 1, ch. 6, § 36 (1852) ................................. 46

## SESSION LAWS

Act of Sept. 17, 1807, ch. 24, in Francis S. Philbrick, *Laws of the
    Indiana Territory 1801-1809* (1930) ............................. 16, 45

1818 Ind. Laws, ch. LII, p. 308 ............................................ 16, 45

1835 Ind. Laws, ch. XLVII, p. 66, § 3 ................................... 16, 46

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## SESSION LAWS [CONT'D]

1859 Ind. Laws, ch. LXXXVI, p. 469, § 2. ............................................................ 16, 46

1881 Ind. Acts, ch. 37, p. 177, §§ 22–23 ............................................................ 16, 46

1905 Ind. Acts, ch. 169, pp. 663–64, §§ 367–368 ................................................ 17, 46

P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741 ................................................ 17, 46, 61

P.L. No. 322, § 2, 1973 Ind. Acts, pp. 1743–46 ................................................ 17

P.L. No. 335, §§ 2–3, 1977 Ind. Acts, pp. 1513–14 ................................................ 17

P.L. No. 187-1995, 1995 Ind. Acts, pp. 3327–29 ................................................ 18

P.L. No. 98-2014, 2014 Ind. Acts, pp. 1119–24 ................................................ 18

P.L. No. 213-2016, 2016 Ind. Acts, pp. 3099–125 ................................................ 18

## RULES

Indiana Rule of Appellate Procedure 56(A) ........................................................ 12, 13

## OTHER AUTHORITIES

1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* (1850) ............................ 36, 37

2 *Brevier Legislative Reports* (1859) ............................................................ 46

Maureen L. Condic, *When Does Human Life Begin? The Scientific Evidence and Terminology Revisited*, 8 U. St. Thomas J.L. & Pub. Pol'y 44 (2013) ........................................................................................ 14

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................................................ 49

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF SUPREME COURT JURISDICTION

This Court has jurisdiction over this appeal because it granted transfer under Indiana Rule of Appellate Procedure 56(A).

## STATEMENT OF THE ISSUES

1.   Whether the plaintiffs—three abortion clinics, a pro-abortion support group, and a physician—have standing to challenge a statutory abortion ban on the ground that it allegedly infringes pregnant women's right to abortion.

2.   Whether Article 1, § 1 of the Indiana Constitution secures a judicially enforceable right to abortion that can support a preliminary injunction against enforcement of a statutory abortion ban.

3.   Whether a "potential" constitutional violation inflicts per se harm that justifies bocking enforcement of state law and permitting abortion, notwithstanding the State's valid and compelling interest in preventing the killing of unborn children.

## STATEMENT OF THE CASE

On August 31, 2022, Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc.; Women's Med Group Professional Corporation; Whole Woman's Health Alliance; All-Options, Inc.; and Amy Caldwell, M.D. (collectively, the challengers) filed suit in Monroe Circuit Court against Members of the Medical Licensing Board of Indiana, the Hendricks County Prosecutor, the Lake County Prosecutor, the Marion County Prosecutor, the Monroe County Prosecutor, the St. Joseph County Prosecutor, the Tippecanoe County Prosecutor, and the Warrick Country Prosecutor challenging the constitutionality of Senate Bill 1 (S.B. 1) under Article 1,

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

§§ 1, 12, and 23 of the Indiana Constitution. App. II 43–64. The challengers contemporaneously moved for a preliminary injunction barring enforcement of S.B. 1. App. II 65–66.

On September 22, 2022, the trial court granted the challengers' preliminary-injunction motion. App. II 42. It prohibited the defendant state officials from enforcing S.B. 1 on the ground that it violated Article 1, § 1 of the Indiana Constitution. App. II 38. The state officials appealed, moved for a stay pending appeal, and sought transfer under Indiana Rule of Appellate Procedure 56(A). On October 12, 2022, this Court granted the motion to transfer and denied the motion to stay.

## STATEMENT OF FACTS

From the time Indiana achieved statehood in 1816 until the U.S. Supreme Court recognized a federal right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973), Indiana prohibited nearly all abortions. It then continued to prohibit many abortions during the nearly 50 years that the U.S. Supreme Court recognized a federal abortion right. After the U.S. Supreme Court overruled *Roe* and held that no federal abortion right existed, Indiana enacted S.B. 1—which recognizes that abortion terminates an unborn child's life—to prohibit nearly all abortions once again.

Despite the State's history of prohibiting abortion for two centuries, the trial court enjoined enforcement of S.B. 1 under Article 1, § 1 of the Indiana Constitution. Although § 1 nowhere mentions abortion and "abortion was not lawful at the time the Indiana Constitution was ratified," the trial court ruled that § 1 should be read to protect abortion nonetheless. App. II 37. "[T]hose who wrote our Constitution," the

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

court stated, had "deficits" so "significant" that their decisions cannot foreclose § 1 "from being interpreted at this point" to protect abortion. *Id.* This appeal concerns whether § 1 secures an abortion right.

## I.   Factual Background

Abortion is the intentional termination of an unborn human life after fertilization. App. II 187, 209–10; App. III 5. At fertilization, the single-celled human, or "zygote," bears a unique molecular composition distinct from its parental gametes, and then "directs *its own* development to more mature stages of human life," producing "increasingly complex tissues, structures and organs that work together." App. II 187–88; *see* App. II 209–10; Maureen L. Condic, *When Does Human Life Begin? The Scientific Evidence and Terminology Revisited*, 8 U. St. Thomas J.L. & Pub. Pol'y 44 (2013). That development happens rapidly.

The first sign of the unborn child's developing brain appears within three weeks of fertilization. App. II 188. In the third week after fertilization, the unborn child develops its own heartbeat. App. II 189. A respiratory system starts to form about a week later. *Id.* "During the sixth week, the preborn baby starts moving, and the first sense develops—touch." App. II 190. "More than 90% of the body parts" form by the end of the eighth week. App. II 191.

At nine weeks, an unborn child starts to exhibit "more complex behaviors, such as thumb-sucking, swallowing, and stretching." App. II 191. The unborn child's lips and nose mature into their adult shape by week eleven, and around that time, the child will start "practic[ing] breathing" and producing "complex facial expressions."

14

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

App. II 192. By thirteen weeks, the unborn "child can feel pain." App. II 193. Ability

to "hear certain sounds" arrives a week later. *Id.*; *see* App. II 195 (explaining that

preborn babies will respond to "music, reading, and singing").

By nineteen to twenty weeks, unborn children will respond "to taste, tempera-

ture, pain, pressure, movement and light." App. II 194–95. And during the eighth and

ninth months of pregnancy, unborn children spend "almost 40% of the time" "prac-

tic[ing] breathing." App. II 196.

## II.    Statutory and Regulatory Background

### A.    Indiana prohibits abortion from its earliest days until federal law requires it to tolerate abortion

Legal prohibition of abortion stretches back to common law. "At common law,

abortion was criminal in at least some stages of pregnancy and was regarded as un-

lawful and could have very serious consequences at all stages." *Dobbs v. Jackson*

*Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). "The 'eminent common-law au-

thorities (Blackstone, Coke, Hale, and the like)' *all* describe[d] abortion after quick-

ening," the first felt movement of a baby in the womb, "as criminal," and even pre-

quickening abortions were regarded as unlawful such that they could support a hom-

icide charge under a "proto-felony-murder rule." *Id.* at 2249–50 (citation omitted).

And "English cases dating all the way back to the 13th century corroborate the trea-

tises' statements that abortion was a crime." *Id.*

Even before achieving statehood, Indiana incorporated the English common

law's prohibitions on abortion into its own laws. In 1807, William Henry Harrison,

then Governor of the Indiana Territory, adopted an act declaring that the "Common

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Law of England, all statutes or acts of the British Parliament, made in aid of the Common Law, prior to the fourth year of the reign of King James the first" (with three exceptions) and of general applicability are "of full force" "until repealed by legislative authority." Act of Sept. 17, 1807, ch. 24, in Francis S. Philbrick, *Laws of the Indiana Territory 1801–1809*, at 323 (1930). After Indiana achieved statehood in 1816, the General Assembly reenacted the statute. *See* 1818 Indiana Laws ch. LII, p. 308; *Ledgerwood v. State*, 134 Ind. 81, 33 N.E. 631, 633 (1893) (observing that Indiana adopted the common law's criminal provisions "without exception or limitation"). It did not repeal the common law's criminal prohibitions until 1852. *See* Ind. Rev. Stat., pt. 1, ch. 61, §§ 1-2 (1852).

In its early days of statehood, Indiana, like "the vast majority of [other] States," supplemented the common law's prohibitions on abortion with a statutory ban. *Dobbs*, 142 S. Ct. at 2252. In 1835, the General Assembly made it a criminal offense to administer "to any pregnant woman[] any medicine, drug, substance or thing whatever . . . with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman." 1835 Ind. Laws ch. XLVII, p. 66, § 3. Amendments adopted after the 1851 Constitution's adoption expanded the statute to prohibit a "druggist, apothecary, physician, or other person selling medicine" from selling any "medicine . . . known to be capable of producing abortion or miscarriage, with intent to produce abortion." 1859 Ind. Laws ch. LXXXVI, p. 469, § 2. In 1881, the penalty for violating the law was raised from a misdemeanor to a felony. 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. And in 1905 the

16

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

legislature made it a crime to "solicit" an abortion or miscarriage. 1905 Ind. Acts ch.

169, pp. 663–64, §§ 367–368.

While those laws were in place, this Court upheld multiple criminal convictions

under them. *See, e.g.*, *Willey v. State*, 52 Ind. 421 (1876); *Adams v. State*, 48 Ind. 212

(1874); *Basset v. State*, 41 Ind. 303 (1872); *Carter v. State*, 2 Ind. 617 (1851). And in

1972, it rejected the claim that Indiana's abortion ban violates a right to abortion

protected by the federal Ninth Amendment. *See Cheaney v. State*, 259 Ind. 138, 285

N.E.2d 265 (1972). The State, this Court held, has a "valid and compelling" interest

in protecting unborn children "from the moment of conception." 285 N.E.2d at 270.

### B.      After *Roe*, Indiana continues to heavily restrict abortion

Only after the U.S. Supreme Court declared there to be a fundamental federal

right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973), did the General Assembly

amend Indiana's abortion ban to conform to "recent U.S. Supreme Court decisions."

P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741. The State, however, disclaimed it was rec-

ognizing any "constitutional right to abortion on demand" and continued to outlaw as

many abortions as federal law permitted. *Id.*; *see* P.L. No. 322, § 2, 1973 Ind. Acts,

pp. 1743–46 (prohibiting abortions to the extent permitted under *Roe*'s trimester

framework). The State also imposed medical reporting requirements on abortion pro-

viders and outlawed experimentation on aborted fetuses. *See* P.L. No. 322, § 2, 1973

Ind. Acts, pp. 1743–46; P.L. No. 335, §§ 2–3, 1977 Ind. Acts, pp. 1513–14.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

In 1992, the State acquired additional authority to protect prenatal life and maternal health when the U.S. Supreme Court upheld Pennsylvania's parental-consent, informed-consent, and 24-hour waiting-period requirements. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). After *Casey*, Indiana adopted its own informed-consent and 18-hour waiting-period requirements, as well as new protocols for physicians performing abortions, definitions for medical emergency warranting an abortion, and criminal penalties for violating the abortion code. P.L. No. 187-1995, 1995 Ind. Acts, pp. 3327–29. It also enacted a host of new requirements, including requirements related to hospital admitting privileges, pre-abortion ultrasounds, abortion clinic licensing and inspection, and the disposition of fetal remains. P.L. No. 213-2016, 2016 Ind. Acts, pp. 3099–125; P.L. No. 98-2014, 2014 Ind. Acts, pp. 1119–24. And the State banned abortions sought solely because of an unborn child's race, sex, or disability status. P.L. No. 213-2016, 2016 Ind. Acts, pp. 3115–17.

Some of Indiana's abortion restrictions were ruled contrary to the federal abortion right recognized in *Roe* and *Casey*. *See, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 265 F. Supp. 3d 859, 873 (S.D. Ind. 2017) (enjoining anti-discrimination, information-dissemination, and fetal-disposition provisions), *aff'd*, 888 F.3d 300 (7th Cir. 2018), *reh'g en banc granted in part and judgment vacated*, 727 F. App'x 208 (7th Cir. 2018), *opinion reinstated by evenly divided court*, 917 F.3d 532 (7th Cir. 2018), *rev'd in part sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) (vacating injunction for fetal-disposition provision, but leaving other provisions enjoined). When Indiana's informed-consent

18

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

requirements were challenged under the Indiana Constitution, however, this Court

declined to decide whether it provided a corresponding state right to abortion, deem-

ing the requirements lawful regardless. *See Clinic for Women, Inc. v. Brizzi*, 837

N.E.2d 973, 978, 988 (Ind. 2005).

### C.   Indiana reenacts an abortion ban after *Roe* is overruled

In June 2022, the U.S. Supreme Court held that the federal constitution did

not confer a right to abortion, overruled *Roe* and *Casey*, and "returned to the people"

of Indiana and "their elected representatives" the "authority to regulate abortion."

*Dobbs*, 142 S. Ct. at 2279. Shortly thereafter, the General Assembly enacted S.B. 1.

S.B. 1, like Indiana's pre-*Roe* statutes, makes most abortions a "criminal act." Ind.

Code § 16-34-2-1(a). Under S.B. 1, abortion is permitted in three circumstances only:

First, S.B. 1 permits abortions "before the earlier of viability of the fetus or

twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical

judgment dictates that performing the abortion is necessary to prevent any serious

health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the

fetus is diagnosed with a lethal fetal anomaly." Ind. Code § 16-34-2-1(a)(1). A "serious

health risk" is one "that has complicated the mother's medical condition and necessi-

tates an abortion to prevent death or a serious risk of substantial and irreversible

physical impairment of a major bodily function," but "does not include psychological

or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory

surgical centers may perform abortions under that exception. Ind. Code § 16-34-2-

1(a)(1)(B).

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Second, S.B. 1 permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-2-1(a)(3). Because those abortions are performed later in the pregnancy, S.B. 1 imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3. Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3, in turn, requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

Third, S.B. 1 permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Ind. Code § 16-34-2-1(a)(2). Only hospitals and ambulatory surgical centers may perform those abortions. Ind. Code § 16-34-2-1(a)(2)(C).

## III.   Procedural Background

On August 31, 2022, the challengers here filed a complaint challenging S.B. 1's constitutionality and moved for a preliminary injunction. App. II 43–68. The complaint alleged that (1) S.B. 1 violates a right to abortion secured by Article 1, § 1 of the Indiana Constitution; (2) S.B. 1 violates Article 1, § 23's Equal Privileges and Immunities Clause by requiring abortions to be performed at hospitals and ambulatory surgical centers; and (3) S.B. 1 violates Article 1, § 12's Due Course of Law Clause

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

by failing to make clear whether abortions can be performed after the earlier of via-

bility or 20 weeks postfertilization age. App. II 61–63.

The trial court granted the challengers' motion, preliminarily enjoining en-

forcement of S.B. 1. App. II 42. Relying on a pair of decisions from 1855 that were

later overruled, the court declared that Article 1, § 1 "provides judicially enforceable

rights." App. II 34. It then declared that those rights include a right to make "deci-

sions about whether to carry a pregnancy to term." App. II 37. In so declaring, the

court conceded that "abortion was not lawful at the time the Indiana Constitution

was ratified." *Id.* The court, however, disregarded the State's longstanding criminal

prohibitions on abortion on the theory that "those who wrote our Constitution" had

"significant . . . deficits . . . particularly as they pertain to the liberty of women and

people of color." *Id.* "[B]y today's lights," the court asserted, "the 1851 Constitution"

left them "in a state incompatible with fundamental principles of ordered liberty." *Id.*

After pronouncing a right to abortion, the trial court ruled that S.B. 1 "materi-

ally burdens" that right by banning most abortions, including elective ones, and re-

quiring abortions to be performed by hospitals and ambulatory surgical centers. App.

II 37–38. The court admitted that "the State has an interest in regulating abortion"

and a "legitimate" interest in "protecting fetal life." App. II 40–41; *see* App. II 37. But

it proclaimed S.B. 1's putative violation of the "constitutional rights of Indiana women

and girls" to be a "*per se* irreparable harm" justifying a preliminary injunction regard-

less of countervailing interests. App. II 40–41.

21

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

The trial court did not identify any alternative basis for the preliminary injunction. It rejected the challengers' claim that S.B. 1 discriminates against abortion clinics in violation of Article 1, § 23, and the challengers "withdrew" their Article 1, § 12 claim. App. II 38–39.

## SUMMARY OF THE ARGUMENT

The preliminary injunction preventing enforcement of S.B. 1 on the ground that it violates Article 1, § 1 of the Indiana Constitution cannot stand.

I.     The plaintiff abortion clinics, physician who performs abortions, and pro-abortion support group lack standing to challenge S.B. 1. To have standing, litigants must suffer a direct, personal injury stemming from a violation of *their* legal rights—not a third party's. Here, however, the plaintiffs do not allege a violation of their rights. They allege a violation of a *pregnant woman's* right to abortion.

This Court—which has never endorsed precedent permitting a litigant to assert another's private constitutional rights—should not adopt federal third-party standing. Carving out an exception to the traditional rule that litigants must assert their own private rights would undermine the separation of powers, dull the presentation of issues, induce confusion about who is bound by decisions, and produce doctrinal inconsistencies.

Enforcing traditional limits on federal third-party standing would require dismissal in any event. The plaintiffs here have not identified specific pregnant women on whose behalf they allegedly sue; the plaintiffs' interests are potentially in conflict

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

with those of the women they purport to represent; and there is no reason why pregnant women seeking abortions prohibited by S.B. 1 cannot sue themselves.

II.    The plaintiffs' claim also fails on the merits. Article 1, § 1 of the Indiana Constitution does not confer any judicially enforceable rights. Section 1 instead declares first principles concerning people's natural rights before "their CREATOR," the origin of government, and its purposes. As the framers recognized, § 1 does "not contravene the power of man" by "law" to limit the exercise of any natural rights. Section 1's theorizing stands in sharp contrast to other constitutional provisions providing that citizens "shall" have specific, enumerated liberties.

Construing § 1 as enforceable would allow litigants to circumvent deliberate decisions about which rights to protect in Article 1 and how to frame them. It would raise inscrutable questions about why § 1 protects a "liberty" right that includes abortion, but why § 1's mention of an "inalienable right" to "life" does not protect unborn children from being killed. It would pit § 1's mention of an "indefeasible right" to amend the state government "at all times" against constitutional provisions restricting how and when the Constitution can be amended. And reading § 1 as enforceable would produce interminable disputes about what it protects, since it provides no objective standard for determining what might be included in a right to "life, liberty, and the pursuit of happiness."

In ruling that § 1 is judicially enforceable, the trial court did not attempt to explain away the textual, structural, and practical difficulties with its ruling. It instead relied on two decisions from 1855 without mentioning that this Court overruled

23

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

them more than a century ago. Embracing the trial court's view would require repudiating a long line of precedent explaining that courts cannot hold statutes unconstitutional unless they violate a specific constitutional guarantee.

III.     Section 1 does not confer a right to abortion in any event. To the extent § 1 confers enforceable rights, this Court's precedent makes clear that "text and history" must show the "founding generation" would have recognized the putative right as fundamental. *Price v. State*, 622 N.E.2d 954, 959 n.4 (Ind. 1993). As the trial court admitted, however, there is no textual or historical evidence of an abortion right. Indeed, Indiana regarded abortion as criminal before, during, and after the 1816 and 1851 Constitutions were drafted, debated, and ratified.

The trial court sought to justify its disregard of text and history with the statement that "those who wrote our Constitution" had "significant . . . deficits." Under this Court's precedents, however, the Constitution must be enforced as written. Judges cannot disregard the Constitution whenever they deem it or its drafters deficient. The trial court, moreover, offered no viable alternative to text and history. It purported to find the framing generation deficient, but it could not explain why subsequent generations—including the current one—continued to outlaw abortion. Nothing but the trial court's disagreement with S.B. 1 undergirds the decision below.

The trial court's assertion that Hoosiers generally value "self-determination," "bodily autonomy," and "privacy" cannot rescue its decision. This Court's precedents demand a showing that the founding generation recognized the specific right as-

24

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

serted, not liberty generally. Self-determination, bodily autonomy, and privacy—interests that nearly all state laws affect—are not recognized constitutional rights in any event. And even if they were, S.B. 1—which concerns a single, narrow issue within those enormous categories—would not materially burden such rights by preventing them from serving their purpose. It would merely qualify their exercise.

Because there is no constitutional right to abortion, S.B. 1 is a legitimate exercise of the State's police power. Consistent with Indiana's historical abortion regulations, it furthers a compelling interest in protecting unborn children.

IV.    Merits aside, the requirements for preliminary injunctive relief are not satisfied. The trial court ruled the alleged violation here inflicts per se irreparable harm. But irreparable harm cannot be presumed—at least without a showing that the challenged conduct is clearly unlawful and against the public interest. S.B. 1, however, is neither. And the challengers cannot show that their legal remedies are inadequate by pointing to effects on third parties.

"[V]alid and compelling" state interests, including an interest in protecting unborn children from "the moment of conception," also preclude issuance of an injunction. *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 270 (1972). That federal law once required Indiana to tolerate abortions is no reason to override elected representatives' determination of where the public interest lies.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## ARGUMENT

The order below finding a novel right to abortion amounts to a judicial amendment of the Indiana Constitution. The Constitution nowhere declares a right to abortion, and the Constitution's framers regarded abortion as a criminal act that destroys innocent human life. As even the trial court admitted, "abortion was not lawful at the time the Indiana Constitution was ratified." App. II 37.

That admission should have been the end of the matter. As this Court explained more than a century ago, the judiciary cannot declare a statute unconstitutional "which violates no provision of the . . . state Constitution." *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19, 22 (1918) (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)). The Indiana Constitution is not "an elastic instrument of no particular rigidity, which stretches to meet the demands of the moment." *Finney v. Johnson*, 242 Ind. 465, 179 N.E.2d 718, 721 (1962). So constitutional rights must be rooted in the constitutional text, as illuminated by history. *Price v. State*, 622 N.E.2d 954, 957, 959 n.4 (Ind. 1993). Thus, when confronted with individual-rights claims, this Court has "examined *text* and *history* to determine whether . . . the *founding generation*" would have recognized a putative right. *Id.* at 959 n.4 (emphasis added); *see City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 447, 450 (Ind. 2001).

Rather than apply the constitutional text, history, and binding precedent, the trial court disregarded all three. It tried to justify its departure on the ground that, "by today's lights," "those who wrote our Constitution" had "significant . . . deficits."

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

App. II 37. Judges, however, may not invent new "rights" whenever the Constitution strikes them as "deficient." Rather, judges "must enforce the Constitution as written and intended." *Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson*, 459 N.E.2d 715, 717 (Ind. 1984). That principle forecloses the trial court's decision to recognize a novel right to abortion that lacks any support in the constitutional text and that history shows the founding generation would never have recognized.

## I.   Plaintiffs Lack Standing To Assert an Article 1, § 1 Claim

Although the trial court's open rejection of constitutional boundaries is its most egregious error, standing is a "threshold" obstacle to upholding the decision below. *Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 182 N.E.3d 212, 216 (Ind. 2022). The decision below declares that, in violation of Article 1, § 1, S.B. 1 infringes "*a woman's* right to determine whether she will carry a pregnancy to term." App. II 34 (emphasis added). But none of the plaintiffs here are pregnant women seeking abortions prohibited by S.B. 1. The plaintiffs are instead abortion providers and advocates who assert no Article 1, § 1 rights of their own and who therefore lack standing to bring a § 1 claim. The plaintiffs' standing to seek a preliminary injunction is reviewed de novo. *See City of Gary v. Nicholson*, 190 N.E.3d 349, 351 (Ind. 2022).

### A.   Plaintiffs do not allege personal, direct injury from a violation of their own rights

Because standing requirements are "vital" to preserving the "separation of powers," a plaintiff must be a "proper person to invoke a court's authority." *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019). The plaintiff must have a "personal stake in the outcome of the litigation," *Solarize*, 182 N.E.3d at 217 (quoting *Bd. of Comm'rs of*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Union Cty. v. McGuinness*, 80 N.E.3d 164, 168 (Ind. 2017)), and suffer a "personal, direct" injury from the alleged unlawful action, *Holcomb v. Bray*, 187 N.E.3d 1268, 1286 (Ind. 2022); *see City of Gary*, 190 N.E.3d at 351. Standing "denies the courts any jurisdiction absent an actual injured party participating in the case." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995).

Typically, a plaintiff suffers injury only if *the plaintiff's* legal rights were violated. *McGuinness*, 80 N.E.3d at 168–69; *see City of Gary*, 190 N.E.3d at 351 (explaining a generic interest in legal compliance was not an "'individual right' vindicable in the courts" (citation omitted)); *Solarize*, 182 N.E.3d at 219–20 (requiring challenger to show it was "personally affected by the[] particular filings" at issue); *City of Indianapolis v. Ind. State Bd. of Tax Comm'rs*, 261 Ind. 635, 308 N.E.2d 868, 870 (1974) (holding a "non-taxpaying municipal corporation" cannot "allege any injury to a legally protected interest" from a decision burdening taxpayers). As this Court has observed, "[c]onstitutional rights are personal, and violation of a third party's constitutional rights cannot be claimed." *Adler v. State*, 248 Ind. 193, 225 N.E.2d 171, 172 (1967); *see Leonard v. State*, 249 Ind. 361, 232 N.E.2d 882, 885 (1968). This Court thus will not "pass on the constitutionality of a statute until a constitutional determination is necessarily and directly involved in a justiciable controversy and is essential to the protection of the *rights of the parties concerned*." *Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*, 266 Ind. 491, 365 N.E.2d 752, 754 (1977) (emphasis added).

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

In this case, however, the plaintiffs—three abortion clinics, a physician who performs abortions, and a pro-abortion support group, App. II 46–48, 110–11, 115–16, 119–20, 123, 140—do not allege any personal injury resulting from a violation of *their* rights. They instead allege that S.B. 1 violates "*a woman's* right to determine whether she will carry a pregnancy to term." App. II 34 (emphasis added); *see, e.g.*, App. II 45 (alleging S.B. 1 "strips away the fundamental rights of *people seeking abortion care*" (emphasis added)); App. II 61 (alleging "S.B. 1 prohibits Plaintiffs' *patients and clients* from exercising their fundamental right to privacy, which encompasses the right to abortion" (emphasis added)); App. II 89, 93 (arguing S.B. 1 violates a putative "right to abortion" by preventing women from "deciding whether to continue with a pregnancy and bear a child"). Because the current challengers to S.B. 1 do not seek to exercise that putative right themselves, none have the requisite personal stake to challenge S.B. 1 under Article 1, § 1 of the Indiana Constitution.

## B.    The Court should not embrace federal third-party standing

Relying on federal precedent, some Indiana Court of Appeals decisions hold that a "litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he has suffered a concrete, redressable injury, that he has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his own interests." *Osmulski v. Becze*, 638 N.E.2d 828, 834 (Ind. Ct. App. 1994) (citing *Powers v. Ohio*, 449 U.S. 400, 411 (1991)); *see also, e.g.*, *Planned Parenthood of Indiana v. Carter*, 854 N.E.2d 853, 870 (Ind. Ct. App. 2006). But this Court has never endorsed decisions permitting a plaintiff to assert another party's

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

private constitutional rights. *See McGuinness*, 80 N.E.3d at 168–69. And sound rationales support the traditional rule that a "violation of a third party's constitutional rights cannot be claimed." *Adler*, 225 N.E.2d at 172.

First, the traditional requirement that a plaintiff suffer a personal injury is "vital" for maintaining "the separation of powers." *Horner*, 125 N.E.3d at 589. That requirement serves to prevent courts from intruding into the province of the political branches and from interfering with democratic self-governance. *See id.* at 589–90. As this Court observed nearly two centuries ago, "it would be a perversion of the purposes for which the[ courts] are instituted, and an assumption of functions that do not belong to them, to undertake to settle abstract questions of law." *Brewington v. Lowe*, 1 Ind. 21, 23 (1848). That is why, this Court has long insisted, courts may only decide questions "bearing upon the *rights of the parties*" that concern "some individual right, *directly affecting the parties litigant*." *Id.* (emphasis added).

Allowing litigants to assert the private rights of third parties would undermine the separation of powers. Where a litigant's own rights have not been invaded, the litigant's interest is no different than "that of the general public." *Pence*, 652 N.E.2d at 488. It is an "undifferentiated public interest in . . . compliance with the law." *City of Gary*, 190 N.E.3d at 351 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992)). Permitting litigants to assert another's right thus risks having the courts being "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual

rights." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). That danger is reason enough to avoid recognizing third-party standing: "'Good fences make good neighbors,' after all." *Horner*, 125 N.E.3d at 589–90 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (1995)); *see id.* at 612–16 (Slaughter, J., concurring).

Second, the traditional rule ensures that the individuals "who would be chiefly affected by [a] decision" have an "opportunity of being heard," *Brewington*, 1 Ind. at 23, preventing situations in which those advocating for a position have "very different interests from the individuals whose rights they are asserting," *Kowalski v. Tesmer*, 543 U.S. 125, 135 (2004) (Thomas, J., concurring); *cf. Ind. Educ. Emp't Relations Bd.*, 365 N.E.2d at 754 (explaining standing ensures "that litigation will be actively and vigorously contested" without "collusion or attempts to obtain advisory opinions").

Third, the traditional rule avoids hard questions about who is bound by a judicial decision—the actual litigants in a case? The absent third parties whose rights are being asserted?

Permitting the plaintiffs here to assert the putative constitutional rights of third parties would wreak doctrinal havoc. It would create a situation in which some individual rights can be asserted by third parties but not others. *See, e.g., Price v. State*, 622 N.E.2d 954, 958 (Ind. 1993) (holding that parties cannot use overbreadth doctrine to assert the speech rights of third parties under Article 1, § 9); *Leonard*, 232 N.E.2d at 885–86 (declining to permit a litigant to assert a self-incrimination right protected by Article 1, § 14 belonging to a third party); *Adler*, 225 N.E.2d at 172 (refusing to allow third parties to assert a right against unreasonable searches). The

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

federal courts' struggle to find principled limits to third-party standing, and the "serious anomalies" it has created in federal law, illustrates why this Court should not attempt an experiment with exceptions to traditional standing principles. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2322 (2016) (Thomas, J., dissenting) ("Lawyers cannot vicariously assert potential clients' Sixth Amendment rights because they lack any current, close relationship. Yet litigants can assert potential jurors' rights against race or sex discrimination in jury selection even when the litigants have never met potential jurors and do not share their race or sex." (citation omitted)).

### C.   The plaintiffs cannot satisfy the usual requirements for third-party standing regardless

The plaintiffs cannot satisfy the usual requirements for third-party standing regardless, including that they have "a close relation with the third party" and that "there exists some hindrance to the third party's ability to protect his own interests." *Osmulski*, 638 N.E.2d at 834; *see Powers*, 449 U.S. at 411. Although some decisions have relaxed those traditional requirements for abortion, *Whole Woman's Health*, 136 S. Ct. at 2323 (Thomas, J., dissenting), those cases simply "ignored the [U.S. Supreme] Court's third-party standing doctrine," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022). Whatever else, this Court should not embrace standing theories giving preferential treatment to abortion providers. The "notion" that some rights "occup[y] a 'preferred' position" finds no support in the "history and structure of the Indiana Constitution." *Price*, 622 N.E.2d at 958.

Enforcing the traditional limits on third-party standing, as understood outside the abortion context, would require dismissal. Although the plaintiff abortion clinics

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

and Caldwell purport to sue on behalf of "current and future patients," App. II 48, none have identified specific pregnant women currently seeking abortions from them prohibited by S.B. 1. Traditionally, a relationship with "hypothetical" clients is not enough to create a close relationship. *Kowalski*, 543 U.S. at 131 (holding a lawyer could not sue on behalf of hypothetical clients); *see Diamond v. Charles*, 476 U.S. 54, 66–67 (1986) (holding a physician lacked standing to defend an abortion law on behalf of either his daughter or future patients). And All-Options, a support organization that does not provide abortions, cannot even claim to sue on behalf of unspecified hypothetical patients. *See* App. II 47–48.

Potential conflicts of interest disqualify the abortion clinics and Caldwell from asserting the rights of pregnant women as well. S.B. 1 requires abortions to be performed at hospitals or ambulatory surgical centers, Ind. Code § 16-34-2-1(a)(1)(B), (a)(3)(C), in part because those facilities can provide a "safer environment" and better "continuity of care" for women, App. III 51, 54. That places the interests of women in potential conflict with those of the plaintiff abortion clinics and Caldwell, who performs abortions at clinics, disqualifying them from asserting women's rights. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (refusing third-party standing where the interests of the parent and child were "potentially in conflict").

Additionally, the plaintiffs have identified no reason pregnant women desiring abortions could not challenge S.B. 1 themselves. A genuine hindrance is something that "signals that the rightholder did not simply decline to bring the claim on his own

33

behalf, but could not in fact do so." *Miller v. Albright*, 523 U.S. 420, 450 (1998) (O'Connor, J., concurring). No such hindrance exists here. State courts provide pregnant women seeking abortions "open avenues" for challenging S.B. 1. *Kowalski*, 543 U.S. at 132–33 (holding attorneys lacked standing to challenge state procedure for appointing counsel because their potential clients could challenge it). Indeed, some non-pregnant women have already (albeit, prematurely, in the State's view) challenged S.B. 1 on the ground that it violates their statutory rights. *See Anonymous Plaintiffs 1–5 v. The Individual Members of the Medical Licensing Board of Indiana*, No. 49D01-2209-PL-031056 (Marion Super. Ct.) (asserting claims under Ind. Code § 34-13-9-8).

## II. Article 1, § 1 of the Indiana Constitution Does Not Confer Judicially Enforceable Rights

The plaintiffs cannot succeed on their claim that S.B. 1 violates Article 1, § 1 of the Indiana Constitution. As the text, structure, and constitutional debates demonstrate, that provision is a precatory statement of political philosophy and does not confer any judicially enforceable rights. The only support the trial court offered for its contrary view was two decisions from 1855 striking down liquor laws. More than 100 years ago, however, this Court overruled those decisions as unprincipled exercises of judicial fiat. The judiciary, it explained, may not invalidate a statute that violates no specific textual guarantee even if it offends someone's general sense of liberty. That reasoning forecloses the trial court's attempt to wield § 1's generic mention of "liberty" to enjoin a statute that violates no enumerated constitutional right. And it means that the plaintiffs cannot satisfy the requirement for a preliminary injunction of showing a "reasonable likelihood of success"—an issue reviewed de novo.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*State v. Econ. Freedom Fund*, 959 N.E.2d 794, 803 (Ind. 2011); *see id.* at 800 ("An

abuse of discretion occurs when the trial court misinterprets the law").

### A.   The constitutional text, structure, and debates demonstrate that § 1 is not judicially enforceable

Article 1 § 1 of the Constitution does not enumerate individual rights enforce-

able by the judiciary. It expresses a basic philosophy of government and the relation-

ship between the individual and the State, but it does not include specific protections

against governmental overreach. It states the fundamental frame of political society

in broad terms:

> WE DECLARE, That all people are created equal; that they are endowed by
> their CREATOR with certain inalienable rights; that among these are life, lib-
> erty, and the pursuit of happiness; that all power is inherent in the people; and
> that all free governments are, and of right ought to be, founded on their au-
> thority, and instituted for their peace, safety, and well-being. For the advance-
> ment of these ends, the people have, at all times, an indefeasible right to alter
> and reform their government.

Ind. Const. art. 1, § 1.

Section 1 reflects the "natural rights philosophy that informs the Indiana Con-

stitution." *State v. Katz*, 179 N.E.3d 431, 447 (Ind. 2022). It acknowledges the exist-

ence of "inalienable rights" with which people are "endowed by their CREATOR." It

recognizes the "inherent" repository of "all power," namely "in the people." From these

Lockean first principles, § 1 "DECLARES" the origins and ends of government, *i.e.,* a

"free government[]" "founded on" "the authority" of "all people" and "instituted for

their peace, safety and well-being." Section 1 itself, however, does not purport to de-

scribe how the government will be structured to achieve those ends, what specific

powers it will have, or what rights citizens will retain after "ced[ing] a quantum of

35

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

their 'natural' rights." *Price v. State*, 622 N.E.2d 954, 958–59 (Ind. 1993). Those are all matters the Constitution addresses elsewhere.

As delegates to the constitutional convention observed, § 1 reflects "the sentiment . . . found in the Declaration of Independence" and Indiana's "theory of civil government." 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 955 (1850) (*Debates of the Convention*); *see id.* at 956–57, 969, 972. It describes "the rights of man as existing under the law of nature"—*i.e.*, before the institution of government—declaring all people to be free and equal. *Id.* at 959. Delegates, however, acknowledged that the political fundamentals expressed in § 1 might not yield "practically true or theoretically true" outcomes for every individual in a governed society. *Id.* at 955; *see id.* at 963–64 (observing "this grave *political idea* . . . is a truth too far in advance of the age").

Debate records also make clear that § 1 did not purport to describe the enforceable rights citizens held under "the laws of man," such as those retained after the 1851 Constitution's adoption. 1 *Debates of the Convention*, *supra*, at 959. The delegates understood civil government had the power to "restrain[]" citizens "from exercising the rights that naturally belong" to them. *Id.* at 967; *see id.* at 138 ("It is evident that it would not do to allow all men the unrestrained and unrestricted exercise of their natural rights"); *id.* at 305, 502, 701 (describing the Constitution itself as a restriction on natural rights). As John B. Howe observed, it would be a "misapprehension" to read § 1 as anything but an acknowledgment of rights held under the "laws of nature." *Id.* at 972–73. Section 1, he explained, did "not contravene the power of

36

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

man[,] . . . by the public or municipal laws of States, to divest other men of those rights." *Id.* at 973. Accordingly, § 1 cannot be read as a "self-executing provision . . . subject to judicial enforcement." *State v. Williams*, 728 N.E.2d 342, 354 (Ohio 2000) (addressing a similar Ohio constitutional provision); *see Shields v. Gerhart*, 658 A.2d 924, 929 (Vt. 1995) (holding a similar Vermont constitutional provision does not establish "any right amenable to legal enforcement" but lists "philosophical truisms").

The constitutional structure confirms § 1 is not enforceable. Section 1 "DE-CLARES" certain broad principles of government. By contrast, all other provisions in Article 1 state that Hoosiers "shall" have specific, enumerated rights, *see, e.g.*, Ind. Const. art. 1, § 2 ("All people shall be secured in the natural right to worship . . ."), § 3 ("No law shall . . . control the free exercise and enjoyment of religious opinions . . ."), § 4 ("No preference shall be given, by law, to any creed, religious society, or mode of worship . . ."), or "may" take specific actions, Ind. Const. art. 1, § 10 ("In all prosecutions for libel, the truth of the matters alleged . . . may be given in justification"). The textual differences between § 1's sweeping declarations of fundamental truths and the specific and mandatory language of §§ 2 to 37 are stark.

Reading § 1 as an enforceable provision, moreover, would wreak havoc on the constitutional structure. Treating § 1 as an enforceable right would permit litigants to circumvent the framers' deliberate choices about which rights to include in Article 1 and how to frame them. Litigants unsatisfied with the speech rights afforded by § 9 or search protections afforded by § 11 could simply invoke § 1's capacious reference to "life, liberty, and the pursuit of happiness" instead.

37

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

The consequences of treating § 1 as enforceable go well beyond its impact on Indiana's Bill of Rights. Section 1 says "the people have, at all times, an indefeasible right to alter and reform their government." Ind. Const. art. 1, § 1. If that were enforceable, constitutional provisions governing the process, *see* Ind. Const. art. 16, § 1, and timing of constitutional amendments, *see* Ind. Const. art. 4, § 9; *Holcomb v. Bray*, 187 N.E.3d 1268, 1277–84 (Ind. 2022), would be vitiated. Hoosiers could simply invoke their "indefeasible right" to alter their government "at all times." The only coherent way to read § 1 is as an unenforceable statement of political theory intended to guide courts' understanding of more specific, enforceable provisions.

Section 1 also says Hoosiers have an "inalienable" right to "life." But the Indiana Constitution has never been understood to prohibit the death penalty, even though Article 1, § 18 directs criminal penalties to be founded on "principles of reformation." *See, e.g.*, *Ritchie v. State*, 809 N.E.2d 258, 261 (Ind. 2004); *Judy v. State*, 275 Ind. 145, 416 N.E.2d 95, 105 (1981); *Driskill v. State*, 7 Ind. 338, 343 (1855); *Rice v. State*, 7 Ind. 332, 338 (1855). Besides, if a God-given "inalienable right" to "life" exists, would not unborn children also have that right? The trial court's decision offers no explanation of how § 1 can be construed to provide a judicially enforceable right to abortion while not also giving unborn children a judicially enforceable right to life.

Other difficulties with construing § 1 as judicially enforceable abound. Attempting to enforce § 1's capacious references to "life, liberty, and the pursuit of happiness" and "all power [being] inherent in the people" would place the judiciary in a

38

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

policymaking role contrary to separation-of-powers principles. Section 1 itself provides no "standard that c[an] be routinely and uniformly applied." *Doe v. O'Connor*, 790 N.E.2d 985, 991 (Ind. 2003). Plainly, "opinions as to what constitutes natural rights greatly differ, and if courts should assume the function of revising the acts of the legislature, on the ground that they invaded natural rights, a conflict would arise which could never end, for there is no standard by which the question could be finally determined." *Hedderich v. State*, 101 Ind. 564, 1 N.E. 47, 47–48 (1885).

This case illustrates that danger. The trial court conceded that "those who wrote our Constitution" did not believe it protected a right to abortion. App. II 37. In fact, they outlawed abortion. *Id.*; *see* pp. 15–17, *supra*. The trial court nonetheless ruled that § 1 protects abortion because *it* regarded abortion as a core value "by today's lights," App. II 37, even though Hoosiers' elected representatives have consistently rejected that view from the State's founding until now, including through S.B. 1's enactment, *see* pp. 15–20, *supra*. Permitting judicial enforcement of § 1 paves the way for individual judges to read into the Constitution whatever values they happen to like, without regard for traditional tools of constitutional interpretation.

The danger is particularly acute considering that § 1 describes not only "life" and "liberty" as "inalienable rights" but also "the pursuit of happiness." If § 1 were judicially enforceable, litigants would be able to "call the state to task for infringing the right to pursue happiness, which makes no sense within a traditional conception of ordered liberty." *Gerhart*, 658 A.2d at 929. "Happiness is such a broad concept that

39

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

no court could ever adequately protect every individual's happiness without transgressing the happiness of another." *Williams*, 728 N.E.2d at 354. This Court should not allow parties to use § 1 to circumvent deliberate choices about which constitutional powers to grant the State and which constitutional liberties to protect.

### B.   The overruled decisions cited by the trial court provide no persuasive reason for holding that § 1 is enforceable

The trial court's decision provides no persuasive reason for treating § 1 as judicially enforceable. The court nominally recognized that "interpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it." *Price*, 622 N.E.2d at 957; *see* App. II 34 ("a court must examine the language of the provision in light of the history surrounding the drafting and its ratification as well as its purpose"). But the trial court eschewed § 1's text, the constitutional structure, and ratification-era history.

The trial court instead cited *Beebe v. State*, 6 Ind. 501 (1855), and *Herman v. State*, 8 Ind. 545 (1855), which invalidated state liquor laws as contrary to common-law rights. App. II 34. More than a century ago in *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19 (1918), however, this Court repudiated *Beebe* and the "cases following" because it could not determine "on what principle the court was acting." 120 N.E. at 21. Every law, the Court observed, "is a restriction upon the common-law right of the individual citizen." *Id.* at 22 (quoting *Welsh v. State*, 126 Ind. 71, 25 N.E. 883, 885 (1890)). But "'the judicial department cannot hold'" void a statute that "'violates no provision of the federal or state Constitution,'" even if it is "repugnant to

40

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

general principles of justice, liberty, and rights not expressed in the Constitution."
*Id.* at 20, 22 (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)). *Beebe*, the
Court explained, had ignored that principle when it invalidated a liquor law, even
though neither it nor "any [other] decision of this Court" had identified a "particular
provision of the Constitution" that "forbids the prohibition of the manufacture and
sale of intoxicating liquor." *Id.*

The principles announced in *Schmitt* foreclose using § 1 to hold legislation un-
constitutional. As *Schmitt* explains, a court may declare a statute unconstitutional
only if violates a "particular provision of the Constitution." 120 N.E. at 22. It is not
enough to allege that the law offends "general principles of justice, liberty, and
rights." *Id.* at 20. Here, however, all that the plaintiffs allege is a violation of § 1's
general reference to "liberty." App. II 34; *see* App. II 89 ("By protecting the inalienable
right to liberty, Article 1, section 1 confers on Hoosiers the freedom to live their pri-
vate lives as they see fit, without unnecessary government interference."). That is
precisely the sort of "general principle[]" that *Schmitt* deemed insufficient for declar-
ing legislation unconstitutional.

 Holding that § 1 is judicially enforceable would require repudiating *Schmitt*
and many decisions since. Whatever the judicial philosophy might have been when
*Beebe* and *Herman* were decided, it is now firmly established that the State "may
subject persons and property to restraints and burdens" that "impair 'natural rights.'"
*Price*, 622 N.E.2d at 959 (quoting *Wiesenberger v. State*, 202 Ind. 424, 175 N.E. 238,

41

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

240 (1931)). Constitutional claims cannot be rooted in the "shifting sands of philosophical inquiry" but must "'have their origin in the express terms of the constitution or which are necessarily to be implied from those terms.'" *Id.* at 959 n.4 (quoting *O'Brien v. State*, 422 N.E.2d 1266, 1270 (Ind. Ct. App. 1981)); *see Sanchez v. State*, 749 N.E.2d 509, 516 (Ind. 2001) ("constitutional rights not grounded in a specific constitutional provision should not be readily discovered"). This Court should not sweep aside decades of precedent by transforming § 1 into a self-executing guarantee of whatever rights someone now believes are part of "life, liberty, and the pursuit of happiness."

## III.   Any Rights Secured by Article 1, § 1 of the Indiana Constitution Do Not Include a Right to Abortion

In no event does § 1 protect a right to abortion—a practice prohibited as criminal before, during, and after the adoption of Indiana's 1816 and 1851 Constitutions. The trial court's recognition of a novel abortion right rests on the unprecedented notion that judges can disregard constitutional limits that offend their sensibilities.

### A.   To the extent that § 1 secures any rights, it protects only rights with textual and historical support

This Court long ago rejected the view that the Indiana Constitution is "an elastic instrument of no particular rigidity, which stretches to meet the demands of the moment." *Finney v. Johnson*, 242 Ind. 465, 179 N.E.2d 718, 721 (1962). Instead, "[i]nterpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it." *State v. Katz*, 179 N.E.3d 431, 443 (Ind. 2022) (quoting *Price v.*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*State*, 622 N.E.2d 954, 957 (Ind. 1993)). Thus, when confronted with individual-rights claims under § 1, this Court has "examined *text* and *history* to determine . . . whether the *founding generation* would have considered" the asserted right to be "fundamental or 'natural.'" *Price*, 622 N.E.2d at 959 n.4 (emphasis added); *see City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 447, 450 (Ind. 2001).

In undertaking that textual and historical analysis, moreover, this Court has focused on the specific "type" of right asserted. *Katz*, 179 N.E.3d at 448; *see, e.g.*, *id.* at 448–50 (asking whether non-consensual expression involving "private, sexual activity" was protected, not expression generally); *Whittington v. State*, 669 N.E.2d 1363, 1370 (Ind. 1996) (distinguishing between speech "focuse[d] on the conduct of a private party" and "political" speech); *Price*, 622 N.E.2d at 959–61 & n.9 (asking whether pure "political speech" was protected, not "speech generally"). To establish that § 1 protects a right to abortion, it therefore is not enough to demonstrate that the founding generation valued liberty, autonomy, or privacy in some or even many contexts. Rather, "text" and "history" must demonstrate that the "founding generation" considered abortion specifically to be a protected core value. *Price*, 622 N.E.2d at 959 n.4; *see Doe v. Town of Plainfield*, 893 N.E.2d 1124, 1131–32 (Ind. Ct. App. 2008) (demanding evidence the founding generation specifically recognized a constitutional "right to enter public parks for legitimate purposes").

Requiring that particularized historical showing is critical to preserving the separation of powers. Section 1, unlike other provisions in Indiana's Bill of Rights,

43

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

provides no textual guideposts for determining what constitutes an enforceable inter-

est in "life, liberty, and the pursuit of happiness." The only way to prevent § 1 from

becoming a vehicle for amending the Constitution by judicial fiat is to examine "*text*

*and history* to determine whether a given interest is of such a quality that *the found-*

*ing generation* would have considered it fundamental or 'natural.'" *Price* 622 N.E.2d

at 959 n.4 (emphasis added). That is precisely why federal substantive due-process

decisions require a "'careful description' of the asserted fundamental liberty interest"

and a showing that it is "objectively, deeply rooted in this Nation's history and tradi-

tion." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted); *see*

*Chavez v. Martinez*, 538 U.S. 760, 775 (2003); *Kerry v. Din*, 576 U.S. 86, 93 (2015)

(Scalia, J., joined by Roberts, C.J., and Thomas, J.). Without an objective standard to

guide a § 1 analysis, "Indiana constitutional jurisprudence" would be cast upon the

uncertain, "shifting sands of philosophical inquiry." *Price*, 622 N.E.2d at 959 n.4.

### B.    No text or history supports a right to abortion

No text or history even remotely suggests that the framers of the 1816 or 1851

Constitutions recognized a right to abortion—and neither the trial court nor plaintiffs

have purported to identify any. Neither § 1 nor any other constitutional provision

mentions a right to abortion—or even a more general right to privacy or bodily au-

tonomy. And as the trial court conceded, "abortion was not lawful at the time the

Indiana Constitution was ratified." App. II 37.

Indeed, Indiana law has consistently treated abortion as a criminal act

throughout the State's existence. "At common law, abortion was criminal in at least

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

some stages of pregnancy and was regarded as unlawful and could have very serious

consequences at all stages." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228,

2248 (2022). Indiana expressly incorporated those prohibitions on abortion into its

own laws as early as 1807 with its common-law reception statute. *See* Act of Sept. 17,

1807, ch. 24, in Francis S. Philbrick, *Laws of the Indiana Territory 1801–1809*, at 323

(1930); 1818 Indiana Laws ch. LII, p. 308. And Indiana courts "followed" precedent

deeming an "unborn child" to have an independent, cognizable existence "without re-

gard to the state of gestation." *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 267

(1972) (quotation marks omitted).

The common law's prohibition of abortion cannot be brushed aside. Even in

*Beebe v. State*, 6 Ind. 501 (1855), the Court recognized that it is "important to ascer-

tain with some degree of precision what" interests rise to the level of an enforceable

right, and it stressed that only rights recognized by "the common law" could be judi-

cially enforced. *Id.* at 510–11; *see Herman v. State*, 8 Ind. 545, 557–58 (1855) (looking

to common-law authorities to determine with "precision" what the State may not pro-

hibit). More recent precedents demanding textual and historical evidence of a right

are even less tolerant of judicial efforts to secure novel rights under nebulous text.

Criminal statutes addressing abortion provide further proof that the founding

generation did not regard abortion as a protected core value. As early as 1835, Indi-

ana made it a criminal offense to "willfully administer to any pregnant woman, any

medicine, drug, substance or thing whatever," or to "use or employ any instrument or

other means whatever, with the intent thereby to procure the miscarriage of any such

45

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

woman, unless the same shall be necessary to preserve the life of such woman." 1835 Ind. Laws ch. XLVII, p. 66 § 3. That prohibition was in effect when the 1851 Constitution was drafted and ratified, and the legislature reenacted it with minor amendments a year after ratification. *See* Ind. Rev. Stat., pt. 1, ch. 6, § 36 (1852). No delegate at the convention or legislator in 1852 (seven of whom had been delegates) suggested that the State's abortion ban was inconsistent with its new Constitution.

To the contrary, the historical record shows that Hoosiers thought abortion laws did not go far enough. In 1859, Indiana expanded its abortion statute to prohibit a "druggist, apothecary, physician, or other person selling medicine" from selling any "medicine . . . known to be capable of producing abortion or miscarriage, with intent to produce abortion." 1859 Ind. Laws ch. LXXXVI, p. 469, § 2; *see also* 2 *Brevier Legislative Reports* 128 (1859) (resolving to examine "whether the crime of procuring abortion has a sufficient punishment under the Statutes—equal to the enormity of the offense"). In 1881, the legislature raised the penalty from a misdemeanor to a felony. *See* 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. And in 1905, the legislature made it a crime to "solicit" an abortion. 1905 Ind. Acts ch. 169, pp. 663–64, §§ 367–368. Those prohibitions remained in effect until the U.S. Supreme Court required Indiana to tolerate abortion as a matter of federal law in *Roe v. Wade*, 410 U.S. 113 (1973).

Even after *Roe*, moreover, Indiana did not accept abortion. It instead disclaimed any "constitutional right to abortion on demand." P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741. The State then continued to prohibit abortion to the extent possible under federal law, imposed stringent regulations on abortion clinics and physicians,

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

and after the U.S. Supreme Court returned authority to the States by overruling *Roe*, promptly reenacted a comprehensive ban. *See* pp. 17–20, *supra*. That history belies the notion that Hoosiers of any generation regarded abortion as a cherished core value. *See Katz*, 179 N.E.3d at 448, 450 (declining to recognize "[n]onconsensual pornography"—a practice prohibited by an "overwhelming majority of state legislatures"—as a core value without textual evidence (citations omitted)); *Town of Plainfield*, 893 N.E.2d at 1130–32 (declining to recognize a "right to enter public parks for legitimate purposes" without textual or historical evidence).

The mere fact that, in 2005, this Court deemed it "unnecessary to determine whether there is any right to privacy or abortion" does not suggest otherwise. *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 978 (Ind. 2005). *Brizzi* did not recognize an abortion right, and prior decisions never "even hinted" that abortion was a core value. *Id.* at 990 (Dickson, J., concurring). To the contrary, prior decisions upheld criminal convictions under Indiana's pre-*Roe* abortion laws. *See, e.g., Willey v. State*, 52 Ind. 421 (1876); *Adams v. State*, 48 Ind. 212 (1874); *Basset v. State*, 41 Ind. 303 (1872); *Carter v. State*, 2 Ind. 617 (1851). And this Court rejected a federal constitutional challenge to the law on the ground that both U.S. law generally and Indiana law specifically recognized a "valid and compelling" state interest in prohibiting abortion. *Cheaney*, 285 N.E.2d at 266–70; *accord Dobbs*, 142 S. Ct. at 2248–59. The Court could hardly have reached that conclusion if Indiana law regarded abortion as a protected core value.

47

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### C.   The trial court's unprecedented rationale for recognizing a novel right to abortion upends the judicial role

This Court's precedents demand textual and historical evidence that the "founding generation" would have recognized an asserted right. *Price*, 622 N.E.2d at 959 n.4. The trial court identified no such evidence and even admitted that "abortion was not lawful at the time the Indiana Constitution was ratified." App. II 37. The trial court instead took the unprecedented position that Indiana's constitutional text and history could be cast aside because the judge deemed "those who wrote our Constitution"—and the "1851 Constitution" itself—to have "significant . . . deficits" "by today's lights." *Id.*

That breathtaking rationale defies the Court's precedents. As this Court has explained, "[j]udges must enforce the Constitution as written and intended." *Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson*, 459 N.E.2d 715, 717 (Ind. 1984). No exception exists for provisions that strike a court as outmoded. The Constitution is not "an elastic instrument" that "stretches to meet the demands of the moment." *Finney*, 179 N.E.2d at 721. Courts thus must "examine[] *text* and *history* to determine whether the *founding generation*" would have recognized a right. *Price*, 622 N.E.2d at 959 n.4 (emphasis added). They have no warrant to declare a statute unconstitutional "which violates no provision of the . . . state Constitution." *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19, 22 (1918) (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)).

The trial court's repudiation of constitutional limits lacks any principled basis. Written constitutions exist to restrain *all* branches of government, courts included.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*See Bunker v. Nat'l Gypsum Co.*, 441 N.E.2d 8, 11 (Ind. 1982). The courts are "not a 'supreme legislature,'" empowered to "substitute [their] convictions as to the desirability or wisdom of legislation for those of our elected representatives." *Id.* (emphasis omitted) (quoting *Sidle v. Majors*, 264 Ind. 206, 341 N.E.2d 763, 766 (1976)). Disregarding that principle would leave all constitutional provisions vulnerable to changing fashions. Perhaps in days of sharp partisan conflict the founding generation's reverence for political speech will eventually strike some as a relic. *Cf. Price*, 622 N.E.2d at 961–63. Does that mean the judiciary may then curtail protections for speech on the theory that the Constitution, or those who wrote it, carried "deficits"?

Ultimately, the notion that judges can improvise to improve upon "constitutional . . . text enfeebles democratic policy," striking at written constitutionalism itself. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 4 (2012). "A system of democratically adopted laws cannot endure—it makes no sense—without the belief that words convey discernible meanings and without the commitment of legal arbiters to abide by those meanings." *Id.* at xxix.

The trial court's decision, moreover, offers no principled replacement for text and history. "[L]iberty," it says, "is an enormous concept," with some contemporary sources defining it as "the power to do as one pleases." App. II 34 (citation omitted). Obviously, the term "liberty" in § 1 cannot confer a right "to do as one pleases"—no law could survive such an expansive definition. But the trial court's decision offers no principle for deciding what "liberty" should encompass, or why only women have a "liberty" right and not their unborn children. The decision below does not even offer

49

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

criteria for determining what might fall within a less expansive right to "self-deter-

mination," "bodily autonomy," or "privacy." How is a court supposed to decide whether

prohibitions on assisted suicide, *see* Ind. Code § 35-42-1-2.5, recreational drugs, *see*

Ind. Code § 35-48-4-7, or driving without a seatbelt, *see* Ind. Code § 9-19-10-2, infringe

on those putative rights? The decision below offers no answers.

On its own terms, the trial court's rationale cannot withstand even superficial

inquiry. The trial court faulted "those who wrote our Constitution" for denying "[m]ar-

ried women . . . property rights" and "people of color . . . the right to vote." App. II 37.

But it identified no evidence suggesting that Indiana's longstanding prohibition on

abortion had anything to do with those issues. In fact, abortion historically has been

used to "implement[] . . . discriminatory preferences," including against people of color

and women. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1790

(2019) (Thomas, J., concurring); *see id.* at 1787–91 (Thomas, J., concurring).

Nor could the trial court explain why Indiana continued to ban abortion long

after the issues it identified were addressed. *See* Ind. Const. art. 2, § 5 (repealed Mar.

14, 1881); *Rosa v. Prather*, 103 Ind. 191, 2 N.E. 575, 578 (1885) (observing the "most

notable" disabilities of married women, including a woman's "inability to enter into a

contract" and "to control her own property," had been "removed" by statute). The only

plausible explanation is that a majority of Hoosier voters and their elected represent-

atives have *never* considered abortion as a core value. Embracing the trial court's

theory would require declaring that Hoosiers of every generation—including the cur-

rent one—have "deficits" so "significant" that their views must be disregarded.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### D. Generic statements about liberty and autonomy cannot support a right to abortion

1. In rejecting the framers' view that no right to abortion existed, the trial court invoked a handful of this Court's decisions it construed to elevate "self-determination," "bodily autonomy," and "privacy." App. II 35–37. As this Court's precedents make clear, however, rights cannot be defined at so high a level of generality. Instead, the question is whether the framing generation recognized the specific asserted right. *See Price*, 622 N.E.2d at 959 n.4, 960–61; *Town of Plainfield*, 893 N.E.2d at 1131–32. Even when addressing speech—a right the Constitution expressly protects—this Court has demanded evidence that the specific "type" of expression at issue is within Article 1, § 9's core. *Katz*, 179 N.E.3d at 447; *see, e.g.*, *id.* at 448–50 (asking about nonconsensual pornography, not expression generally); *Whittington*, 669 N.E.2d at 1370 (distinguishing between speech "focuse[d] on the conduct of a private party" and "political" speech); *Price*, 622 N.E.2d at 961 (asking about right to "pure political speech," not speech generally). The generic statements the trial court invoked regarding "self-determination, "bodily autonomy," and "privacy"—terms that appear nowhere in the Constitution—cannot show abortion is a protected core value.

The breadth of the concepts "self-determination," "bodily autonomy," and "privacy" illustrates why the Court must focus on whether abortion itself is protected. "Self-determination" and "bodily autonomy" are concepts so capacious that nearly any law—including drug laws, seatbelt laws, truancy laws—will infringe on someone's concept of those terms. And "privacy" (a relatively "new" concept foreign to the fram-

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

ers, *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 684 (Ind. 1997)) could potentially encompass any activity occurring outside of public view, from taking family pictures, to cultivating marijuana, to making child pornography. Treating any state law that affects self-determination, autonomy, or privacy as infringing a core value would make it impossible for the State to "exercise its police power to promote the health, safety, comfort, morals, and welfare of the public." *Price*, 622 N.E.2d at 959.

As this Court has recognized, moreover, a "fundamental distinction" exists between abortion and other putative liberty, autonomy, and privacy interests. *Cheaney*, 285 N.E.2d at 269. "Abortion," as even its proponents have recognized, "is a unique act . . . fraught with consequences for others." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). "What sharply distinguishes the abortion right" from other putative interests is that "[a]bortion destroys" what even abortion apologists call "potential life" and what Indiana, through S.B. 1, regards as an unborn child. *Dobbs*, 142 S. Ct. at 2258; *see Cheaney*, 285 N.E.2d at 269 (explaining the difference between contraceptives and abortion is "the difference between prevention and destruction"); App. II 212–18 (explaining how abortion arguments diverges from patient-autonomy and -integrity arguments in medical ethics); App. III 6–9 (explaining how a harm-to-others principles justifies prohibiting abortion as an ethical and policy matter). That "valid and compelling" interest in protecting unborn children is why this Court recognized decades ago that the State may ban abortion. *Cheaney*, 285 N.E.2d at 270.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

2.     Regardless, the trial court's theory of a constitutional right to "self-determination," "bodily autonomy," or "privacy" fails on its own terms. None of the decisions the trial court cited recognizes such a capacious right. At most, *Beebe* and *Herman* stand for the proposition that legislation cannot infringe some unwritten "common law" rights. *Beebe*, 6 Ind. at 510–11; *see Herman*, 8 Ind. at 557–58 (looking to common-law authorities to determine what the legislature may and may not prohibit). But the common law never recognized a right to abortion; it regarded abortion as "criminal" after quickening and as "unlawful" at every stage of pregnancy. *Dobbs*, 142 S. Ct. at 2248. And more than a century ago this Court overruled *Beebe* and *Herman*—a development that the trial court ignored—explaining that they were unprincipled exercises of judicial will bereft of constitutional support. *See Schmitt*, 120 N.E. at 21–23.

*In re Lawrance*, 579 N.E.2d 32 (Ind. 1991), recognizes no right to self-determination either. *Lawrance* concerned Indiana's Health Care Consent Act, not the Constitution. *See id.* at 37, 39. Although *Lawrance* mentioned § 1 in passing, it never held that § 1 secures enforceable rights. *Lawrance* merely observed that "those who wrote the constitution believed that liberty included the opportunity to manage one's own life *except* in those areas yielded up to the body politic." *Id.* at 39 (emphasis added). That observation, however, provides no insight into which rights were retained and which were yielded to the body politic. *See Town of Plainfield*, 893 N.E.2d at 1131–32. As this Court later explained, answering that question requires looking to "text and history." *Price*, 622 N.E.2d at 959 n.4 (citing *Lawrance*, 579 N.E.2d at 39).

53

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

The only other decision that the trial court identified as supporting the exist-

ence of a right to "privacy," App. II 36, is even further afield. In *Pirtle v. State*, 263

Ind. 16, 323 N.E.2d 634 (1975), this Court "h[e]ld that a person who is asked to give

consent to search while in police custody is entitled to the presence and advice of

counsel prior to making the decision whether to give such consent." 323 N.E.2d at

640. It nowhere mentioned abortion or recognized a general privacy right. Instead,

this Court merely observed that a Fourth Amendment violation invades "the privacy

of a person or his property." *Id.* at 642. That the trial court could not identify a single

decision holding there is a right to privacy, much less abortion, speaks volumes.

3.     Other problems attend the trial court's attempt to make this case about

"self-determination," "autonomy," or "privacy." As the trial court recognized, App. II

36, this Court's material-burden analysis requires a court to ask whether "the right,

as impaired, would no longer serve the purpose for which it was designed," *Price*, 622

N.E.2d at 960 n.7; *see id.* at 960. Here, however, the trial court refused to commit to

whether the "right" S.B. 1 allegedly impairs is "a privacy right, a right to bodily au-

tonomy, a right of self-determination, a bundle of liberty rights, or [a right known] *by*

*some other appellation*." App. II 37 (emphasis added). That refusal to identify the

right at stake renders the trial court's statement that S.B. 1 materially burdens the

right groundless. A court cannot conclude that a law frustrates the "purpose for which

[a right] was designed" without first identifying the right at issue. *Cf. Katz*, 179

N.E.3d at 448 ("we first look to the type of expression at issue").

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Nor does it follow that S.B. 1 materially burdens a "bundle of liberty interests," "a right of self-determination," or any of the other putative rights on the trial court's list. As discussed above, liberty, self-determination, autonomy, and privacy potentially encompass huge swaths of human conduct. *See* pp. 49–50, *supra*. Every voluntary choice potentially constitutes an exercise in self-determination; every activity occurring inside a private residence or physician's office potentially falls within "privacy" (at least under the challengers' view). S.B. 1, however, regulates only a single, narrow activity: abortion. S.B. 1 does not plausibly "alienate"—rather than merely "qualify"—the right at stake if the question is whether Hoosiers still enjoy liberty, autonomy, or privacy on a whole. *Price*, 622 N.E.2d at 960.

*Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973 (Ind. 2005), does not establish otherwise. There, this Court assumed a "woman's right to terminate her pregnancy"—a far narrower interest than an undifferentiated interest in self-determination, bodily autonomy, or privacy. *Id.* at 982; *see id.* 984 (same).

Indeed, while invoking *Brizzi*, the trial court made no serious attempt to apply it. The trial court faulted S.B. 1 for requiring any permitted abortions to be performed at hospitals and ambulatory surgical centers because that would reduce "availability" of abortions and increase "cost." App. II 38. The *Brizzi* majority, however, expressly rejected arguments that an abortion regulation "increas[ing] the cost of care" materially burdened any abortion right, even though the regulation might cause "*many* women" to "travel to other states to obtain abortions," "carry pregnancies to term," or "seek alternatives to legal abortions." 837 N.E.2d at 981 (citation omitted).

55

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

4.     As a last-ditch effort, the trial court mentioned that some courts in other

States have found a right to abortion under *their* constitutions. App. II 41. But those

decisions cannot justify the trial court's disregard for the Indiana Constitution's text,

structure, and history. Whatever other state courts have done, "an interpretation of

Indiana's Constitution" must ultimately be "conducted independently." *Hoagland v.*

*Franklin Twp. Cmty. Sch. Corp.*, 27 N.E.3d 737, 741 (Ind. 2015).

In that regard, the trial court made no attempt to explain why decisions from

other States are persuasive. Without analysis, it cited three out-of-state trial-court

decisions—mentioned for the first time in a reply filed the day before the hearing.

App. II 41. It, however, did not even acknowledge that each relied in whole or part on

constitutional provisions nothing like § 1—the only provision at issue in this case.

*See, e.g.*, App. III 106–07 (invoking Ohio's "Health Care Freedom Amendment"); App.

III 124–26 (invoking "due process"); App. III 171 (invoking "equal protection").

Nor did the trial court acknowledge that other courts have rejected its views.

As pointed out below, several state courts have rejected the trial court's view that

constitutional provisions with language similar to § 1 create judicially enforceable

rights. *See, e.g.*, *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*,

975 N.W.2d 710, 743 n.23 (Iowa 2022); *State v. Williams*, 728 N.E.2d 342, 352 (Ohio

2000); *Shields v. Gerhart*, 658 A.2d 924, 928–29 (Vt. 1995); *Sepe v. Daneker*, 68 A.2d

101, 105 (R.I. 1949). And still more have rejected arguments that generic references

to liberty in state constitutions protect abortion. *See, e.g.*, *Planned Parenthood of the*

*Heartland*, 975 N.W.2d at 740–42; *Mahaffey v. Att'y Gen.*, 564 N.W.2d 104, 109–11

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

(Mich. Ct. App. 1997) (per curiam); *cf. EMW Women's Surgical Ctr., P.S.C. v. Cameron*, No. 2022-SC-0326-I, 2022 WL 3641196, at *1 (Ky. Aug. 18, 2022) (declining to stay enforcement of state law "effectively outlaw[ing] abortion"). Recently, for example, the Iowa Supreme Court held that its constitution's "silen[ce]" on abortion and Iowa's long history of banning abortion demonstrated that no right to abortion existed. *Planned Parenthood of the Heartland*, 975 N.W.2d at 739–40.

### E.    S.B. 1 is a permissible exercise of police power

In the absence of a core constitutional right to abortion, the General Assembly is entitled to exercise its police power to ban abortion—just as it did before *Roe*. Abortion terminates the existence of what science shows to be a distinct "living human being" with the capacity to think, feel, hear, move, and "direct[] *its own* development." App. II 187–88; *see* App. II 188–96. Usually, around or shortly after the woman becomes aware of her pregnancy, an unborn child's brain will have begun to develop and the child will have a heartbeat. App. II 188–89. And an unborn child will start moving, practicing breathing, engaging in complex behaviors, feeling pain, hearing sounds, and much more—all within 14 weeks of fertilization. App. II 189–93. In short, unborn children, being human beings, have all the *characteristics* of a human being— many of them acquired in the earliest stages of pregnancy.

As this Court has recognized, the State has a "valid and compelling" interest in protecting unborn children who are, "at the very least, from the moment of conception a living being and potential human life." *Cheaney*, 285 N.E.2d at 270. Protecting unborn human beings is consistent with traditional views of ordered liberty, which

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

allows restrictions on liberty to prevent harm to others, and the longstanding, majority view of medical ethicists that physicians should not intentionally kill humans. *See* App. II 208–19; App. III 5–9. The argument that an unfettered right to abortion exists "pretend[s]" that the unborn have "no competing interest" that can justify abortion restrictions. App. III 9; *see* App. III 6–9; App. II 212–14. As even the trial court conceded, "the State has an interest in regulating abortion so long as that regulation is not in violation of the Indiana Constitution." App. II 40; *see* App. II 37.

## IV.   The Lack of Irreparable Harm and the State's Significant Interest in Protecting Unborn Children Preclude a Preliminary Injunction

Not only do the challengers here have no likelihood of success on the merits, but the remaining requirements for injunctive relief are lacking. A preliminary injunction is "an extraordinary equitable remedy that should be granted in rare instances" only. *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011) (internal quotation marks omitted). An injunction may only issue where "remedies at law are inadequate," the threatened injury to the party seeking an injunction outweighs the potential harm to others, and the public interest favors injunctive relief. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008). A trial court's weighing of those considerations is reviewed for abuse of discretion. *Econ. Freedom Fund*, 959 N.E.2d at 800. An abuse "occurs when the trial court misinterprets the law." *Id.* Such an abuse occurred here.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### A.  No irreparable harm will occur absent a preliminary injunction

The trial court ruled that legal remedies were inadequate solely on the theory that a § 1 violation constitutes "*per se* irreparable harm." App. II 40. But this Court has never held that *all* legal violations automatically inflict irreparable harm; any such a rule would collapse the preliminary-injunction test from four factors to three. *See Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 & n.3 (Ind. 2002). And although "a relaxed standard may sometimes be applied for clear, uncontested unlawful conduct," this Court has stated that a relaxed standard is "'*only* proper'" for cases involving "*clearly unlawful*" conduct "*against the public interest*." *Id.* at 162 (emphasis added) (quoting *Union Twp. Sch. Corp. v. State ex rel. Joyce*, 706 N.E.2d 183, 192 (Ind. Ct. App. 1998)). S.B. 1—which is consistent with abortion restrictions at the time of the Constitution's ratification, contravenes no express constitutional guarantee, and furthers a compelling state interest in protecting unborn children who cannot protect themselves—falls well outside any per se rule.

That the plaintiffs do not allege a violation of their own legal rights further weakens any assertion of irreparable injury. Whether or not "plaintiffs have *standing* to raise the injury claims of their clients and patients," App. II 40 (emphasis added), a requirement for a preliminary injunction is that "the *movant's* remedies at law are inadequate," *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003) (emphasis added); *see Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005) ("alleged harm to third parties did not provide plaintiff a basis for a preliminary injunction"); *CMM Cable Rep., Inc. v. Ocean Coast Props.*,

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties"). That requirement makes sense: A preliminary injunction is an "extraordinary" remedy intended to prevent irreparable harm occurring before trial. *Econ. Freedom Fund*, 959 N.E.2d at 801; *see Mich. Coal. of State Emp. Unions v. Mich. Civ. Serv. Comm'n*, 634 N.W.2d 692, 699–701 (Mich. 2001). Where a litigant asserts the rights of unidentified, absent parties, however, there can be no assurance that injunctive relief is required.

### B.   The compelling public interest in protecting unborn children from destruction militates against injunctive relief

The balance of harms and public interest preclude injunctive relief as well. As the trial court admitted, there are significant state interests in regulating abortion, including "protection of maternal health, preserving fetal life, maintaining societal ethics, promulgating medical ethical standards, and creating bright line rules distinguishing between infanticide and lawful abortion." App. II 37. It nonetheless deemed a preliminary injunction proper because "Indiana women and girls" face "*potential* constitutional deprivations." App. II 40 (emphasis added); *see* App. II 41 (similar). In *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265 (1972), however, this Court held that the State's "valid and compelling" interests would justify a ban on abortion *even if* a "certain right to privacy does exist." 285 N.E.2d at 267, 270. An "unborn child," the Court observed, has "certain rights" that "the state may protect." *Id.* at 269. *Cheaney* thus makes clear that, when "balancing" the interests of women against those of unborn children, the balance favors the State's abortion ban. *Id.* at 269–70.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Cheaney*'s observation is consistent with traditional legal and ethical views. Abortion irreversibly terminates an unborn child's life—an act the unborn child is powerless to prevent. "[T]reating human beings in the fetal stage with the basic respect of not intentionally killing them" "aligns with centuries of medical tradition," App. II 219; *see* App. II 208–19; finds "ample support in the history of American public bioethics," App. III 5; *see* App. III 7–9; and accords with the traditional legal view that "abortion kills a human being," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022); *see id.* at 2249–56. It is no answer to say that some women who want abortions might face difficulties, financial or otherwise. Should a pregnancy threaten a woman's life or pose a serious health risk, abortion remains an option. *See* Ind. Code § 16-34-2-1(a)(1), (3). As centuries of tradition reflect, the State's compelling interest in preventing intentional destruction of human life outweighs impacts that do not rise to the level of seriously threatening life or health.

Without addressing *Cheaney*, the trial court observed that less stringent abortion regulations were in place "for nearly fifty years." App. II 41. But the mere fact that the law once imposed different requirements does not show there is a public interest in permitting abortion. For one thing, pre-S.B. 1 abortion laws were enacted under protest "to conform" to now-overruled "U.S. Supreme Court decisions" requiring Indiana to tolerate abortion. P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741. They do not show there is a public interest in allowing abortion. For another, it is not the courts' role to second guess "our elected representatives'" determinations as to where the public interest lies. *Bunker v. Nat'l Gypsum Co.*, 441 N.E.2d 8, 11 (Ind. 1982)

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

(quoting *Sidle v. Majors*, 264 Ind. 206, 341 N.E.2d 763, 766 (1976)); *see Avemco Ins.*

*Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 121 (Ind. Ct. App. 2004) ("The laws

promulgated by the General Assembly reflect its determination of what is in public

interest."). As *Cheaney* stated, abortion regulation is a "legislative function and

properly outside the ambit of the judiciary." 285 N.E.2d at 269.

## CONCLUSION

The trial court's grant of a preliminary injunction should be reversed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

By:   /s/ Thomas M. Fisher
      THOMAS M. FISHER
      Solicitor General
      Attorney No. 17949-49

Office of the Attorney General                  JAMES A. BARTA
IGC South, Fifth Floor                          Deputy Solicitor General
302 W. Washington Street                        Attorney No. 31589-49
Indianapolis, IN 46204
Phone:  (317) 232-6255                          MELINDA R. HOLMES
Fax:  (317) 232-7979                            Attorney No. 36851-79
Email:  Tom.Fisher@atg.in.gov                   Deputy Attorney General

*Counsel for Appellants*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF WORD COUNT

I verify that this brief contains 13,953 words.


<u>/s/ Thomas M. Fisher</u>
Thomas M. Fisher
Solicitor General

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2022, I electronically filed the foregoing document using the Indiana E-filing System (IEFS). I also certify that on November 2, 2022, the foregoing document was served upon the following persons using the IEFS:

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Jared M. Schneider
400 West Seventh Street, Suite 105C
Bloomington, IN 47404
Jared@schneiderpc.com

Paul Benjamin Linton
921 Keystone Ave.
Northbrook, IL 60062
pblconlaw@aol.com

Zechariah D. Yoder
Adler Attorneys
136 South 9th Street
Noblesville, IN 46060
zech@noblesvilleattorney.com

Carlos Federico Lam
Lam Law Office
P.O. Box 20267
Indianapolis, IN 46220-0267
lamlawindy@gmail.com

/s/ Thomas M. Fisher
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov