**EXHIBIT B**

IN THE
INDIANA COURT OF APPEALS

_____

No. 22A-PL-02938

_____

| | |
|---|---|
| THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, et al., | Interlocutory Appeal from the Marion Superior Court, |
| Appellants, | Trial Court Case No. 49D01-2209-PL-031056, |
| v. | The Honorable Heather A. Welch, Judge. |
| ANONYMOUS PLAINTIFF 1, et al., | |
| Appellees. | |

**BRIEF OF APPELLANTS**

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
Tel:  (317) 232-6255
Fax: (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
RAZI S. LANE
Attorney No. 37798-49
Deputy Attorneys General

*Counsel for Appellants*

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. 4

STATEMENT OF THE ISSUES .......................................................... 9

STATEMENT OF THE CASE .............................................................. 10

STATEMENT OF FACTS ................................................................... 10

I.    Regulation of Abortion in Indiana................................................ 10

      A.  The Science and Secular Ethics of Fetal Development and
          Abortion................................................................................ 10

      B.  Indiana's Restrictions on Abortion ...................................... 12

II.   Plaintiffs Challenge S.B. 1 on Religious-Exercise Grounds ........... 15

           A.  Complaint and demand for relief ................................... 15

           B.  Named plaintiffs ........................................................... 16

                1.  Anonymous Plaintiff 1 ........................................... 16

                2.  Anonymous Plaintiff 2 ........................................... 17

                3.  Anonymous Plaintiff 3 ........................................... 18

                4.  Anonymous Plaintiffs 4 and 5................................. 19

                5.  Hoosier Jews for Choice ........................................ 21

           C.  Preliminary Injunction ................................................. 21

      SUMMARY OF THE ARGUMENT ................................................ 24

      ARGUMENT ............................................................................... 29

      I.    The Court Lacks Jurisdiction To Hear These Claims................ 29

            A.  Hoosier Jews for Choice lacks standing to assert its members'
                RFRA claims against S.B. 1............................................ 29

            B.  None of plaintiffs' claims is ripe for review...................... 33

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

1. No plaintiff asserts facts necessary to review whether S.B. 1 substantially burdens sincere religious exercise ..................... 34

2. No plaintiff presents facts necessary to undertake individual compelling-interest inquiry ....................................... 40

3. This is an as-applied challenge, but the trial court improperly applied ripeness standards for facial challenges .................... 41

II.   Notwithstanding RFRA, the State May Enforce S.B. 1 Even Where an Abortion Is Motivated By a Sincere Religious Belief ............... 42

A. The record shows that neither abortion nor plaintiffs' birth control practices carry religious significance for these plaintiffs .................... 42

B. S.B. 1 is the least restrictive means of furthering the State's compelling interest in protecting unborn human lives ........................ 48

1. The State's compelling interests justify any burden on the plaintiffs' religious exercise ....................................... 48

2. S.B. 1 is the least restrictive means to achieve the State's compelling interests ................................................ 52

III.  The Plaintiffs Failed to Demonstrate the Remaining Preliminary Injunction Factors Favor Injunctive Relief .................................. 57

A. Irreparable harm ................................................................ 57

B. The balance of harms and public interest weigh against injunctive relief ......................................................................... 59

C. The requested relief exceeds the remedies RFRA authorizes and fails to meet Trial Rule 65(D)'s requirements ....................... 61

CONCLUSION ................................................................................... 62

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

# TABLE OF AUTHORITIES

CASES

*Abington Sch. Dist. v. Schempp,*
  374 U.S. 203 (1963) ........................................................................ 32

*Ackerman v. Washington,*
  16 F.4th 170 (6th Cir. 2021) .................................................... 26, 43

*Adkins v. Kaspar,*
  393 F.3d 559 (5th Cir. 2004) ......................................................... 43

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.,*
  13 F.4th 531 (6th Cir. 2021) .......................................................... 30

*Avemco Ins. Co. v. State ex rel. McCarty,*
  812 N.E.2d 108 (Ind. Ct. App. 2004) ....................................... 28, 60

*Baranowski v. Hart,*
  486 F.3d 112 (5th Cir. 2007) ......................................................... 43

*Barr v. City of Sinton,*
  295 S.W.3d 287 (Tex. 2009) ..................................................... 31, 35

*Bd. of Comm'rs of Union Cnty. v. McGuinness,*
  80 N.E.3d 164 (Ind. 2017) ........................................................ 25, 30

*Bd. of Comm'rs v. Ne. Ind. Bldg. Trades Council,*
  954 N.E.2d 937 (Ind. Ct. App. 2011) ............................................ 30

*Blattert v. State,*
  190 N.E.3d 417 (Ind. Ct. App. 2022) ...................................... *passim*

*Box v. Planned Parenthood of Ind. & Ky., Inc.,*
  139 S. Ct. 1780 (2019) ................................................................... 51

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) .................................................................. *passim*

*Central Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health
  & Mental Hygiene,*
  763 F.3d 183 (2d Cir. 2014) .......................................................... 55

*Cheaney v. State,*
  285 N.E.2d 265 (Ind. 1972) ..................................................... *passim*

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993) .................................................................. 52, 53, 55

*Civil Liberties for Urb. Believers v. City of Chicago*,
    342 F.3d 752 (7th Cir. 2003) ................................................. 43

*Crossman Cmtys., Inc. v. Dean*,
    767 N.E.2d 1035 (Ind. Ct. App. 2002)........................................ 27, 59

*Daugherty v. Allen*,
    729 N.E.2d 228 (Ind. Ct. App. 2000)................................................ 58

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ....................................................................*passim*

*Doe v. Rokita*,
    54 F.4th 518 (7th Cir. 2022) ............................................................ 51

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) ........................................................... 58

*Employment Div., Dep't of Human Res. v. Smith*,
    494 U.S. 872 (1990) ......................................................................... 43

*Foundations of E. Chi., Inc. v. City of East Chicago*,
    927 N.E.2d 900 (Ind. 2010) ......................................................... 24, 25

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ................................................................. 55, 56

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ....................................................................... 51

*Gonzalez v. O Centro Espirita Beneficente Uniao de Vegetal*,
    546 U.S. 418 (2006) ...................................................................*passim*

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends
    v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
    16 F.4th 67 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022) .......................... 44

*Harris v. McRae*,
    448 U.S. 297 (1980) ...................................................................*passim*

*Holcomb v. Bray*,
    187 N.E.3d 1268 (Ind. 2022) ............................................. 29, 34, 41, 42

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Horner v. Curry,*
    125 N.E.3d 584 (Ind. 2019) ............................................................ 29, 34

*Hunt v. Wash. State Apple Advertising Comm'n,*
    432 U.S. 333 (1977) ............................................................................ 30

*Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.,*
    643 N.E.2d 331 (Ind. 1994) .......................................... 25, 34, 39, 40

*Ind. Family Inst. Inc. v. City of Carmel,*
    155 N.E.3d 1209 (Ind. Ct. App. 2020) .......................................... 34

*In re Ind. Newspapers v. Junior Achievement of Central Ind.,*
    963 N.E.2d 534 (Ind. Ct. App. 2013) ............................................ 23

*Ind. Pacers L. P. v. Leonard,*
    436 N.E.2d 315 (Ind. Ct. App. 1982) ............................................ 58

*Indiana Fam. & Soc. Servs. Admin. v. Walgreen Co.,*
    769 N.E.2d 158 (Ind. 2002) ...................................................... 27, 58

*McGowan v. Maryland,*
    366 U.S. 420 (1961) ............................................................................ 52

*Ex parte Phillips,*
    287 So.3d 1179 (Ala. 2018) .............................................................. 49

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
    134 S. Ct. 506 (2013) ........................................................................ 60

*Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State,*
    975 N.W.2d 710 (Iowa 2022) .......................................................... 48

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ...................................................................*passim*

*Planned Parenthood v. Carter,*
    963 N.E.2d 853 (Ind. Ct. App. 2006) ............................................ 23

*Roe v. Wade,*
    410 U.S. 113 (1973) ...................................................................*passim*

*Save the Valley, Inc. v. Ind.-Ky. Elec. Corp.,*
    820 N.E.2d 677 (Ind. Ct. App. 2005) ............................................ 30

*Schloss v. City of Indianapolis,*
    553 N.E.2d 1204 (Ind. 1990) ..................................................... 29, 42

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*State v. Merrill*,
    450 N.W.2d 318 (Minn. 1990) ................................................................ 48

*State v. Econ. Freedom Fund*,
    959 N.E.2d 794 (Ind. 2011) ............................................................ 42, 61

*Texas v. United States*,
    523 U.S. 296 (1988) .......................................................................... 34

*Thomas v. Review Bd. of. Ind. Emp. Security Div.*,
    450 U.S. 707 (1981) .......................................................................... 47

*Tilley v. Roberson*,
    725 N.E.2d 150 (Ind. Ct. App. 2000) ..................................................... 58

*Tyms-Bey v. State*,
    69 N.E.3d 488 (Ind. Ct. App. 2017) ...................................................... 53

*United States v. Affleck*,
    765 F.2d 944 (10th Cir.1985) .............................................................. 35

*United States v. Bauer*,
    84 F.3d 1549 (9th Cir. 1996) .............................................................. 36

*United States v. Christie*,
    825 F.3d 1048 (9th Cir. 2016) ........................................................ 40, 53

*United States v. Grady*,
    18 F.4th 1275 (11th Cir. 2021) ........................................................... 53

*United States v. Quaintance*,
    315 Fed. App'x 711 (10th Cir. 2009) ..................................................... 35

*United States v. Quaintance*,
    608 F.3d 717 (10th Cir. 2010) ............................................................. 35

*Wagler Excavating Corp. v. McKibben Const., Inc.*,
    679 N.E.2d 155 (Ind. Ct. App. 1997) ......................................... 27, 57, 58

*Whole Woman's Health v. Hellerstedt*,
    579 U.S. 582 (2016) .......................................................................... 30

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .......................................................................... 53

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## STATUTES

1835 Ind. Laws ch. XLVII, p. 66, § 3 ............................................................ 12

1859 Ind. Laws ch. LXXXVI, p. 469, § 2 ..................................................... 12

1995 Ind. P.L. 187-1995 ............................................................................... 13

2014 Ind. P.L. 98-2014 ................................................................................. 13

2016 Ind. P.L. 213-2016 ............................................................................... 13

1881 Ind. Acts, Chapter 37, p. 177, §§ 22–23 ............................................. 12

Ind. Code § 16-18-2-327.9 ............................................................................ 14

Ind. Code § 16-34-2-1 ...................................................................... 9, 14, 15, 60

Ind. Code § 16-34-2-3 ................................................................................... 15

Ind. Code § 34-13-9-7 ................................................................................... 29

Ind. Code § 34-13-9-8 .............................................................................*passim*

Ind. Code § 34-13-9-10 ..................................................................... 28, 39, 40, 61

Ind. Code § 35-1-58-1 (1971) ....................................................................... 12

P.L. 1973 Ind. Acts, pp. 1743–46 No. 322, § 1, 2 ....................................... 13

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF THE ISSUES

S.B. 1 criminalizes the performance of abortions in most cases except where a pregnancy seriously endangers the mother's health or life, the pregnancy is the result of rape or incest, or the fetus has a lethal anomaly. Ind. Code § 16-34-2-1. The plaintiffs in this case—five women and an organization—have challenged S.B. 1 on the grounds that it "substantially burdens" their "religious exercise" under Indiana's Religious Freedom Restoration Act, while failing to be the "least restrictive means" of furthering a "compelling government interest." Ind. Code § 34-13-9-8. None of the plaintiffs is pregnant; even if pregnant, none would be certain to have an abortion; even if one or more would have an abortion, none would *necessarily* be motivated by religious beliefs. Still, the trial court granted the plaintiffs a preliminary injunction, ruling, among other things, that the State lacks a compelling interest in protecting fetal life before viability. The trial court's order gives rise to three issues for review:

1.      Whether Indiana courts lack jurisdiction to hear these claims because plaintiffs cannot assert existing or imminent direct injury giving rise to ripe justiciable claims under the Religious Freedom Restoration Act.

2.      Whether, notwithstanding the Religious Freedom Restoration Act, Indiana may prohibit an abortion where a woman concludes that her religious beliefs permit or even require her to have an abortion.

3.      Whether plaintiffs failed to demonstrate that an injunction will prevent certain harm to their religious exercise.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF THE CASE

On September 8, 2022, Anonymous Plaintiffs 1-5 and Hoosier Jews for Choice filed suit in Marion County against the Individual Members of the Licensing Board of Indiana, the Lake County Prosecutor, Marion County Prosecutor, Monroe County Prosecutor, St. Joseph County Prosecutor, and Tippecanoe County Prosecutor (collectively, the State), challenging Senate Bill 1 (S.B. 1) under Indiana's Religious Freedom Restoration Act (RFRA), Ind. Code § 34-13-9-0.7, *et seq*. App. II 60. The plaintiffs contemporaneously moved for a preliminary injunction barring enforcement of S.B. 1 against them. App. II 87.

On December 2, 2022, the trial court granted plaintiffs' preliminary-injunction motion, enjoining state officials from enforcing S.B. 1 against the plaintiffs on the ground that it substantially burdens their religious exercise without furthering a compelling government interest. App. II 59. The State filed its notice of appeal and moved for immediate transfer to the Indiana Supreme Court on December 9, 2022. The Indiana Supreme Court has not ruled on that motion.

## STATEMENT OF FACTS

### I.   Regulation of Abortion in Indiana

#### A. The Science and Secular Ethics of Fetal Development and Abortion

Abortion at any time after fertilization is the intentional termination of an unborn human being. Dr. Tara Sander Lee, a biochemist and researcher with over twenty years of experience in academic and clinical medicine, says "[a] living human being, unique from all other persons, is created at fertilization when a man's sperm

10

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

combines with a woman's egg inside the fallopian tube." App. II 203 (Declaration of Dr. Tara Sander Lee). Dr. Farr Curlin, a licensed physician and bioethics professor at Duke University, says "whether or not a particular person believes that the life of a human organism begins at conception (fertilization of the egg), the scientific consensus is that it does. "App. III 7 (Declaration of Dr. Farr Curlin).

Fertilization occurs when a male's sperm combines with a female's egg, resulting in a "single-celled . . . zygote" genetically distinct from the parents. App. II 203 (Sander Lee). From the start of its existence, a human zygote contains the full 46 chromosomes of DNA necessary for it "to develop, grow and become an adult." *Id.* Its unique DNA sequence also "produces the genetic variation that creates a person's biological individuality, including sex, eye color, and other physical traits." *Id.*

Following fertilization, "[t]he zygote produces increasingly complex tissues, structures and organs that work together in a coordinated way," App. II 203, and "[t]he embryo develops over time because these structures develop as part of the plan set forth in the organism's DNA." App. V 128 (Declaration of Dr. Brian Gray). "This organized, coordinated behavior of the embryo is the defining characteristic of a human organism." App. II 203 (Sander Lee); *see also* App. III 6 (Curlin) ("It is an uncontroversial scientific holding that an organism is: 'An individual living thing that can react to stimuli, reproduce, grow, and maintain homeostasis.'").

Thus, absent interruption in the process (such as miscarriage or abortion), from fertilization, a human organism genetically distinct from—even though dependent on—the mother, exists. "[W]hether or not a particular person believes that the

11

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

life of a human organism begins at conception" as a religious matter, "the *scientific* consensus is that it does." App. III 7 (Curlin) (emphasis added).

Furthermore, according to Carter Snead, a bioethicist and director of the Center for Ethics and Culture at the University of Notre Dame, ethically speaking, "all living human beings are entitled to moral concern and the equal protection of the law, without discrimination." App. III 45–46. Abortion restrictions therefore preserve the lives of human organisms between fertilization and birth. App. III 47 (Snead). Snead also observed that, "[o]ne need not profess any religious faith at all to understand and assent to these propositions." App. III 46.

### B. Indiana's Restrictions on Abortion

Indiana has long restricted abortion. From its earliest days of statehood, Indiana prohibited abortion at any stage by statute. *See, e.g.*, 1835 Ind. Laws ch. XLVII, p. 66, § 3; 1859 Ind. Laws ch. LXXXVI, p. 469, § 2; 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. In 1972, just before *Roe v. Wade*, the Indiana Supreme Court upheld the State's prohibition of all abortions except where "necessary to preserve [the mother's] life." *Cheaney v. State*, 285 N.E.2d 265, 266 (Ind. 1972) (quoting Ind. Code § 35-1-58-1 (1971)). In *Cheaney*, the court assumed "that a certain [federal constitutional] right to privacy does exist," but considered "whether there is a compelling state interest in the regulation of this activity." *Id.* at 267. It held there is: according to *Cheaney*, the "State's interest" in protecting an unborn child "from the moment of conception" and throughout fetal development "is both valid and compelling." *Id.* at 270.

12

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

One year later, however, the U.S. Supreme Court declared abortion a federal fundamental right and established a viability-based understanding of the State's interest in that context. *Roe v. Wade*, 410 U.S. 113, 93, 163–164 (1973). As a result, the General Assembly amended Indiana's abortion ban to conform to "recent Supreme Court decisions" but still prohibited abortions to the extent permitted under *Roe*'s trimester framework. P.L. No. 322, § 1, 2, 1973 Ind. Acts, pp. 1743–46.

In 1992, the U.S. Supreme Court expanded states' authority to protect prenatal life and maternal health when it upheld Pennsylvania's parental consent, informed consent, and 24-hour waiting period requirements. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). But *Casey*, like *Roe*, imposed the "viability" line on the State's interest in protecting fetal life. *Id.* at 846. After *Casey*, Indiana adopted additional regulations, including informed consent and 18-hour waiting period requirements, new protocols for physicians performing abortions, definitions for medical emergency warranting an abortion, and criminal penalties for violating the abortion code. *See* 1995 Ind. P.L. 187-1995; *see also, e.g.*, 2014 Ind. P.L. 98-2014 (hospital admitting privileges, ultrasound requirements, and clinic licensing and inspection laws); 2016 Ind. P.L. 213-2016 (prohibiting race-selective, sex-selective and disability-selective abortions and regulating disposition of fetal remains).

In June 2022, the U.S. Supreme Court held that the federal constitution does not confer a right to abortion, reversed *Roe* and *Casey*, and "returned to the people" of Indiana and "their elected representatives" the "authority to regulate abortion." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2279 (2022). *Dobbs* rejected

13

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Roe* and *Casey*'s viability line, describing the "glaring deficiencies" in their reasoning and observing they provided no "principled defense of the viability line"—which is, the U.S. Supreme Court further explained, nothing more than an "arbitrary line." *Id.* at 2268–72.

Shortly thereafter, in August 2022, the General Assembly enacted S.B. 1, which, like Indiana's historical restrictions on abortions, makes "abortion" a "criminal act" except when expressly authorized. Ind. Code § 16-34-2-1(a) (as amended by S.B. 1, Sec. 21). Under S.B. 1, abortion is permitted in only three circumstances:

*First*, as amended, Indiana Code § 16-34-2-1(a)(1) permits abortions "before the earlier of viability of the fetus or twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the fetus is diagnosed with a lethal fetal anomaly." A "serious health risk" is one "that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function," but "does not include psychological or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory surgical centers may perform abortions under subsection (a)(1). Ind. Code § 16-34-2-1(a)(1)(B).

*Second*, Indiana Code § 16-34-2-1(a)(3) permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save

the pregnant woman's life." Because subsection (a)(3) permits abortions later in pregnancy than subsection (a)(1), it imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3.  Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3—which governs "abortions performed on or after the earlier" of viability twenty (20) weeks postfertilization age—in turn requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also id.* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

*Third*, Indiana Code § 16-34-2-1(a)(2) permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Only hospitals and ambulatory surgical centers may perform abortions under subsection (a)(2). Ind. Code § 16-34-2-1(a)(2)(C).

## II.   **Plaintiffs Challenge S.B. 1 on Religious-Exercise Grounds**

### A. Complaint and demand for relief

The named plaintiffs are five women and the organization Hoosier Jews for Choice. On September 8, 2022, they filed a putative class action complaint challenging S.B. 1 under Indiana's Religious Freedom Restoration Act (RFRA), Ind. Code § 34-13-9-0.7, *et seq.*, App. II 60, and a motion for preliminary injunction, App. II 87. The complaint alleges that S.B. 1 "burdens the plaintiffs' sincere religious beliefs, and those of a putative class of those similarly situated," by prohibiting abortion in circumstances where plaintiffs' religion "direct[s]" them to obtain an abortion. App. II

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

61. The plaintiffs seek "a preliminary injunction, later to be made permanent, enjoining defendants from taking any action that would prevent or otherwise interfere with the ability of the individual plaintiffs, the class members, and Hoosier Jews for Choice's members from obtaining abortions as directed by their sincere religious beliefs." App. II 85. Although the plaintiffs styled their complaint a "class action complaint," App. II 60, the parties are briefing the plaintiffs' motion for class certification in the trial court, and no class has been certified, App. II 19.

### B. Named plaintiffs

### 1. Anonymous Plaintiff 1

Anonymous Plaintiff 1 is a 39-year-old woman who is married and has one child. App. II 126–27. Anonymous 1 "wish[es] to try to have another child," App. II 132, but fears that "because of [her] age . . . a pregnancy might seriously endanger [her] health, without necessarily causing death or [the] serious risk of substantial and irreversible physical impairment" sufficient to obtain an abortion under S.B. 1's exceptions. App. II 131–32. She also might seek an abortion if her future child is diagnosed with a genetic abnormality in the womb, regardless of whether such diagnosis would meet the statutory exception under S.B. 1. App. II 131; App. III 123:7–12. But, of course, she might also choose to have a baby with a genetic abnormality. App. III 124:18–21.[1]

---

[1]     By agreement between the parties, plaintiffs' counsel redacted identifying information from the Anonymous Plaintiffs' depositions in the record.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Anonymous 1 believes "according to Jewish law and teachings . . . that the life of a pregnant woman, including her physical and mental wellbeing, must take precedence over the potential for life embodied in a fetus." App. II 128. Whether circumstances justify or require abortion "is something that can be interpreted by an individual" and is ultimately an individual decision. App. III 109:7–8. According to Anonymous 1, "there's not one answer for me." App. III 121:1.

Lately, "because [she] would not have the option to terminate a pregnancy if [she] decided [she] needed one," Anonymous 1 has not been trying to become pregnant. App. III 125:10–12, 15–16. Anonymous 1 is "not having sex with [her] husband" yet is still "taking birth control." App. III 126:3–6. When asked what might change if granted a preliminary injunction, Anonymous 1 "imagine[d] [she] would resume sexual relations with [her] husband" but "can't say for sure," ultimately concluding that she does not know how her behavior would change—if at all. App. III 127:16–23.

## 2. Anonymous Plaintiff 2

Anonymous Plaintiff 2 is 30 years old and has a husband and two children. App. II 134. Although she does not wish to have another child right now, Anonymous 2 stated that she "may in the future become pregnant," yet be unable to obtain an abortion should her "beliefs . . . require" one. App. II 136. Anonymous 2, who "use[d] condoms every now and then" and used "the rhythm method . . . much more than . . . now," has increased the "extent" to which she tracks ovulation and abstains from physical intimacy with her husband. App. III 194:13–195:16. If granted a preliminary injunction, Anonymous 2 said she would "go back to [her] normal behavior" by being

less "stringent" with the "extra precautions" to avoid pregnancy. App. III 195:15,
198:2–7.

Anonymous 2 believes that "within the universe exists a supernatural force or
power that connects all humans" and "direct[s] [us] to act in a manner that promotes
and does not harm our fellow humans or this community of humanity." App. II 135.
For Anonymous 2, "if a pregnancy or the birth of another child would not allow [her]
to fully realize [her] humanity and inherent dignity, [she] should terminate that preg-
nancy." App. II 136. "[R]ealiz[ing] [her] humanity" includes (1) "being able to continue
with [her] education and then continue on with [her] career as [she] wanted," (2) "fi-
nancial stability," and (3) "do[ing] as [she is] doing in [her] life right now." App. III
155:22–156:21.

### 3. Anonymous Plaintiff 3

Anonymous Plaintiff 3 is a 24-year-old unmarried Muslim woman who does
not have children and "do[es] not want to have children at any point in the foreseeable
future," in part because she suffers from Crohn's disease. App. II 138–40. For Anon-
ymous 3, "if [her] health or wellbeing—physical, mental, or emotional—were harmed
by a pregnancy or a pregnancy-related condition, [she] should terminate the preg-
nancy." App. II 140. This harm could arise when "a pregnancy . . . [i]s simply un-
wanted," *id.*, where she has "flare-ups" from Crohn's disease, App. IV 56:11, or where
the pregnancy implicates her "financial well-being or just not being able to take care
of a . . . child." App. IV 56:9–10.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Although she would like to have children someday, Anonymous 3 believes she must "abstain from sexual intercourse" to "ensure that [she] will not need an abortion that would be prohibited" by S.B. 1—even though her partner successfully used contraceptives when they were intimate before S.B. 1's enactment, App. II 141; *see* App. IV 69:13–20, and would presumably continue using them even with an injunction. App. IV 57:16–19. Anonymous 3 said that, if granted an injunction, she would "not be abstinent." App. IV 12:18.

Anonymous 3 believes, "according to the teachings of Islam," that "life does not begin at conception," but rather at the time an unborn child's soul is "breathed into a womb at around 120 days' gestation." App. II 139. She further believes "that the life of a pregnant woman, including her overall wellbeing, always takes precedence over a fetus." *Id.*

### 4.  Anonymous Plaintiffs 4 and 5

Anonymous Plaintiff 4 and Anonymous Plaintiff 5 are married "female individuals." App. II 143. They would like to conceive a child using "assisted reproductive technologies." App. II 145. Anonymous 4 "was going to be the one to first . . . try to become pregnant and carry," App. IV 103:16–18, and Anonymous 5 is willing to "be the backup." App. IV 166:19. Despite wishing to become pregnant, this couple wishes to have abortion available if things do not work out as they envision. So, while before S.B. 1 they had begun "[c]onsulting a doctor" about becoming pregnant, App. IV 103:1, they suspended that process to avoid becoming pregnant during a time when abortion

19

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

is unavailable, App. II 145. Anonymous 4 acknowledged that, even if granted a pre-liminary injunction, she "would still be hesitant to get pregnant, because if an appeal went through and [the injunction] was overturned again, then [she] would be pregnant but in a place where the law [against abortion] was still standing." App. IV 109:12–16.

Why might a couple seeking to become pregnant be concerned about access to abortion?  In addition to concern about needing an abortion if her "life would possibly be in danger"—which S.B. 1 would permit—Anonymous 4 wishes for abortion to be available in case "something else was going on where [she] felt [she] needed to have an abortion." App. IV 104:22–25.

Anonymous 4 and 5 believe Judaism teaches that "the life of a pregnant person, including their physical and mental health and wellbeing, takes precedence over the potential for life embodied in a fetus." App. II 144. They believe that, where their "physical or mental health would be harmed by a pregnancy, but where the pregnancy d[oes] not put [them] at risk of death or permanent impairment of a bodily system," their "religious beliefs would direct [them] to terminate a pregnancy." App. II 145.

For Anonymous 4, "I think my Jewish faith tells me that if having an abortion is the way that means that I'm taking care of my health and well-being, that I should do that to take care of myself as the person who is living in the world right now. . . . [My faith] would require me to take care of myself in how I felt that I should in order to be a healthy person living in the world." App. IV 106:25–107:9. Likewise, for Anonymous 5, "if there was something that emotionally or physically was going on that

20

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

was causing distress, Judaism and my faith and my values would mean that I would

need to have an abortion." App. IV 161:9–13.

### 5. Hoosier Jews for Choice

Hoosier Jews for Choice, a newly formed organization, "exists to take action

within the Jewish community and beyond to advance reproductive justice, support

abortion access, and promote bodily autonomy . . . across the state of Indiana." App.

II 149. The organization subscribes to the belief that "an abortion is directed to occur

if it is necessary to prevent physical or emotional harm to a pregnant person." *Id.*

"The pregnant person" makes the decision whether an abortion is necessary—Hoosier

Jews for Choice "do[es not] think there's one answer for every pregnant person." App.

V 33:18–22.

Hoosier Jews for Choice avers that some of its members—around 45, App. V

55:19—"are capable of becoming pregnant and if they became pregnant, could require

an abortion that would be prohibited" by S.B. 1. App. II 149. Individuals need not

hold the same Jewish beliefs, however—or any religious beliefs for that matter—to

be members of Hoosier Jews for Choice. App. V 35:25–36:2, 36:8–12.

### C. Preliminary Injunction

On December 2, 2022, the trial court issued an order enjoining enforcement of

S.B. 1 "against the Plaintiffs." App. II 59. It concluded that they "demonstrated by

the greater weight of the evidence that the Plaintiffs have a prima facie likelihood of

success on the merits of their claims," namely that the law "substantially burdens the

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

religious exercise of the Plaintiffs" and "is not the least restrictive means to achieve

a compelling government interest." App. II 59.

Regarding the plaintiffs' burden, the trial court "f[ound] that the Plaintiffs'

practices regarding abortion are religious in nature," and that they demonstrated

S.B. 1 substantially burdens those practices because the plaintiffs "are avoiding be-

coming pregnant" and have changed their "sexual and reproductive practices." App.

II 46–47.

As for the State's interest, the trial court refused to apply Indiana Supreme

Court precedent holding that the State's interest in protecting fetal life at all stages

of development is "compelling." App. II 50–51 (citing *Cheaney*, 285 N.E.2d at 265).

Although it recognized that, as a "factual" matter, "[o]f course, it is not disputed that

human zygotes, embryos, and fetuses are of the human species," the trial court

faulted the State for "attempting to establish as a factual matter when a human

comes into being." App. II 48–49. Notably, "[the] Court f[ound] that the question of

when life begins is a theological one not a factual question for this Court." App. II 49.

Thus, in the trial court's view, it and "other Courts"—including the Indiana Supreme

Court—cannot hold that the State's interest in protecting human lives inside the

womb is compelling because such a holding would require "select[ing] different theo-

logical or religious definitions of conception," which "is prohibited under RFRA." App.

II 51.

And despite acknowledging that the U.S. Supreme Court overruled *Roe v.*

*Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the trial court

Brief of Appellants

The Individual Members of the Medical Licensing Board of Indiana, et al.

nevertheless invoked their articulation of the State's interest at "viability" because, according to the court, "*Dobbs* said nothing to suggest that the nature of the State's interest has somehow changed." App. II 51. So, according to the trial court, while the General Assembly and courts may not decide that a protectable human being exists upon fertilization, the U.S. Supreme Court's overturned precedents irrefutably establish a state interest in protecting a fetus at viability but not before.

As for the justiciability issues raised by the State, the court first held that "Hoosier Jews for Choice has standing to raise its claim under Indiana law caselaw [sic] and RFRA." App. II 40. In the court's view, Hoosier Jews for Choice may bring its members' claims because it meets the statutory requirement of an organization bringing a RFRA claim—it "exists for a religious purpose"—and "the Indiana Court of Appeals has recognized third-party standing specifically in the abortion context." App. II 39 (citing *Planned Parenthood v. Carter*, 963 N.E.2d 853, 870 (Ind. Ct. App. 2006); *In re Ind. Newspapers v. Junior Achievement of Central Ind.*, 963 N.E.2d 534, 549 (Ind. Ct. App. 2013)). And while the court described standing in general, including the requirement that "a party . . . show a specific injury," the court did not identify an injury suffered by Hoosier Jews for Choice. *See* App. II 39–40.

The court further concluded that "this matter is sufficiently ripe for review" because "[t]he Plaintiffs in this case are . . . merely challenging the validity of the statute" and need not "become pregnant before they may challenge the law." App. II 40–41. For the court, "that the Plaintiffs are suffering injury and altering their behavior" related to birth control and sexual practices is enough to satisfy ripeness for

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

their RFRA claims about abortion access—even though none alleged that their sexual

practices (or desire to use artificial reproductive technology) constitute a religious

exercise. App. II at 40.

After concluding all "requirements for a preliminary injunction [we]re met,"

the court "ENJOIN[ED] the Defendants and their officers from enforcing the provi-

sions of [S.B. 1] against the Plaintiffs." App. II 59. The injunction order is not limited

to circumstances where the plaintiffs seek an abortion for sincere religious reasons.

*See* App. II 56–59.

## SUMMARY OF THE ARGUMENT

After several decades of federal restrictions on the State's ability to regulate

abortion, the U.S. Supreme Court has "returned to the people" of Indiana "and their

elected representatives" the "authority to regulate abortion." *Dobbs*, 142 S. Ct. at

2279. The trial court, however, has enjoined the State from enforcing its new abortion

law against Hoosier Jews for Choice and five women because, in the court's view, S.B.

1's restrictions on when abortions may be performed substantially burdens plaintiffs'

religious exercise without furthering a compelling government interest. App. II 46–

55. That holding must be overturned for several reasons.

I. Indiana's standing and ripeness doctrines bar plaintiffs' RFRA claims. First,

Hoosier Jews for Choice lacks standing to assert its members' RFRA claims. "The

judicial doctrine of standing focuses on whether the complaining party is the proper

party to invoke the court's power." *Foundations of E. Chi., Inc. v. City of East Chicago*,

24

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

927 N.E.2d 900, 903 (Ind. 2010). Here, although RFRA allows an organization to assert its own claims, it does not authorize it to assert its members' personal religious-exercise claims. Moreover, associational-standing doctrine—the availability of which is not certain, *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 169–70 (Ind. 2017)—does not otherwise allow Hoosier Jews for Choice to do so. Religious-exercise claims "ordinarily require[] individual participation" of members, and their participation is even more important where—as is the case here—the asserted religious beliefs depend entirely on individual assessments. *Harris v. McRae*, 448 U.S. 297, 321 (1980).

Second, no plaintiff's claim is ripe for review. The doctrine of ripeness demands that the record be adequately developed for adjudication so that courts decide the "issues in a case . . . based on actual facts rather than on abstract possibilities." *Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind. 1994). RFRA claims require "case-by-case consideration" of sincere religious exercise, substantial burden, and compelling interest in each case. *Gonzalez v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 436 (2006). The record here lacks the facts necessary for a court to decide the plaintiffs' RFRA claims—namely, whether S.B. 1 "substantially burdens" the plaintiffs' "sincere exercise of religion," *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022)—which plaintiffs define as "obtaining an abortion" under future, contingent, and as-yet unknown circumstances.

II. Regardless, plaintiffs' claims fail under RFRA. The plaintiffs have not met their burden of showing that obtaining an abortion—or having unfettered access to

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

abortion—is "religious exercise" under the statute. "Religious exercise" means that an action *itself* is imbued with "religious significance." *Ackerman v. Washington*, 16 F.4th 170, 189 n.10 (6th Cir. 2021). Abortion does not carry religious significance to these plaintiffs, but is instead a means by which they can mitigate "harm" to their "physical, mental, or emotional" "health or wellbeing" if, in their estimation, a pregnancy threatens them. App. II 70–71, 76, 81, 83. The plaintiffs' birth control practices likewise do not carry religious significance, and they do not claim that these practices are the religious exercise for which they seek relief from a government-imposed burden. They have therefore failed to make their prima facie showing.

Even if plaintiffs have met their burden of demonstrating a substantial burden to their sincere religious exercise, the State nevertheless may enforce S.B. 1 against the plaintiffs because S.B. 1 is the "least restrictive means" of furthering its "compelling government interest" in protecting human lives in the womb. Ind. Code § 34-13-9-8(a). The Indiana Supreme Court has already held that the State's interest in protecting unborn children is "valid and compelling" from "the moment of conception." *Cheaney v. State*, 285 N.E.2d 265, 270 (1972). The trial court refused to apply *Cheaney* because, despite being overruled, *Roe* and *Casey* still mean that the State cannot act to protect human life before fetal viability. That is not a valid reason for refusing to apply *Cheaney*, which remains binding precedent on all lower Indiana courts. Besides, regardless of precedent, protecting human life from destruction at all stages of development is grounded in science and ethics, not religion, and the trial court erred in concluding that the legislature has no power to establish such ethical norms.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Further, S.B. 1 is sufficiently narrowly tailored in advancing the State's interest in protecting human life at all stages of development. S.B. 1's narrow exceptions—where there is serious risk to the life of the mother, serious risk of serious, permanent injury to the mother, the fetus has a lethal abnormality, or the pregnancy was the result of criminal conduct—do not render it impermissibly underinclusive in pursuing this interest. Because S.B. 1 undoubtedly furthers the State's interest in protecting unborn human lives by prohibiting abortions in nearly all cases, and no other means would further its interest while being less restrictive on the plaintiffs' asserted religious exercise, it meets the least-restrictive-means requirement.

III. Finally, the remaining preliminary-injunction factors weigh against granting injunctive relief to these plaintiffs because they have not demonstrated that an injunction will prevent any certain RFRA violation and, moreover, broadly enjoins future conduct that may not constitute RFRA violations at all.

Indiana does not endorse per-se irreparable harm, *Indiana Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 & n.3 (Ind. 2002), and the plaintiffs have shown no "certain" threat to their alleged religious exercise, *Wagler Excavating Corp. v. McKibben Const., Inc.*, 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). Indeed, there is no certainty whatever that (1) any plaintiff will ever become pregnant in the future; (2) in the event of a future pregnancy, she will seek an abortion, let alone one motivated by sincere religious beliefs; and (3) the circumstances under which she seeks an abortion will not meet one of S.B. 1's exceptions. "[I]njunctive relief is not to be used simply to eliminate a possibility of a remote future injury," *Crossman Cmtys.,*

27

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Inc. v. Dean*, 767 N.E.2d 1035, 1041 (Ind. Ct. App. 2002), but that is all plaintiffs seek to do here.

The balance of harms and public interest also disfavor injunctive relief, as the State's interest in protecting unborn children carries great weight, and the legislature's law reflects the public interest. *Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 121 (Ind. Ct. App. 2004).

Additionally, the relief granted here—"ENJOIN[ING] the Defendants and their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs," App. II 59—exceeds the court's remedial authority. For one, this broad injunction fails to "specif[y] in terms[, and] . . . describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained," as Indiana Trial Rule 65(D) requires. The trial court's injunction also enjoins conduct far beyond RFRA's remedial authorization. RFRA allows injunctive relief that "prevents, restrains, corrects, or abates the violation," Ind. Code § 34-13-9-10(b)(1), but the trial court has enjoined the State from enforcing S.B. 1 against the plaintiffs without limit, implicating future government conduct that may not constitute a "violation" of RFRA at all.

For these reasons, the Court should reverse the trial court's order granting a preliminary injunction.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

**ARGUMENT**

**I.   The Court Lacks Jurisdiction To Hear These Claims**

**A. Hoosier Jews for Choice lacks standing to assert its members'
RFRA claims against S.B. 1**

Hoosier Jews for Choice lacks standing to bring its members' RFRA claims.

RFRA allows an organization to bring its *own* RFRA claim where its practices are

implicated. Ind. Code § 34-13-9-7. So, for example, churches have brought RFRA

claims to use controlled substances in their religious ceremonies. *See, e.g.*, *Gonzales*

*v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423–24 (2006) (reli-

gious sect sued under federal RFRA to protect practice of "receiv[ing] communion by

drinking a sacramental tea" containing federally banned hallucinogen). Here, how-

ever, Hoosier Jews for Choice asserts the purported religious-exercise rights of its

*members* "to access abortion care consistently with their religion." App. II 83; App. II

36–38.

Standing "is a limit on the court's jurisdiction which restrains the judiciary to

resolving real controversies in which the complaining party has a demonstrable in-

jury." *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990). The court

reviews procedural defenses, like standing, de novo. *Holcomb v. Bray*, 187 N.E.3d

1268, 1275 (Ind. 2022). The doctrine is predicated on the "express distribution of pow-

ers clause" of Article 3, Section 1. *Horner v. Curry*, 125 N.E.3d 584, 589–90 (Ind.

2019). The Court's "responsibility lies in preserving these boundaries." *Id.* ("Good

fences make good neighbors"). It is therefore incumbent upon the Court to police its

jurisdiction and not create new exceptions to standing doctrine.

29

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Although federal courts in certain circumstances allow associations to assert claims on behalf of their members, judges and academics increasingly critique the doctrine. Critics observe, for example, that associational standing in the federal courts lack "historical support," and "arose more from historical accident than practice." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 538–39 (6th Cir. 2021). Allowing associations to assert standing premised on their members' injuries also creates problems of enforcement and remedy: are *all* present and future members entitled to relief and bound by the judgment? *Id.* at 541. Moreover, as a practical matter, "when the wrong party litigates a case, [the court] end[s] up resolving disputes that make bad law." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 2322–23 (2016) (Thomas, J., dissenting). The availability of this doctrine in Indiana remains uncertain, as the Indiana Supreme Court has "never . . . ruled with respect to associational standing." *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 169–70 (Ind. 2017) ("assuming without deciding" the doctrine applied). The Court should decline to recognize it here.

Even if the Court applies the "federal" doctrine of associational standing, *McGuinness*, 80 N.E.3d at 169–70, that doctrine does not permit Hoosier Jews for Choice to assert its members' RFRA claims here. Where the Court of Appeals has considered associational standing, it has applied the requirements articulated in *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)). *See, e.g., Bd. of Comm'rs v. Ne. Ind. Bldg. Trades Council*, 954 N.E.2d 937, 941 (Ind. Ct. App. 2011) (citing *Save the Valley, Inc. v. Ind.-Ky. Elec. Corp.*, 820 N.E.2d 677 (Ind. Ct. App.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

2005)). One such requirement—that "neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit," *id.*—bars Hoosier Jews for Choice from asserting its members' RFRA claims.

The individual-participation requirement is met where the claim "does not involve or implicate individual [members] in determining operative facts." *Bd. of Comm'rs*, 954 N.E.2d at 942. Religious-exercise claims like RFRA, however, require "case-by-case consideration" and individualized determinations of operative facts. *Gonzalez*, 546 U.S. at 436 (federal RFRA); *see also, e.g.*, *Barr v. City of Sinton*, 295 S.W.3d 287, 302 (Tex. 2009) (Texas' RFRA "requires a case-by-case, fact-specific inquiry").

For a plaintiff to meet her burden under RFRA, she must "show[] the disputed governmental action substantially burdens a sincerely held religious belief." *Blattert*, 190 N.E.3d at 421. After that, "the burden shifts to the government to establish that a compelling governmental interest is 'satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (quoting *Gonzales*, 546 U.S. at 420). Thus, the resolution of multiple issues in a RFRA case—including whether the plaintiffs' religious exercise is sincere, whether the government action substantially burdens the religious exercise, and whether the government's application of the law to the claimant furthers the claimed government interest—require the *individual claimant*'s participation.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Critically, the U.S. Supreme Court has rejected associational standing by an organization advancing the claims of low-income members demanding federal funding for abortion as a matter of religious exercise. *Harris v. McRae*, 448 U.S. 297, 321 (1980). The Court explained, "[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,'" religious-exercise claims "ordinarily require[] individual participation." *Id.* (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963)). The claims in *Harris* were no exception. There, the organization "concede[d] that 'the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is a diversity of view within . . . our membership, and is a determination which must be ultimately and absolutely entrusted to the conscience of the individual before God." *Id.* Accordingly, the Court held that "the participation of individual members" is "essential to a proper understanding and resolution of their free exercise claims." *Id.*

The same is true here. Hoosier Jews for Choice itself explained that, in its view, whether a woman's circumstances require an abortion under Jewish law "is probably [determined] on a case-by-case basis," and the organization "do[es not] think there's one answer for every pregnant person." App. V 33:18–22. Just as the claims in *Harris* required individual participation by members because the "necessity of abortion" was left to the "conscience of the individual before God," *Harris*, 448 U.S. at 321, in Hoos-

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ier Jews for Choice's view, "[t]he pregnant person" decides whether abortion is required "depending on . . . the circumstances surrounding the pregnancy, or the pregnant person's physical and mental health." App. V 33:10–12, 22.

Perhaps even more significant, Hoosier Jews for Choice will accept anyone who wishes to join, not only those who hold the same religious beliefs. App. V 35:25–36:19. Thus, simply claiming membership in Hoosier Jews for Choice does not guarantee an individual holds sincere religious beliefs consistent with Hoosier Jews for Choice's professed beliefs.

Because the analysis of each member's sincerity and the substantial burden on their religious exercise necessarily will differ from that of other members', participation of the members in this litigation is "essential to a proper understanding and resolution of their free exercise claims," *Harris*, 448 U.S. at 321. No proper understanding of associational standing doctrine allows Hoosier Jews for Choice to bring these claims.

## B. None of plaintiffs' claims is ripe for review

This Court cannot review the merits of the individual plaintiffs' claims because they brought their claims far too early, and no claim is sufficiently ripe for adjudication. Put simply, the sincerity of plaintiffs' beliefs that their religions require abortion, and the level of burden on their exercise of those beliefs, are highly circumstantial and must be assessed in the moment under concrete circumstances, not in the abstract.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

"[R]ipeness asks whether [a] claim is sufficiently developed to merit judicial review." *Holcomb*, 187 N.E.3d at 1285. A corollary of standing doctrine, ripeness is a "vital element in the separation of powers," as it "limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive." *Horner*, 125 N.E.3d at 589. "Ripeness relates to the degree to which the defined issues in a case are based on actual facts rather than on abstract possibilities." *Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind. 1994). Importantly, "[a] claim is not ripe for adjudication if it rests upon contingent future events 'that may not occur as anticipated or . . . may not occur at all." *Ind. Family Inst. Inc. v. City of Carmel*, 155 N.E.3d 1209, 1218 (Ind. Ct. App. 2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1988)).

The claims in this case are entirely too premature for any court to decide without resorting to reliance on "abstract possibilities," *Ind. Dep't of Envtl. Mgmt.*, 643 N.E.2d at 336, about "contingent future events," *Ind. Family Inst. Inc.*, 155 N.E.3d at 1218.

### 1. No plaintiff asserts facts necessary to review whether S.B. 1 substantially burdens sincere religious exercise

RFRA first requires the claimant to "show[] that the disputed governmental action substantially burdens a sincerely held religious belief." *Blattert*, 190 N.E.3d at 421 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014)); Ind. Code § 34-13-9-8(a). Whether the plaintiff has met that burden necessarily involves a "case-by-case consideration" sensitive to individual facts and circumstances. *Gonzales v. O*

34

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (applying federal RFRA); *see also, e.g.*, *United States v. Quaintance*, 315 Fed. App'x 711, 713 (10th Cir. 2009) (quoting *United States v. Affleck*, 765 F.2d 944, 952 (10th Cir.1985)) ("whether a particular question is 'substantial' [under federal RFRA] must be determined on a case-by-case basis"); *Barr v. City of Sinton*, 295 S.W. 3d 287, 302 (Tex. 2009) (Texas' RFRA "requires a case-by-case, fact-specific inquiry").

The plaintiffs' claims here—that S.B. 1 "severely burdens [their] sincere religious beliefs" by prohibiting abortions under circumstances where their "sincere religious beliefs direct them to obtain an abortion," App. II 61—evade the "focused inquiry required by RFRA." *Gonzales*, 546 U.S. at 432.

To start, this analysis requires an inquiry into the plaintiffs' sincerity. *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022) (plaintiff's burden under RFRA requires demonstrating burden on her "sincere exercise of religion"). In any given circumstance, the decision to obtain an abortion could be motivated either by sincere religious belief or another reason for which religion is asserted as pretext. *See, e.g.*, *United States v. Quaintance*, 608 F.3d 717, 722 (10th Cir. 2010) (Gorsuch, J.) (describing "numerous pieces of evidence in this case strongly suggest[ing] that the Quaintances' marijuana dealings were motivated by commercial or secular motives rather than sincere religious conviction").

Thus far, however, the State has not been able to make a direct sincerity argument because no plaintiff has presented concrete facts about seeking an abortion by which her sincerity might be considered. "Neither the government nor the court has

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

to accept the [claimant's] mere say-so," *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996), and so the State is entitled to test a claimant's sincerity when she makes the abortion decision, not ex ante months or years before the relevant circumstances come to pass.

In any event, an abortion is possible only if there is a pregnancy, so the existence of a pregnancy is essential to the plaintiffs' request to obtain "an abortion in the future consistent with the[ir] beliefs." App. II 61. In *Harris v. McRae*, for example, the U.S. Supreme Court held that some of the individual plaintiffs could not bring their free-exercise claims demanding state-funded abortions because, although they "provide[d] a detailed description of their religious beliefs," they "failed to allege either that they are or expect to be pregnant or that they are eligible to receive Medicaid." 448 U.S. at 2690. Thus, the plaintiffs "lack[ed] the personal stake in the controversy needed to confer standing to raise such a challenge to the Hyde Amendment." *Id.* Likewise, here, no plaintiff is currently pregnant, and whether any will become pregnant—and whether, if pregnant, any will wish to have an abortion for religious (or any other) reasons—is speculative.

Even in the event of a future pregnancy, whether any plaintiff also will face circumstances she believes require abortion—under circumstances not meeting one of S.B. 1's exceptions—is uncertain and highly contingent on multiple speculative future events. For example, Hoosier Jews for Choice explained, "if [its members] became pregnant, [they] could require an abortion that would be prohibited by S.E.A.

36

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

1," if the pregnant person determines that "it is necessary to prevent physical or emotional harm to [her]." App. II 149. This could include anything from minor discomfort from pregnancy to mental-health concerns. App. V 32:23–25, 33:13–19. It depends entirely on what "[t]he pregnant person" decides is necessary. App. V 33:18–22. The individual plaintiffs described similarly speculative circumstances under which they might seek an abortion in the future.

Take Anonymous 1, for instance: "if my health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal abnormality, I must terminate the pregnancy." App. II 128. She acknowledged that in "most of the cases," the presence of the "same chromosomal abnormality that [she] had in [her] previous pregnancy" would fall within S.B. 1's exception for lethal fetal anomalies. App. III 124:1–7, 126:23–127:3. And even if a future pregnancy does not fall within the exceptions, Anonymous 1 would not necessarily abort the fetus. App. III 124:8–11, 18–21. Instead, if faced with those circumstances, she would at that time consider "[t]he impact on [her] physical, mental, and emotional well-being and health." App. III 124:22–25. In any event, however, Anonymous 1 is not pregnant, does not wish to become pregnant soon, and is taking precautions to prevent pregnancy. App. III 125:1–4, 10–12, 125:22–126:3. Any burden S.B. 1 imposes on Anonymous 1's ability to obtain an abortion is thus remote and contingent on several as-yet-unknown events.

Anonymous 2 "believe[s] that if a pregnancy or the birth of another child would not allow me to fully realize my humanity and inherent dignity, I should terminate

that pregnancy." App. II 136. This includes myriad considerations such as whether she can "mentally . . . take on another human" and whether she can "financially sustain a living." App. III 188:22, 189:10–11. In fact, "[i]t entails everything" and requires her to "do as [she] see[s] fit for [her]self and [her] family" at that time. App. III 189:18–20. Anonymous 2 is not pregnant and is taking precautions to prevent pregnancy. App. III 194:6–15. But she explained, "if I deem that it is necessary for me to have another child in order to realize . . . my full humanity, then I would have another child." App. III 189:23–190:1. Thus, any application of S.B. 1 to Anonymous 2's circumstances is highly remote and contingent on future circumstances, particularly her future state of mind.

For Anonymous 3, "according to my Islamic beliefs, if my health or wellbeing—physical, mental, or emotional—were harmed by a pregnancy or a pregnancy-related condition, I should terminate the pregnancy." App. II 140. "This could include circumstances involving a pregnancy that was simply unwanted, as pregnancy and childbirth involve significant discomfort, pain, and health risk, or instances of risk to my physical health . . . ." *Id.* Anonymous 3 is not pregnant and is remaining abstinent to prevent pregnancy. App. IV 57:22–24, 67:14–17. In the unlikely event of a future pregnancy, Anonymous 3 will not necessarily seek an abortion. Instead, the decision will depend on many considerations, including her "financial well-being" and whether she has "go[ne] into remission [for Crohn's disease] for an extended period of time." App. IV 60:15–16, 24. With so many contingencies, no court can assess whether and how S.B. 1 imposes a substantial burden on Anonymous 3's sincere religious exercise.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

And for Anonymous 4 and Anonymous 5, "[i]f we became pregnant, there are circumstances in which our religious beliefs would direct us to terminate a pregnancy, but where such a termination would be prohibited by S.E.A. 1." App. II 145. Anonymous 4 and Anonymous 5, who are married, are under no certain or immediate risk of getting pregnant, which would require use of artificial insemination or in vitro fertilization. Nevertheless, in case of a future pregnancy, they want to have a child and would only decide to get an abortion if their "physical, mental, [or] emotional well-being endangered their holistic well-being," which "is up to that individual person." App. IV 152:13–14, 154:15–16; App. IV 103:7, 106:25–107:3. Again, whether they will face a substantial burden to their sincere religious exercise of obtaining an abortion depends on a host of contingencies, preventing a court from making the necessary assessments under RFRA at this time.

Identifying concrete facts is also critical because RFRA does not authorize a court to grant an injunction preventing application of S.B. 1 to the plaintiffs in all circumstances. RFRA requires that any relief be tailored to "prevent[], restrain[], correct[], or abate[] the [alleged] violation." Ind. Code § 34-13-9-10(b)(1). The trial court's order, which vaguely"ENJOINS the Defendants and their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs," App. II 59, covers conduct far beyond preventing a "violation of" RFRA.

The plaintiffs' claims are unripe because none rely on "actual facts" but instead require the Court to accept their reliance on mere "abstract possibilities." *Ind. Dep't*

39

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*of Envtl. Mgmt.*, 643 N.E.2d at 336. And without actual facts as to these issues, no court can make these determinations—and grant appropriate relief—under RFRA.

### 2. No plaintiff presents facts necessary to undertake individual compelling-interest inquiry

In the State's view, its compelling interest in saving prenatal life *always* justifies applying S.B. 1's general prohibition on abortion to religious claimants. The plaintiffs, however, have argued that the State's interest justifies S.B. 1's application only to *some* women or under *some* circumstances. *See* App. V 116. If the plaintiffs are correct, however, a "fact-specific," "context-dependent" analysis as to this compelling interest is required, *United States v. Christie*, 825 F.3d 1048, 1062 (9th Cir. 2016), yet the plaintiffs have failed to present the necessary context by which a court can make this assessment.

"RFRA empowers courts to grant *exceptions* to generally applicable laws . . . ." *Christie*, 825 F.3d at 1064 (emphasis added); *see* Ind. Code § 34-13-9-10(b)(1) (authorizing relief to "prevent[], restrain[], correct[], or abate[] *the violation*" (emphasis added)). It requires an individual assessment as to whether the "compelling governmental interest is 'satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Blattert*, 190 N.E.3d at 421 (quoting *Gonzales*, 546 U.S. at 420)).

For all plaintiffs, their asserted religious exercise of "obtaining abortions," App. II 84, is nothing more than an "abstract possibilit[y]." *Ind. Dep't of Envtl. Mgmt.*, 643 N.E.2d at 336. No plaintiff is certain to become pregnant in the future, no plaintiff is

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

certain to seek an abortion in case of a future pregnancy, and, furthermore, no plaintiff is certain to do so under circumstances not allowed under S.B. 1. The plaintiffs have therefore failed to present claims that are ripe for adjudication under RFRA, which requires particularized assessments of each plaintiffs' sincerity, the alleged substantial burden to religious exercise, and the government's compelling interest.

### 3. This is an as-applied challenge, but the trial court improperly applied ripeness standards for facial challenges

In the trial court's view, the case was ripe because "[t]he Plaintiffs in this case are doing as did the Governor in *Holcomb v. Bray* and merely challenging the validity of a statute." App. II 40. This analysis is entirely too facile and ignores critical distinctions with *Holcomb v. Bray*.

Merely "challenging the validity of a statute" does not satisfy ripeness; such a rule would require nothing more than a complaint to be filed. The Indiana Supreme Court's cases—including *Holcomb v. Bray*—demand more. In *Holcomb v. Bray*, the Supreme Court explained that "the Governor alleges the law is unconstitutional *on its face*, [so it] need not consider specific facts." 187 N.E.3d at 1287. Indeed, the Court specifically observed that no additional "occurrence would add anything to the record to help [the Court] address HEA-1123's constitutionality." *Id.* at 1288.

Here, in contrast, the plaintiffs do *not* assert a facial constitutional challenge against S.B. 1 but rather seek individual exceptions authorized by another statute when fact-dependent criteria are met. As explained above, the record is *not* adequately developed because no one knows what circumstances the plaintiffs will face

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

in the future. *Holcomb v. Bray*, a facial constitutional challenge that acknowledged the absence of any factual questions, does not support ripeness in this case.

Finally, whether "the Plaintiffs are suffering injury and altering their behavior at the current time," App. II 40, likewise does not support ripeness. At most, it demonstrates the individual plaintiffs are injured for purposes of standing. *Schloss*, 553 N.E.2d at 1206 ("The standing requirement is a limit on the court's jurisdiction which restrains the judiciary to resolving real controversies in which the complaining party has a demonstrable injury."). But standing and ripeness involve different inquiries. *Holcomb v. Bray*, 187 N.E.3d at 1285. While current and ongoing injury may be relevant to standing and mootness, it does not demonstrate that the claim is ripe for adjudication, which requires adequate development of the record for adjudication of the claims. *Id.* Here, no plaintiff's claim is ripe for review.

## II.   Notwithstanding RFRA, the State May Enforce S.B. 1 Even Where an Abortion Is Motivated By a Sincere Religious Belief

The plaintiffs' claims also fail on the merits under RFRA. No reasonable understanding of religious liberty encompasses the plaintiffs' extraordinary claims of entitlement to abortion. Thus plaintiffs failed to demonstrate a "reasonable likelihood of success"—an issue reviewed de novo. *State v. Econ. Freedom Fund.*, 959 N.E.2d 794, 800 (Ind. 2011).

### A.  The record shows that neither abortion nor plaintiffs' birth control practices carry religious significance for these plaintiffs

To succeed on their RFRA claims, plaintiffs must make a prima-facie showing that the challenged government action "substantially burden[s] a person's exercise of religion." Ind. Code § 34-13-9-8(a); *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct.

42

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

App. 2022). This burden is heavy: "[A] substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). The plaintiffs have not made that showing—they have not demonstrated that "obtain[ing] abortions under circumstances where abortions are now prohibited in Indiana," App. V 92, is a "religious exercise." Merely believing that a fetus is but an appendage of the mother's body or that the mother's physical, mental, and emotional health and wellbeing take precedence over her child while it is in the womb, do not make abortion—or unfettered access to abortion—a "religious exercise."

Religious exercise requires "'not only belief and profession'" but also "'performance of (or abstention from) physical acts' that are 'engaged in for religious reasons,'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990)). "Religious exercise" means that an action *itself* is imbued with "religious significance." *Ackerman v. Washington*, 16 F.4th 170, 189 n.10 (6th Cir. 2021) ("[T]he food at issue in a RLUIPA case must have some religious significance or else there is no claim in the first place.").

Cognizable religious exercises have included prison diets for "keeping kosher," *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007), "Sabbath and holy day gatherings," *Adkins v. Kaspar*, 393 F.3d 559, 568 (5th Cir. 2004), and "participating in sacramental use of bread and wine," *Smith*, 494 U.S. at 877. In contrast, preferring

43

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Saturdays over Wednesdays for religious meetings does not qualify for religious protection when, though it better facilitates religious meetings, the day of the meeting carries no religious significance. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 85 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022) (holding that Quaker prisoners "failed to establish that scheduling the Quarterly Meetings on Saturdays (as opposed to any other day) bears any religious significance whatsoever" even if it "would inconvenience" some plaintiffs).

Obtaining an abortion—or having unfettered access to abortion—is not itself religious for plaintiffs. Plaintiffs' own words belie any claim that abortion itself carries religious significance for them.

Anonymous 1 would welcome another child, so it is no surprise that she would never get pregnant with the intention of having an abortion. App. III 125:5–9. She also does not believe her faith ever requires her to have an abortion where she does not want to have one. App. III 121:6–7. Nowhere does Anonymous 1 claim that abortion itself carries religious significance; instead, she believes her faith requires her to take care of her "physical, mental, and emotional well-being and health," which may in some cases involve delivering the baby and in others involve abortion. App. III 124:15–17, 22–25.

Anonymous 2, in contrast, does not want another child right now. App. III 194:8–9. Nevertheless, she is taking precautions to prevent pregnancy, App. III 194:13–195:1, would not become pregnant with the intention of having an abortion,

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

191:13–15, and would not seek an abortion if she "deem[s] that it is necessary for [her] to have another child." App. III 189:23–190:1. She asserts that "bodily autonomy" and "realiz[ing her] own humanity" are important aspects of her spiritual beliefs, App. III 163:14–15. Abortion itself, however, is not one of her spiritual practices. *See* App. III 162:22–165:22.

Like Anonymous 2, Anonymous 3 does not wish to become pregnant anytime soon, and she is avoiding pregnancy by remaining abstinent. App. IV 67:14–17. While Anonymous 3 believes Islam requires her not to act in a manner that would harm herself, App. IV 34:5–6, she would not seek to have an abortion as a religious practice, but rather to avoid harm, *see* App. IV 29:11–16.

Anonymous 4 and Anonymous 5, who would like to have children and "definitely would not go into a pregnancy with the intent to have an abortion," App. IV 165:15–17, explained that Judaism "does not require us to become pregnant," App. IV 165:7. Rather, they believe they must prioritize their physical, mental, and emotional health and well-being while they are pregnant. App. II 144–45.

Unlike previously recognized protected religious exercises, which were burdened with every application of the challenged law or policy, abortion is not necessarily or always associated with a religious viewpoint for these plaintiffs. Rather, it is merely one way for an individual, in some circumstances, to achieve an outcome that her religion deems important—namely, primacy of her physical, mental, and emotional health and wellbeing over that of the unborn child. Plaintiffs, after all, will not necessarily seek abortion to terminate a future pregnancy. And they can make

45

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

other attempts to protect their wellbeing before resorting to abortion. *See, e.g.*, App.

III 109:13–15 (Anonymous 1 would consult doctors for medical advice).

For instance, they might seek counseling to alleviate anxiety and other mental- and emotional-health concerns. To reduce harm to their well-being arising from financial concerns, they could seek public or private financial assistance and resources. And they can always seek the guidance of physicians to take care of their physical and mental health needs through means other than abortion.

Notably, the plaintiffs identify no principle that makes abortion a religious act any more than countless other actions that they believe affect their physical, mental, and emotional health and wellbeing. Adopting plaintiffs' view would permit RFRA exceptions to any law that regulates practices the plaintiffs believe could affect their wellbeing, including restrictions on raw milk or marijuana, even if the action itself carries no religious significance.

In concluding that the plaintiffs face a substantial burden on their religious exercise, the trial court's order veered from their articulation of their alleged religious exercise—"obtaining abortions," App. II 84—to the plaintiffs' sexual and birth control practices, stating "[t]he government's pressure upon them to abandon their religious beliefs is clear." App. II 47. In a free-exercise challenge, however, the relevant subject of any "pressure" is on the adherent "to violate his *beliefs*." App. II 44 (quoting *Thomas v. Review Bd. of. Ind. Emp. Security Div.*, 450 U.S. 707, 718 (1981)) (emphasis added). Any "pressure" to change birth control or sexual practices does not go to the plaintiffs' alleged religious exercise of "obtaining an abortion" under circumstances not allowed

46

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

by S.B. 1. Indeed, the plaintiffs themselves disclaimed that the birth control practices

they are undertaking carry religious significance for them.

Anonymous 3, for example, raises no religious objection to using "birth control"

in general, but instead has concerns about how "birth control medication" might cause

"complications associated with Crohn's" disease. App. IV 66:2–7. In fact, Anonymous

3 and her partner have been—and presumably will continue—using condoms to avoid

pregnancy. App. IV 69:14–17. Anonymous 2 and her husband likewise often use "a

condom" and "track [her] ovulation" to avoid pregnancy. App. III 154:25–155:1. Mean-

while, Anonymous 1 "do[es not] know" what Jewish religious sources say about taking

birth control, or other family planning decisions, but believes using birth control is

permissible. App. III 103:11–13, 104:17–19. Indeed, she "resumed taking birth con-

trol" after her "last pregnancy" ended in early 2022, well before S.B. 1's enactment.

App. III 126:5–6; App. II 130–31. Anonymous 4 and Anonymous 5, who will not be-

come pregnant unless they use artificial reproductive technology, do not believe that

Judaism requires them to make those attempts to become pregnant, App. IV 165:7.

Because none of the alleged conduct—whether obtaining an abortion or chang-

ing sexual or birth control practices—carries any more religious significance than any

other act taken to support the plaintiffs physical, mental, or emotional health or well-

being, the plaintiffs failed to demonstrate S.B. 1 substantially burdens their religious

exercise.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

### B. S.B. 1 is the least restrictive means of furthering the State's compelling interest in protecting unborn human lives

Next, RFRA allows the State to enforce S.B. 1 against plaintiffs because it is the least restrictive means to achieve a compelling government interest—namely, protecting unborn human lives from intentional destruction in most circumstances.

### 1. The State's compelling interests justify any burden on the plaintiffs' religious exercise

In lower courts, the State's compelling interest is not up for debate. In *Cheaney v. State*, the Indiana Supreme Court held that the State's interest in protecting unborn children is "valid and compelling" from "the moment of conception." 285 N.E.2d 265, 270 (Ind. 1972). Other jurisdictions agree, recognizing that States have an interest in protecting unborn human life at various stages during pregnancy. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 736 n.16 (Iowa 2022), *reh'g denied* (July 5, 2022) ("[T]he State has a compelling interest in promoting human life" in the womb); *State v. Merrill*, 450 N.W.2d 318, 322 (Minn. 1990) (recognizing that the State has an interest in "protect[ing] . . . the unborn child, whether an embryo or a nonviable or viable fetus"); *Ex parte Phillips*, 287 So.3d 1179, 1234 (Ala. 2018) (affirming double-homicide conviction for convict who killed a pregnant woman).

A basic understanding of biology supports these holdings. "That human fetuses are human beings is a scientific fact, not a theological claim." App. III 5 (Curlin). Regardless whether an individual person believes this, "the scientific consensus" is that "[d]evelopment begins at fertilization," after which the newly created "unicellu-

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

lar zygote divides many times and becomes progressively transformed into a multi-cellular human being through cell division, migration, growth, and differentiation." App. III 7. The "living human being . . . created at fertilization" has DNA "packaged into 46 chromosomes, [with] . . . every instruction [it] needs to develop, grow and become an adult . . . including sex, eye color, and other physical traits." App. II 203 (Sander Lee). This "DNA sequence produces the genetic variation that creates a person's biological individuality." *Id.* Science thus tells us that "[t]he act of performing an induced abortion during *any* stage of pregnancy, from fertilization up to birth, ends the life of an innocent human being." App. II 202. The State's interest in protecting unborn fetal life at any stage from intentional destruction accordingly is nothing less than "compelling." *Cheaney*, 285 N.E.2d at 270.

The trial court, however, held that the State "has not established a compelling interest in enforcing S.E.A. 1 against the plaintiffs." App. II 47. The court refused to apply *Cheaney*'s holding for two reasons, neither of which is valid.

First, it invoked the overruled cases *Roe v. Wade* and *Planned Parenthood v. Casey*, under which the Supreme Court deemed the State's interest in protecting unborn human lives not to be compelling, at least "prior to fetal viability." App. II 51 (citing *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)). The trial court concluded that "[w]hile *Dobbs* determined that the Constitution does not protect a fundamental liberty interest in abortion, *Dobbs* said nothing to suggest that the nature of the State's interest has somehow changed." *Id.*

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

The trial court was clearly mistaken. In *Dobbs*, the U.S. Supreme Court explained in detail the "glaring deficiency [in] *Roe*'s failure to justify the critical distinction it drew between pre- and post-viability abortions" and its relationship to the government's compelling interest. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022). The viability line that *Roe* leaned on is "arbitrary," and *Casey* also "provided no principled defense of the viability line," and instead "merely rephrased what *Roe* had said." *Id.* at 2269, 2271. Having demonstrated that "[t]he viability line . . . makes no sense" by which to understand the State's interest, the Court overruled *Roe* and *Casey* and "return[ed] th[e] authority to the people and their elected representatives" to regulate abortion. *Id.* at 2270, 2284.

If the U.S. Supreme Court's renouncement of the viability line is not enough, the Indiana Supreme Court also expressly—and in great detail—rejected viability as a boundary on the State's interest. In *Cheaney*, the Supreme Court noted that, in the torts context at that time, "many of the cases cling to a viability distinction," but "that the distinction was based on the extent of the medical knowledge at the time." 285 N.E.2d at 268. The Court observed that "medical science has made great strides since that time," and, citing medical sources, "[i]t is now established that some sort of independent life begins at conception." *Id.* at 268. Thus, the Court stated that "biologically [viability] is merely an arbitrary distinction," and rejected it as a basis for cabining the State's interest in prohibiting abortion. *Id.* at 269. The trial court's reason-

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ing here, which relies on the viability line to limit the State's interest, directly conflicts with both the U.S. Supreme Court's and the Indiana Supreme Court's rejection of such a line.

Second, the trial court refused to follow *Cheaney*'s holding because, in the court's view, it "and other Courts cannot select different theological or religions['] definitions of conception as such is prohibited under RFRA." App. II 51. And it faulted the State for "attempting to establish as a factual matter when a human comes into being." App. II 48–49. Not only is the court's reasoning factually wrong, *supra* p. 49, it conflicts with case law establishing that States are "entitled to have, express, and act on, their own views about contestable subjects," including "fetal personhood." *Doe v. Rokita*, 54 F.4th 518, 520 (7th Cir. 2022). *Cf. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, (2019) ("a State has a 'legitimate interest in proper disposal of fetal remains'").

Not even *Roe* or *Casey* supports the trial court's assertions here; both acknowledged that the "[t]he State has legitimate interests from the outset of the pregnancy in protecting . . . the life of the fetus." *Casey*, 410 U.S. at 846; *Roe*, 410 U.S. at 150, 154 (observing the "State's interest . . . in prenatal life," even prior to viability, is "legitimate"). While perhaps *courts* cannot decide when life begins, *legislatures* certainly can. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 127 (2007) (explaining States may enact abortion regulations that "promote respect for life").

States can, and do, enact laws based on norms of ethical behavior, and they are not invalid simply because they "happen[] to coincide or harmonize with the tenets of

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

some or all religions." *McGowan v. Maryland*, 366 U.S. 420, 442 (1961); *see also Harris*, 448 U.S. at 319 ("That the Judaeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws against larceny."). And without *any* evidence that the Indiana General Assembly acted to target religion, *see Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993), the trial court had no basis for disregarding *Cheaney*'s decision embracing the State's interest in protecting fetal life. The trial court gravely erred when it held the State's interest invalid, and this Court should not let this shocking disregard for Indiana Supreme Court precedent go unchecked.

In sum, the State's interest in protecting unborn children from intentional destruction is both "valid and compelling." *Cheaney*, 285 N.E.2d at 275. The plaintiffs' disagreement with that interest, *see* App. II 38, does not negate its validity and importance. Accordingly, even if S.B. 1 substantially burdens the plaintiffs' religious exercise, it does so in furtherance of a compelling governmental interest.

### 2. S.B. 1 is the least restrictive means to achieve the State's compelling interests

S.B. 1's restriction on when an abortions may occur also "is the least restrictive means of furthering" the State's compelling interest in preserving fetal life. Ind. Code § 34-13-9-8(b). "The relevant 'means,' for purposes of RFRA, is the 'burden' the party hopes to avoid." *Tyms-Bey v. State*, 69 N.E.3d 488, 491 (Ind. Ct. App. 2017). Here, the burden that the plaintiffs seek to avoid is S.B. 1's limitations on when abortions may

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

be performed. "[T]he least-restrictive-means standard invokes a 'comparative analysis,'" meaning the Court "must take the State's preferred means . . . and then [it] must 'lay such preferred means side by side with other potential options." *Blattert*, 190 N.E.3d at 424 (quoting *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016)). "[I]n order to be a viable least-restrictive means for purposes of RFRA, the proposed alternative need[s] to accommodate both the religious exercise practiced in this case . . . *and simultaneously achieve the government's compelling interest*[]." *United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021) (emphasis added).

The plaintiffs have never proposed an alternative that would allow the State to achieve its interest; indeed, they could not because their claimed religious exercise requires aborting unborn children, while the State's interest requires preventing those abortions. Instead, they asserted that S.B. 1 is "underinclusive." App. II 118. The mere existence of exceptions, however, does not spoil narrow tailoring under RFRA. Instead, courts hold a law is underinclusive where exceptions (1) "reveal that [the] law does not actually advance a compelling interest, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015); (2) suggest viable alternatives, *Hobby Lobby*, 573 U.S. at 728–32; or (3) exclude all non-religious conduct, demonstrating a "targeting" of religion, *Lukumi*, 508 U.S. at 547. S.B. 1's extremely narrow exceptions do not render the law impermissibly underinclusive.

First, the inclusion of numerous, arbitrary exceptions may in some cases indicate that the government is not actually pursuing a compelling interest. *See, e.g.*, *Lukumi*, 508 U.S. at 547 (explaining under First Amendment strict scrutiny analysis,

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

"a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited" (cleaned up)). But that is not always the case, as in *Blattert*, where a parental corporal punishment exception from the child battery prohibition did not undermine the compelling nature of the State's interest in preventing child abuse. 190 N.E.3d at 422–23. Both there and here, no one can seriously doubt that the law materially advances the State's compelling interest, notwithstanding narrow exceptions. Narrow tailoring within S.B. 1 does not undermine its capacity to preserve human life.

Second, exceptions can be problematic if they suggest the adequacy of more narrowly tailored alternatives. In *Burwell v. Hobby Lobby Stores, Inc.*, for example, the Court ruled that *for-profit* companies were entitled to religious exemption because the law already afforded a religious exception for *non-profit* companies. 573 U.S. at 728–32. With no relevant distinction between non-profits and for-profits, the exception for non-profits undermined the government's claim that no less restrictive alternative would work. *Id.* But while distinguishing between non-profits and for-profits advanced no legitimate government interest, here distinguishing between the exceptions defined by statute and those demanded by the plaintiffs does. S.B. 1 affords exceptions for limited circumstances defined in law and, in some cases, assessed by medical professionals. Unlike the law at issue *Hobby Lobby*, however, S.B. 1 does not provide any exceptions for religiously motivated conduct. It therefore does not indicate that a means less restrictive on religion is available.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Third, even if sometimes a law's exclusion of a broad swath of conduct—but not religious conduct—may indicate invidious discrimination against religion, there is no suggestion that S.B. 1 "targets" religious conduct. In stark contrast to the ordinances in *Lukumi*, S.B. 1 "make[s] virtually all abortions illegal in Indiana," App. II 90, covering as much if not more non-religious conduct than religious conduct. *Contrast Lukumi*, 508 U.S. at 535–36 (invalidating ordinances that "target[ed] Santeria sacrifice" because the narrow definition of prohibited conduct and broad exceptions meant that "few if any killings of animals [we]re prohibited other than Santeria sacrifice").

Nevertheless, the trial court concluded that S.B. 1 "invidious[ly] discriminat[es] against the religious beliefs" of the plaintiffs by exempting narrow categories of conduct from its prohibition without also categorically exempting religiously motivated conduct. App. II 55. This argument is untenable, however, and incorrectly conflates strict scrutiny with the "general applicability" inquiry in First Amendment free-exercise claims.

In the First Amendment context, a law that "single[s] out" religious conduct—such as by "inclu[ding] . . . a formal system of entirely discretionary exceptions," *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021)—triggers strict scrutiny. *Central Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). But "this does not mean that the [law] is not narrowly tailored—a factor relevant in the application of strict scrutiny, and not to

55

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

the question of whether strict scrutiny applies." *Id.* Importantly, the presence of exceptions sufficient to trigger strict scrutiny does not automatically fail the law for a lack of narrow tailoring; they are different inquiries. *See Fulton*, 141 S. Ct. at 1876. Here, RFRA already requires strict scrutiny, and the mere presence of narrow exceptions to the law is not a fatal blow to narrow tailoring.

In contrast, the trial court's broad injunction would swallow S.B. 1 and entirely undermine the State's interest. *See* App. II 59. The trial court asserted a "limiting principle"—"the Plaintiffs' sincerely held religious beliefs," App. II 54, but the plaintiffs' own statements demonstrate it is no limit at all. Although the court faulted the State for "unfairly criticiz[ing] the Plaintiffs' Religious practices as subjective," *id.*, the plaintiffs themselves described their beliefs as depending on individual persons, which is the very definition of subjective.

For Hoosier Jews for Choice, whether Jewish law requires an abortion is up to "the pregnant person," who decides "on a case-by-case basis," "depending on, perhaps, the circumstances surrounding the pregnancy, or the pregnant person's physical and mental health." App. V  33:10–12, 18–22. There is not "one answer for every pregnant person." *Id.* at 33:18–19.

The same is true for the individual plaintiffs' beliefs. Anonymous 4 and Anonymous 5 explained, "Judaism . . . leaves us to be able to decide . . . if [abortion] is the right avenue for us," App. IV 100:10–16, and the religious guidance "[i]s whatever decision that individual makes," App. IV 154:19–20. Anonymous 1 agrees. App. III 109:7–9. An individual thus could choose to get an abortion solely because they face

56

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

minor discomfort from pregnancy because whether it constitutes a harm to their physical health "is something that can be interpreted by an individual." App. III 109:5–8; *see also* App. IV 101:6–9 (Anonymous 4); App. IV 154:13–20 (Anonymous 5). Anonymous 2 and Anonymous 3 explained that they could feel a religious mandate to abort a future pregnancy even if the child is "simply unwanted" at that time. App. II 140. Anonymous 3 explained that it "is up to . . . the personal discretion of different women and their . . . school of teachings." App. IV 52:22–24. All that matters for Anonymous 2 is whether "I deem that it is necessary for me to have another child in order to realize  . . . my full humanity." App. III 189:23–190:1.

The effect of the trial court's injunction therefore is to authorize abortions at any point in the future for any reason, including to alleviate morning sickness or anxiety. No understanding of religious liberty heretofore has encompassed such an extraordinary claim, with all its unfathomable implications. The Court should reject it here.

## III.  Plaintiffs Failed to Demonstrate They Are Otherwise Entitled to Injunctive Relief

### A. Irreparable harm

Merits aside, plaintiffs also failed to meet their "burden of demonstrating an injury which [would be] certain and irreparable if the injunction is denied." *Wagler Excavating Corp. v. McKibben Const., Inc.*, 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). To obtain an injunction, a plaintiff must demonstrate personal harm. *See, e.g., Tilley v. Roberson*, 725 N.E.2d 150, 154 (Ind. Ct. App. 2000) ("Tilley had the burden of show-

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ing that her remedies at law were inadequate, thereby causing her to suffer irreparable harm."). Critically, "speculative injuries do not justify th[e] extraordinary remedy" of an injunction. *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005); *see Ind. Pacers L. P. v. Leonard*, 436 N.E.2d 315, 318 (Ind. Ct. App. 1982). Nor "apprehensions or fears . . . unsustained by facts." *Daugherty v. Allen*, 729 N.E.2d 228, 236 (Ind. Ct. App. 2000).

The trial court accepted the plaintiffs' argument that an "unlawful" action always inflicts irreparable harm "per se." App. II 56. But that amounts to saying that plaintiffs need never establish irreparable harm independent of establishing unlawful conduct. The Indiana Supreme Court has never endorsed this "per se" rule and has even disclaimed any such rule absent "clearly unlawful" challenged conduct that is "against the public interest." *Indiana Fam. & Soc. Servs. Admin. v. Walgreen*, 769 N.E.2d 158, 162 & n.3 (Ind. 2002). No conduct here is "clearly unlawful" given that no plaintiff is pregnant, no plaintiff would necessarily seek an abortion if she becomes pregnant in the future, and the State has a compelling interest in protecting the unborn.

Moreover, a preliminary injunction is not justified here because the plaintiffs failed to demonstrate "an injury which is certain and irreparable if the injunction is denied." *Wagler Excavating Corp.*, 679 N.E.2d at 157. Plaintiffs' religious exercise—"obtaining abortions that are directed by their sincere religious beliefs," App. II 84—is by no means facing a "certain" threat. None of the plaintiffs are currently pregnant,

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

and no plaintiff will necessarily seek an abortion if she becomes pregnant in the future. "[I]njunctive relief is not to be used simply to eliminate a possibility of a remote future injury." *Crossman Cmtys., Inc. v. Dean*, 767 N.E.2d 1035, 1041 (Ind. Ct. App. 2002).

Although the plaintiffs may change their sexual or birth control practices, they do not claim that those are the religious conduct for which they claim exemption from S.B. 1. Indeed, S.B. 1 has nothing to do with birth control or sexual practices. Even if getting an abortion were a religious exercise in some circumstances for these plaintiffs, none makes a case that a preliminary injunction would prompt them to undertake *any* religious exercise whatever. This is simply not a case where a preliminary injunction could temporarily remedy an injury to legally protected behavior that is the subject of the suit.

### B. The balance of harms and public interest weigh against injunctive relief

The balance of harms and public interest weigh heavily against a preliminary injunction as well. An injunction here risks the infliction of irreparable harm on unborn Hoosiers whose existence the plaintiffs would seek to terminate in indeterminate circumstances. App. II 112–13; *see* App. II 202 (Sander Lee). As with ending any life, abortion is an *irreversible* procedure; once an unborn life has been intentionally taken, it cannot be restored. *See* App. III 43–45 (Snead). Consequently, the state and public interest in preventing the irreparable harms that the plaintiffs seek to inflict

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

is paramount. As the Indiana Supreme Court has observed, there is a "valid and compelling" interest in protecting prenatal human life at all stages. *Cheaney*, 285 N.E.2d at 270.

Moreover, the plaintiffs' asserted harms regarding their religious exercise—"obtaining abortions that are directed by their sincere religious beliefs," App. II 84—depend on a chain of contingencies that have not yet begun and may never come to pass. And their asserted harms regarding changes to their contraceptive and sexual practices do not outweigh the grave consequences of killing an unborn child. Importantly, should a future pregnancy threaten a life or pose a serious health risk, abortion remains an option under the statute. *See* Ind. Code § 16-34-2-1(a)(1), (3). The balance of harms favors the enforcement of S.B. 1.

Finally, the legislature has decided what "balance" to strike between "the rights of the unborn child" and "the rights of the mother," *Cheaney*, 285 N.E.2d at 269, and "[t]he laws promulgated by the General Assembly reflect its determination of what is in public interest," *Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 121 (Ind. Ct. App. 2004). Moreover, it is in the public interest to enforce the laws duly enacted by the people's representatives. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013) (Scalia, J., concurring in denial of application to vacate stay). The trial court failed to address these factors in its balance of harms and assessment of the public interest. *See* App. II 58. Both weigh

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

decidedly against granting a preliminary injunction to the named plaintiffs. In con-

cluding that the preliminary-injunction factors favored relief, the trial court abused

its discretion. *See State v. Econ. Freedom Fund.*, 959 N.E.2d 794, 800 (Ind. 2011).

### C. The requested relief exceeds the remedies RFRA authorizes and fails to meet Trial Rule 65(D)'s requirements

Not only is injunctive relief disfavored under the preliminary-injunction fac-

tors, the relief granted by the trial court exceeds its remedial authority. First, the

court's order "ENJOIN[ING] the Defendants and their officers from enforcing the

provisions of S.E.A. 1 against the Plaintiffs," App. II 59, fails to "specif[y] in terms[,

and] . . . describe in reasonable detail, and not by reference to the complaint or other

document, the act or acts sought to be restrained," as Indiana Trial Rule 65(D) re-

quires. Because no plaintiff is pregnant, it is unclear what acts, specifically, the in-

junction targets.

Second, the order enjoins future government enforcement actions that may not

constitute a "violation" of RFRA at all. RFRA authorizes only relief that "prevents,

restrains, corrects, or abates the violation of this chapter." Ind. Code § 34-13-9-

10(b)(1). The trial court's order, however, prevents the State from enforcing S.B. 1

against the plaintiffs full stop, regardless whether a particular enforcement action

constitutes a "violation" of RFRA. This unlimited injunction, not grounded in even

the plaintiffs' sincere religious beliefs, far exceeds the court's remedial authority un-

der RFRA.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Accordingly, in any event, the preliminary injunction cannot stand because it exceeds the remedies authorized by RFRA and violates Trial Rule 65's specificity requirement.

## CONCLUSION

The trial court's order granting a preliminary injunction should be reversed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

By:  /s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
RAZI S. LANE
Attorney No. 37798-49
Deputy Attorneys General

*Counsel for Appellants*

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF WORD COUNT

I verify that this brief contains no more than 14,000 words.

/s/ Thomas M. Fisher
Thomas M. Fisher
Solicitor General

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2023, I electronically filed the foregoing

document using the Indiana E-filing System (IEFS). I also certify that on January 17,

2023, the foregoing document was served upon the following persons using the IEFS:

    Kenneth J. Falk
    Gavin M. Rose
    Stevie J. Pactor
    ACLU of Indiana
    1031 E. Washington St.
    Indianapolis, IN 46202
    kfalk@aclu-in.org
    grose@aclu-in.org
    spactor@aclu-in.org

                /s/ Thomas M. Fisher
                Thomas M. Fisher
                Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov