**EXHIBIT C**

F I L E D
December 2, 2022
CLERK OF THE COURT
MARION COUNTY
LB

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) | |
| COUNTY OF MARION | ) | CAUSE NO. 49D01-2209-PL-031056 |

| | |
|---|---|
| ANONYMOUS PLAINTIFF 1, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE INDIVIDUAL MEMBERS OF THE | ) |
| MEDICAL LICENSING BOARD OF | ) |
| INDIANA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### I.  Procedural History

On September 8, 2022, Plaintiffs, Anonymous Plaintiffs 1-5 on their own behalf and on behalf of those similarly situated; Hoosier Jews for Choice ("Plaintiffs") filed a Complaint challenging Senate Enrolled Act No. 1(ss) ("S.E.A. 1") under Indiana's Religious Freedom Restoration Act ("RFRA") and a Motion for Preliminary Injunction. On September 12, 2022, the Plaintiffs filed a Memorandum in Support of their Motion for Preliminary Injunction and initial evidentiary submission.

On October 3, 2022, the Defendants, The Individual Members of the Medical Licensing Board of Indiana, and the Marion County Prosecutor, Lake County Prosecutor, Monroe County Prosecutor, St. Joseph County Prosecutor, and Tippecanoe County Prosecutor ("Defendants') filed their Objection to Plaintiffs Motion for Preliminary Injunction. On October 11, 2022, the Plaintiffs filed their Reply in Support of their Motion for Preliminary Injunction. On October 14, 2022, the Court heard oral argument on the

above motions from counsel for the Plaintiffs and Defendants.[1]   The Plaintiffs and Defendants' attorneys submitted proposed findings of fact and conclusions of law to the Court on October 28, 2022.

The Complaint alleges that S.E.A. 1 violates RFRA because it "burdens the plaintiffs' sincere religious beliefs, and those of a putative class of those similarly situated," by prohibiting abortion in circumstances where Plaintiffs' religion "direct[s]" them to obtain an abortion. Compl. ¶¶ 2, 11. The complaint also requested "a preliminary injunction, later to be made permanent, enjoining defendants from taking any action that would prevent or otherwise interfere with the ability of the individual plaintiffs, the class members, and Hoosier Jews for Choice's members obtaining abortions as directed by their sincere religious beliefs." Compl. at 26.   The Plaintiffs move for a preliminary injunction enjoining enforcement of S.E.A. 1.   Plaintiffs argue that S.E.A. 1—which prohibits abortion except where a pregnancy seriously endangers a mother's health or life, a pregnancy is the result of rape or incest, or the unborn child has a lethal anomaly— violates their rights under Indiana's RFRA.

The Defendants argue that the Plaintiffs' claims are not ripe and also fail on the merits. Furthermore, the Defendants argue that at this early stage of the case that the Plaintiffs have failed to demonstrate that S.E.A. 1 substantially burdens their exercise of religion, and that S.E.A. 1 is the least restrictive means to further a compelling government interest.

---

[1] The Court recognizes and appreciates the excellent advocacy and arguments by both counsel for Plaintiffs and counsel for Defendants at the hearing on this matter, as well as in their briefs.

Plaintiffs also seek relief on behalf of a putative class and have filed a motion for class certification. The parties agreed to postpone briefing on the motion for class certification while the preliminary-injunction motion is pending. No class has been certified.   Plaintiffs are five individuals and one organization.

## II.    Propriety of injunctive relief

The Defendants argue in a footnote that because another Indiana court has issued an injunction as to S.E.A. 1, the plaintiffs do not have standing to raise a claim or seek a preliminary injunction. (State's Br. at 5). See *Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc., et al. v. Member of the Medical Licensing Board of Indiana, et al.*, No. 53C06-2208-PL-001756 (Mon. Circ. Ct. Sept. 22, 2022), *petition to transfer granted*, 22A-PL-2260.

The Court takes judicial notice of the fact that the State sought a stay of the above preliminary injunction. The stay request was denied by the Indiana Supreme Court and the case has been set for oral argument in the Indiana Supreme Court on January 19, 2023.

The State is pursuing its defense of S.E.A. 1 in that litigation, and a resolution of that matter will not resolve the issues raised in this case, as the cases are based on entirely different legal claims and sources of rights.  *See Northwest Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020) (finding that plaintiffs were suffering irreparable harm and entitled to a preliminary injunction despite the fact that the challenged rule had been enjoined in a parallel proceeding in a different court).

[3]

### III.   Findings of Fact[2]

**A. The History of Indiana's abortion law**

1.      Prior to the effective date of S.E.A. 1, abortions were generally lawful in Indiana (with some exceptions) up to the earlier of fetal viability or 20 weeks post fertilization. Indiana Code 16-34-2-1(a).

2.      However, this was altered by S.E.A. 1, which prohibits all abortions in Indiana, with only three limited exceptions, listed below in paragraphs 3 through 5.

3.      An abortion may be performed if a physician determines that an "abortion is necessary when reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-3-1(1)(A)(i), (3)(A) (eff. Sept. 15, 2022). "Serious health risk" means "a condition exists that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function." Ind. Code § 16-18-2-327.9. The term expressly excludes "psychological or emotional conditions." *Id.*

4.      An abortion may be performed if a physician determines that the fetus has a "lethal fetal anomaly," before the earlier of viability or twenty (20) weeks of postfertilization age. Ind. Code § 16-34-2-1(a)(1)(A)(ii) (eff. Sept. 15, 2022). A "lethal fatal anomaly," as defined as "a fetal condition diagnosed before birth that, if the pregnancy results in a live birth, will with reasonable certainty result in the death of the child not more than three (3) months after the child's birth." Ind. Code § 16-25-4.5-2.

---

[2]      Citations to the record include the filings made by the parties accompanying their briefing, the consideration of which was stipulated to by the parties at the hearing held on October 14, 2022.

5.     An abortion may be performed "during the first ten (10) weeks of postfertilization age of the fetus" if the pregnancy is the result of rape or incest. Ind. Code § 16-34-2-1(a)(2) (eff. Sept. 15, 2022).[3]

6.     Physicians who violate the prohibitions in S.E.A. 1 face criminal penalties, Ind. Code § 16-34-2-7 (amended eff. Sept. 15, 2022), and revocation of their licenses to practice medicine, Ind. Code § 25-22.5-8-6(b)(2).

7.     "At common law, abortion was criminal in at least some stages of pregnancy and was regarded as unlawful and could have very serious consequences at all stages." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Indiana incorporated the common law's criminal prohibitions "without exception or limitation" into its own laws as early as 1807 while it was still a territory. *Ledgerwood v. State*, 33 N.E. 631, 633 (Ind. 1893); *see* Act of Sept. 17, 1807, ch. 24, in Francis B. Philbin, Laws of the Indiana Territory 1801–1809, at 323 (1930); 1818 Indiana Laws ch. LII, p. 308.

8.     Indiana, like "the vast majority of the States" in early America, also "enacted statutes criminalizing abortion at all stages of pregnancy." *Dobbs*, 142 S. Ct. at 2252. Indiana's first statute dates from 1835. That statute imposed criminal penalties on "every

---

[3]     S.E.A. 1 also amends preexisting prohibitions on abortion because of disability or other status, so that, effective September 15, 2022:

   a.     A person may not intentionally perform or attempt to perform an abortion allowed under IC 16-34-2 if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with Down syndrome or has a potential diagnosis of Down syndrome. Ind. Code § 16-34-4-6(a) (eff. Sept. 15, 2022).

   b.     A person may not intentionally perform or attempt to perform an abortion allowed under IC 16-34-2 if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with any other disability or has a potential diagnosis of any other disability. Ind. Code § 16-34-4-7(a) (eff. Sept. 15, 2022).

person" who administered "to any pregnant woman[] any medicine, drug, substance or thing whatever . . . with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman." 1835 Ind. Laws ch. XLVII, p. 66 § 3. Amendments adopted after the 1851 Constitution's adoption expanded the statute to prohibit a "druggist, apothecary, physician, or other person selling medicine" from selling any "medicine . . . known to be capable of producing abortion or miscarriage, with intent to produce abortion." 1859 Ind. Laws ch. LXXXVI, p. 469, § 2. In 1881, the penalty for violating the law was raised from a misdemeanor to a felony. 1881 Ind. Acts, ch. 37, §§ 22–23, p. 177. And in 1905 the legislature made it a crime to "so-licit" an abortion or miscarriage. 1905 Ind. Acts ch. 169, §§ 367–368, pp. 663–64.

9.      The United States Supreme Court held that abortion was a fundamental right in 1973, *see Roe v. Wade*, 410 U.S. 113, 93 (1973), and the Indiana General Assembly amended Indiana law to permit abortion under some circumstances, *see* 1973 Ind. Acts, P.L. No. 322 (codified at Ind. Code § 35-1-58.5-1 to -8 (1973)); 1977 Ind. Acts, ch. 335, § 21.

10.     In 1992, Indiana acquired additional authority to enact abortion regulations when the U.S. Supreme Court upheld Pennsylvania's parental consent, informed consent, and 24-hour waiting period requirements. *See Planned Parenthood of Southeast Pennsylvania. v. Casey*, 505 U.S. 833 (1992). Following *Casey*, Indiana adopted its own requirements for performing abortions, including informed consent and 18-hour waiting period requirements. *See* 1995 Ind. Acts, P.L. 187-1995, pp. 3327–29; *see also* 2014 Ind. Acts, P.L. 98-2014, pp. 1119–24 (requiring hospital admitting privileges, requiring

ultrasounds, and regulating abortion clinic licensing and inspections); 2016 Ind. Acts, P.L. 213-2016, pp. 3099–125 (banning abortions sought solely because of race, sex, or disability; regulating disposition of fetal remains, and imposing other requirements).

11.     In June 2022, the U.S. Supreme Court held that the federal Constitution does not confer a right to abortion, reversing *Roe* and *Casey*, and "returned to the people" of Indiana and "their elected representatives" the "authority to regulate abortion." *Dobbs*, 142 S. Ct. at 2279. Shortly thereafter, in August 2022, the Indiana General Assembly enacted S.E.A. 1, which makes performing an "abortion" a "criminal act" unless one of the following three statutory exceptions apply. Ind. Code § 16-34-2-1(a) (as amended by S.E.A. 1).

12.     Indiana Code § 16-34-2-1(a)(1) permits abortions "before the earlier of viability of the fetus or twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the fetus is diagnosed with a lethal fetal anomaly." A "serious health risk" is one "that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function," but "does not include psychological or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory surgical centers majority owned by hospitals may perform abortions under subsection (a)(1). Ind. Code § 16-34-2-1(a)(1)(B).

13.     Indiana Code § 16-34-2-1(a)(3) permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's

life." Because subsection (a)(3) permits abortions later in the pregnancy than subsection (a)(1), it imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3. Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3—which governs "abortions performed on or after the earlier" of viability twenty (20) weeks postfertilization age—in turn requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

14.    Indiana Code § 16-34-2-1(a)(2) permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Only hospitals and ambulatory surgical centers majority owned by hospitals may perform abortions under subsection (a)(2). Ind. Code § 16-34-2-1(a)(2)(C).

15.    Physicians who violate the prohibitions in S.E.A. 1 face criminal penalties, Ind. Code § 16-34-2-7 (amended September 15, 2022), and revocation of their licenses to practice medicine, Ind. Code § 25-22.5-8-6(b)(2).

### B. Abortion and Religious Practice

#### i.  Judaism

16.    Under Jewish law, a fetus attains the status of a living person only at birth, when the greater part emerges from the mother. (Declaration of Rabbis Dennis and Sandy Sasso ["Sassos"] ¶ 9; Declaration of Rabbi Brett Krichiver ["Krichiver"] ¶ 6). Prior to that time, the fetus is considered as part of the woman's body, not having a life of its own or independent rights. (Sassos ¶ 9; Krichiver ¶ 6). Rabbinic sources note that prior to the 40th day of gestation, the embryo is considered to be "mere water." (Sassos ¶ 9).

17.    In order to protect the woman, Jewish law recognizes that there are circumstances in which abortion should occur and is mandated even if there is not a physical health risk that is likely to cause death or the substantial and irreversible physical impairment to a woman's major bodily function. (Krichiver ¶ 8). An abortion is mandated to stop a pregnancy that may cause serious consequences to the woman's physical or mental health. (*Id.*; Sassos ¶ 10). For example, Judaism recognizes that an abortion should be allowed if necessary to prevent the mother's mental anguish that could arise from severe physical or mental health issues, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairments of a major bodily function. (Sassos ¶ 10). Judaism allows for and requires that an abortion be provided if the pregnancy threatens the woman's mental health, for instance if the pregnancy would aggravate psychological problems or cause such problems. (Krichiver ¶ 8).

18.    Rabbinic law requires the alleviation of the pain and suffering of the woman if the fetus endangers her physical or mental health. (*Id.* ¶ 8). Jewish law therefore stresses the necessity of protecting the physical and mental health of the mother prior to birth as the fetus is not considered a person. (Sassos ¶ 11; Krichiver ¶ 7).

### ii.    Islam

19.    Islam also does not believe that a fetus is ensouled at the moment of fertilization or conception. (Declaration of Rima Shahid ¶ 7).

20.    Although, as in any religion, there are different Islamic schools and views, some Muslim scholars take the position that the fetus does not possess a soul until 120 days after conception. (*Id.* ¶¶ 5, 7). This is based on a tradition in which the Prophet (SAW) mentions that an angel breathes the soul into a fetus by 120 days. (*Id.* ¶ 7).

[9]

21.     Muslim scholars indicate that within 40 days of conception, it is proper and appropriate to seek an abortion for any reason, including reasons not authorized by S.E.A. 1. (*Id.* ¶ 8).

22.     Once the fetus reaches 40 days from conception, conservative Muslim scholars believe that an abortion must be available if there is a pressing need that justifies it in the eyes of Islamic law. (*Id.* ¶ 9). This pressing need includes the physical or mental health of the mother, even if the physical health risk does not involve death or the potential substantial impairment of a major bodily function, and therefore Islam allows abortions, even in situations prohibited by S.E.A. 1 (*Id.*). Thus, in a number of Muslim-majority nations, e.g., Kuwait, Jordan, Qatar, Bahrain, and the United Arab Emirates, abortions are allowed in cases of a risk to woman's mental or physical health. They may also occur in these countries in cases of fetal impairment. (*Id.* ¶ 10).

### iii.    Unitarian Universalism

23.     The Unitarian Universalist community has long supported reproductive justice. (Declaration of Reverend Catherine Josephine Romano Griffin ¶ 7). A core belief of Unitarian Universalists is that every human being has inherent worth and dignity, which is an endowed right bestowed by the Creator. (*Id.* ¶ 8).

24.     Denying a pregnant person, the ability to obtain an abortion impinges on this endowed right. (*Id.* ¶ 10). Therefore, being denied the ability to obtain an abortion when a Unitarian Universalist believes the abortion is necessary breaks the covenant that adherents have to honor their own inherent worth and dignity. (*Id.* ¶ 11). In this situation, a Unitarian Universalist is directed to obtain an abortion to maintain the covenant. (*Id.*).

### iv.    Paganism

25.     Paganism is not a specific religious belief, but is an umbrella term that comprises many spiritual belief systems that are polytheistic in nature. (Declaration of J.D. Grove ¶ 4).

26.     These spiritual belief systems play similar roles in the lives of Pagans as do monotheistic religions for believers in those religious traditions. (*Id.* ¶ 5).

27.     Many Pagans recognize that there are Gods and Goddesses and stress the feminine face of divinity. (*Id.* ¶ 6). Creation and life-giving are seen as feminine acts, and Pagans emphasize the importance of women being free and autonomous as representations of the Goddesses in their many forms. (*Id.* ¶ 7).

28.     Because of this, most Pagans demand, as part of their religious and spiritual tradition, that women exercise control over their bodies, free from interference by others. (*Id.* ¶ 8). As part of their religious and spiritual beliefs, therefore, many Pagans believe that in recognition of women's autonomy demanded by their sincere beliefs, women must be allowed to obtain abortions. (*Id.* ¶ 9).

### v.     Episcopalianism

29.     The Episcopal Church also affirms that abortions may occur under situations not allowed by S.E.A. 1. (Declaration of Reverend Julia Whitworth ¶ 5). Specifically, if a pregnant person is in a situation where continuing a pregnancy will cause serious problems to her mental or physical health, even if the health problems are not severe enough to fall within the limited exceptions to the ban on abortions erected by S.E.A. 1, it is religiously permissible for the woman to obtain an abortion and it should be obtained. (*Id.* ¶¶ 5, 8).

[11]

30.     This is because the wellbeing of the pregnant person is of primary importance.
(*Id.*).

31.     This is part of the Episcopal Church's recognition that "equitable access to
women's health care, including women's reproductive health care, is an integral part of a
woman's struggle to assert her dignity and worth as a human being." (*Id.* ¶ 6).

### C.  The Plaintiffs

#### i.  Anonymous Plaintiff 1

32.     Anonymous Plaintiff ("Anon.") 1 is a 39-year-old married woman with one child who
resides in Monroe County. (Declaration of Anon. 1 ["Anon. 1 Dec."] ¶¶ 1-3). She is Jewish
and her religious beliefs inform her life, including her lifestyle, moral and ethical decision-
making, family life, and observance of holidays. (*Id.* ¶ 4). She is active in her synagogue
and observes Jewish traditions. (*Id.* ¶ 5-8).

33.     Anon. 1's Jewish beliefs include the belief that life begins for the child at its birth.
(*Id.* ¶ 9). She also believes, according to Jewish law and teachings, that the life of a
pregnant woman, including her physical and mental health and wellbeing, must take
precedence over the potential life. (*Id.* ¶ 10). Therefore, according to her Jewish beliefs,
if her health or wellbeing—physical, mental, or emotional—were endangered by a
pregnancy, pregnancy-related condition, or fetal abnormality, she must terminate the
pregnancy. (*Id.*).

34.     Anon. 1's first pregnancy resulted in a live birth, but she experienced a variety of
pregnancy-related and post-partum complications and health conditions. (*Id.* ¶¶ 14-16).

35.     Genetic testing of Anon. 1's subsequent pregnancy revealed that the fetus had a
severe non-hereditary chromosomal defect that generally results in the fetus being either

miscarried or stillborn or, if a live birth occurs, results in the child being severely disabled with no more than 10% of the children surviving beyond 12 months. (*Id.* ¶¶ 23-24). The pregnancy put Anon. 1's physical, mental, and emotional health at risk and would have continued to do so even though (1) it would not have resulted in her death or caused a serious risk of substantial and irreversible physical impairment to a major bodily function and (2) may not have resulted in the child dying within three months of birth. (*Id.* ¶¶ 25-26). She obtained an abortion in March of 2022 in accordance with her religious belief that the abortion was required to protect her physical and mental health. (*Id.* ¶¶ 27-28).

36.    Anon. 1 would like to have another child. (*Id.* ¶ 31; Deposition of Anonymous Plaintiff 1 ["Anon. 1 Dep."] at 50:5-6). She understands that she is of advanced maternal age and therefore any pregnancy carries with it heightened risk both to herself and to the fetus, including increased occurrence of certain pregnancy-related health conditions and non-hereditary chromosomal fetal abnormalities. (Anon. 1 Dec. ¶ 31). Because of her age, any pregnancy would be high risk, and Anon. 1 is aware that a pregnancy might seriously endanger her health, without necessarily causing death or a serious risk of substantial and irreversible physical impairment of a major bodily function. (*Id.* ¶¶ 12-13). For example, during any pregnancy she would be prone to serious health effects such as high blood pressure that could lead to pre-eclampsia and gestational diabetes. (*Id.* ¶¶ 12, 14, 15, 31, 32).

37.    There are many scenarios under which Anon. 1's physical or mental health would be at risk in the pregnancy, such that her religious beliefs would direct her to terminate the pregnancy, but where such a termination would not be permitted by the newly enacted statute. (*Id.* ¶ 33).

[13]

38.     Individuals of Jewish ancestry also face heightened risks of passing on certain genetic disorders to children, many of which are severe and will result in profound physical and cognitive disabilities and which will result in death prior to adulthood, although they may not do so within the three months following birth. (*Id.* ¶ 13).

39.     Anon. 1 is also aware that in other states, where abortion bans have already taken effect, some women have experienced extreme and emergent risks to their physical health because physicians delayed providing necessary medical care, for fear of violating similar statutes. (*Id.* ¶ 34). She believes that her religion instructs her that she cannot imperil her life in that way given that Jewish law instructs her that a fetus is not a life. (*Id.* ¶¶ 34-35).

40.     Anon. 1 has ceased having sex with her husband due to her fear of getting pregnant. (Anon. 1 Dep. at 52:2-25).

41.     Anon. 1's religious beliefs are sincerely held.

42.     Although Anon. 1 and her husband wish to try to have another child, she is unwilling to become pregnant unless she is able to obtain an abortion consistent with her religious beliefs, and she is refraining from becoming pregnant due exclusively to the enactment of S.E.A. 1. (Anon. 1 Dec. ¶ 36; Anon. 1 Dep. at 50:10-16).

43.     If S.E.A. 1 were preliminarily enjoined, Anon. 1 imagines that she would resume sexual relations with her husband. (Anon. 1 Dep. at 52:16-17).

### ii. Anonymous Plaintiff 2

43.     Anonymous Plaintiff 2 is a 30-year-old woman who resides in Allen County and is married with two children. (Declaration of Anon. 2 ["Anon. 2 Dec."] ¶¶ 1-3).

[14]

44.     She does not belong to a specific religious denomination, but has personal religious and spiritual beliefs that guide her moral and ethical practice and life. (*Id.* ¶ 4). She does not believe in a single, theistic god, but believes that there is within the universe a supernatural force or power that connects all humans and is larger than any individual person. (*Id.* ¶¶ 6-7).

45.     Central to her spiritual beliefs is the belief that persons are endowed with bodily autonomy and that the bodily integrity of others should not be infringed upon. (*Id.* ¶¶ 8-9). To do so constitutes a spiritual and moral wrong and inhibits the full expression of a person's humanity. (*Id.* ¶ 9).

46.     Anon. 2 believes that, at least prior to viability, a fetus is a part of the body of the mother. (*Id.* ¶¶ 10-11).

47.     Central to her religious beliefs is that she maintains spiritual and physical autonomy over her own body, including a fetus, and it is her spiritual obligation to determine whether to remain pregnant. (*Id.* ¶ 12).

48.     She believes that if a pregnancy or the birth of another child would not allow her to fully realize her humanity and inherent dignity, she should terminate that pregnancy, and this is so in circumstances which would not be permitted under S.E.A. 1. (*Id.* ¶ 13). Anon. 2 has terminated a pregnancy for precisely this reason in the past. (*Id.* ¶ 14).

49.     Anon. 2's religious beliefs are sincerely held.

50.     Anon. 2 may in the future become pregnant, and there are therefore circumstances in which her beliefs would require her to terminate a pregnancy, but such termination would not be allowed by S.E.A. 1. (*Id.* ¶ 15).

51.     The passage of S.E.A. has caused Anon. 2 significant anxiety about the possibility of an unintended pregnancy and her inability to terminate such a pregnancy under S.E.A. 1. (*Id.* ¶ 16). This anxiety has resulted in a reduction in physical intimacy between Anon. 2 and her husband and in Anon. 2 using birth control methods that she otherwise would not. (Deposition of Anonymous Plaintiff 2 ["Anon. 2 Dep."] at 55:13-56:16).

52.     If S.E.A. 1 were preliminarily enjoined, Anon. 2 would go back to her normal behavior. (Anon. 2 Dep. at 58:23-59:2).

### iii.  Anonymous Plaintiff 3

53.     Anonymous Plaintiff 3 is an unmarried 24-year-old woman who lives in Marion County. (Declaration of Anon. 3 ["Anon. 3 Dec."] ¶¶ 1-3). She does not have children and does not wish to have children at any time in the near future. (*Id.* ¶ 3).

54.     She is Muslim and her understanding of Islam influences many aspects of her life, including her daily activities such as diet and wardrobe. (*Id.* ¶¶ 4-5).

55.     She believes, consistent with her understanding of Islam, that life does not begin at conception and that the life of a pregnant woman, including her overall wellbeing, takes precedence over a fetus. (*Id.* ¶¶ 9-10).

56.     She holds this belief, among other reasons, because she understands that even among Islam's strongest beliefs and practices, a person's physical health and wellbeing is always the priority.  (*Id.* ¶ 11).

57.     For example, during the holy month of Ramadan, when individuals are commanded to fast between sunrise and sunset, an individual may eat if fasting would harm their health or wellbeing.  (*Id.* ¶ 11). This harm need not take the form of a risk of

death or the permanent impairment of a major bodily function—it may take the form of pain or other discomfort. (*Id.* ¶ 12).

58.     Therefore, according to her Islamic beliefs, if her health or wellbeing—physical, mental, or emotional—were harmed by a pregnancy or a pregnancy-related condition, she should terminate the pregnancy. (*Id.* ¶ 13).

59.     Anon. 3's religious beliefs are sincerely held.

60.     There are many circumstances in which such a need might arise, where an abortion would be directed by her religious beliefs but prohibited by the statute, involving risks to her physical or mental health, since the statute only allows for abortion in limited circumstances.  (*Id.* ¶¶ 14-15).

61.     Anon. 3 has Crohn's disease for which she continuously takes a prescribed immunosuppressant medication and intermittently takes a steroid medication when she has flare-ups. (*Id.* ¶ 16). She understands that women with active Crohn's disease, including herself, have a higher risk of miscarriage and stillbirth, which themselves pose risks to the women's health. (*Id.* ¶¶ 17-18). This disease, in combination with a pregnancy, would also result in significant related risks to her health. (*Id.* ¶ 19).  When she has Crohn's flare-ups, it is almost impossible for her to eat, and in the midst of these episodes, she sometimes has to receive intravenous nutrition supplements.  (*Id.* ¶ 20).  As a result of past flare-ups, she has lost 70-80 pounds over the past three years.  (*Id.*).  And although steroids are a necessary medication for her during flare-ups, she understands that steroids are not advised during pregnancy. (*Id.* ¶ 21).

62.     She is at risk of becoming pregnant, and if she did, she would seek to terminate a pregnancy under circumstances not permitted by S.E.A. 1.  (*Id.* ¶ 22). She does not want

to start hormonal birth control, because she is concerned about the potential side effects, particularly in light of her Crohn's disease.  (*Id.* ¶ 23).

63.    She is therefore abstaining from sexual intercourse, as that is the only way she can ensure that she will not need an abortion that would be prohibited by S.E.A. 1.  (*Id.* ¶ 24). She is making this decision solely because of the application of S.E.A. 1. (*Id.* ¶ 25).

64.    Without the operation of S.E.A. 1, and if it were preliminarily enjoined, Anon. 3 would once again be able to be intimate. (Deposition of Anonymous Plaintiff 3 ["Anon. 3 Dep."] at 68:9-12).

### iv.  Anonymous Plaintiffs 4 and 5

65.    Anonymous Plaintiffs 4 and 5 are women who live in Monroe County and are married to each other.  (Declaration of Anons. 4 and 5 ["Anons. 4 and 5 Dec."] ¶¶ 1-2). They are Jewish and their understanding of Judaism impacts and informs their lives. (*Id.* ¶ 3).

66.    They believe, according to Jewish law and teachings, that the life of a pregnant woman, including her physical and mental health and wellbeing, takes precedence over the potential for life embodied in a fetus. (*Id.* ¶ 10). The fetus is not a life. (*Id.* ¶ 9). Therefore, according to their Jewish beliefs, if their health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal abnormality, they would be directed by those beliefs to terminate the pregnancy. (*Id.* ¶ 12).

67.    Prior to the passage of S.E.A. 1, Anons. 4 and 5 were planning to use assisted reproductive technologies in order try to become pregnant. (*Id.* ¶ 11). Either individual

could become pregnant, depending on the outcome of the medical tests and procedures required to facilitate such a pregnancy. (*Id.* ¶ 11).

68.    If either Anons. 4 or 5 become pregnant, there are circumstances in which their religious beliefs would direct whoever was pregnant to terminate that pregnancy, but where such a termination would be prohibited by S.E.A. 1. (*Id.* ¶ 12). This includes circumstances in which the pregnant person's physical or mental health would be harmed by a pregnancy, but where the pregnancy did not put them at risk of death or permanent impairment of a major bodily function. (*Id.* ¶ 13). It would also include circumstances of a non-fatal fetal anomaly or a fetal anomaly that would be fatal, but not within three months of birth. (*Id.* ¶ 13).

69.    Anons. 4 and 5 are also aware that in other states, where abortion bans have already taken effect, some women have experienced extreme and emergent risks to their physical health because physicians were delayed in providing necessary medical care, for fear of violating similar statutes. (*Id.* ¶ 14). They believe that their religion instructs them that they cannot imperil their life in that way. (*Id.* ¶ 14).

70.    The religious beliefs of Anons. 4 and 5 are sincerely held.

71.    Although Anons. 4 and 5 wish to try to have a child, neither is willing to become pregnant unless they would be able to obtain an abortion consistent with their religious beliefs, and they are therefore refraining from becoming pregnant due exclusively to the enactment of S.E.A. 1. (*Id.* ¶ 16).

72.    If the statute was preliminarily enjoined Anon. 5 would feel more secure in being able to use assisted reproductive technologies to attempt to become, or for Anon. 4 to

[19]

attempt to become pregnant. (Deposition of Anonymous Plaintiff 5 ["Anon. 5 Dep."] at 48:17-49:2).

### v. Hoosier Jews for Choice

73.     Hoosier Jews for Choice is a membership organization comprised of Jewish persons, and it exists to take action within the Jewish community and beyond to advance reproductive justice, support abortion access, and promote bodily autonomy for all people across the state of Indiana.  (Declaration of Rabbi Leon Olenick ["Olenick Dec."] ¶ 3).

74.     The organization is made up of persons who believe that under Jewish law and religious doctrine, life does not begin at conception, and that a fetus is considered a physical part of the woman's body, not having a life of its own or independent right. (*Id.* ¶ 4). The organization endorses this belief. (*Id.* ¶ 5).

75.     The organization and its members believe that under Jewish law an abortion is directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairment of a major bodily function. (*Id.* ¶ 6).

76.     Some members of the organization are capable of becoming pregnant and if they became pregnant, could require an abortion that would be prohibited by S.E.A. 1. (*Id.* ¶ 7). Under those circumstances, they would not be permitted to act as directed by their religious beliefs. (*Id.* ¶ 7). Hoosier Jews for Choice has about 128 members. Exhibit 9, HJ4C Membership Demographics. It avers that some members—around 45, Defendants' Exhibit 10, 30(B)(6) Deposition of Hoosier Jews for Choice Through Amalia Shifriss (Hoosier Jews Dep.) 53:19—"are capable of becoming pregnant and if they became pregnant, could require an abortion that would be prohibited" by S.E.A. 1. Pltfs.' Ex. 5,

Hoosier Jews Decl. ¶ 7. A few such members—perhaps six—have "alter[ed] their sexual practices, birth control practices, and family planning as a result of the law and their fear of becoming pregnant." *Id.* Specifically, according to Hoosier Jews for Choice Steering Committee Chair Amalia Shifriss, "[a] couple people are having their husbands get vasectomies" while "several" others opted for "arm implants or IUDs." Defs.' Ex. 10, Hoosier Jews Dep. 53:7, 8; 10–12. Shifriss "doubt[s]" these members would alter their efforts at birth control—i.e., reverse vasectomies or remove implants and IUDs—should the Court grant a preliminary injunction, even concluding that she "do[esn't] think" that they would. *Id.* at 55:9–10. She stressed twice on cross examination that her own "behavior would not change because the preliminary injunction is temporary." *Id.* at 58:34. Hoosier Jews for Choice believes that "a person's right to . . . have an abortion . . . should just be between that person and their doctor," and when asked whether the State has a "role to play in the regulation of abortion," answered "[w]e don't believe it should." *See id.* at 27:8–10; 29:2–11. Shifriss allowed that a woman pregnant after the point of viability who seeks to terminate her pregnancy to preserve her physical or mental well-being might do so through induction of labor, which may save the child's life. *Id.* at 61:2–15. Yet she also answered "yes" when asked whether "there be a circumstance where even if induction is available, a woman might, consistent with Jewish law and tradition, want to have an abortion." *Id.* at 61:10–15.

77.     The religious beliefs of the members of Hoosier Jews for Choice are sincerely held, as are the beliefs of the organization.

78.   Members are currently altering their sexual practices, birth control practices, and family planning as a result of the law and their fear of becoming pregnant. (*Id.* ¶ 7; Deposition of Hoosier Jews for Choice ["HJ4C Dep."] at 53:5-22).

### D.  Beliefs about when life begins are theological or philosophical in nature

79.   Facts about the process of human zygotic, embryonic, and fetal development do not answer the question of when life begins. See Declaration of Dr. Peter Schwartz.

80.   The "personhood" status of a zygote, embryo, or fetus cannot be stated as matters of fact. See *Id.*

81.   For many individuals, such as the Plaintiffs, questions such as the beginning of life or when personhood begins cannot be stated without reference to moral, ethical, spiritual, and religious beliefs. (See *Id.*; Anon. 1 Dec. ¶ 9; Anon. 2 Dec. ¶¶ 10-11; Anon. 3 Dec. ¶ 9; Anons. 4 and 5 Dec. ¶ 9; HJ4C Dec. ¶ 5).

### E.  Summary of findings of fact

82.   The plaintiffs' religious beliefs are sincerely held and mandate that they receive abortions in circumstances that are prohibited by S.E.A. 1.  The plaintiffs are currently altering their sexual and/or reproductive behaviors as a direct consequence of S.E.A. 1 and their behaviors would be different but-for the operation of the statute and would be different if a preliminary injunction of the statute issued.

## IV.   Conclusions of Law

### A.  Standing as to Hoosier Jews for Choice

1.   The State has challenged whether Hoosier Jews for Choice has standing to bring its claim, conceding that RFRA specifically confers standing on religious organizations, but argues that principles of standing in the federal or abortion context preempt this.

(State's Br. at 28-29).  The Plaintiffs argue that RFRA clearly provides Hoosier Jews for Choice have standing.

2.      The text of RFRA is states: "a group organized and operated primarily for religious purposes" is a "person" who may raise a RFRA claim.  It is undisputed that Hoosier Jews for Choice exists for a religious purpose, and the evidence establishes that this religious purpose is the sole reason for its existence. Ind. Code § 34-13-9-7. Furthermore, the Indiana Court of Appeals has recognized third-party standing specifically in the abortion context.  *See, e.g., Planned Parenthood v. Carter*, 854 N.E.2d 853, 870 (Ind. Ct. App. 2006) (allowing Planned Parenthood to raise the interests of its patients); *In re Indiana Newspapers v. Junior Achievement of Central Indiana*, 963 N.E.2d 534, 549 (Ind. Ct. Ap. 2013) (allowing the *Indianapolis Star* to raise the First Amendment interests of an anonymous commentator who made online comments to a news article).

3.      The doctrine of standing "asks whether the plaintiff is the proper person to invoke a court's authority". *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019).   "The party challenging the law must show adequate injury or the immediate danger of sustaining some injury." *Id.* The Indiana Supreme Court has held that "the purpose of standing— along with the corollary doctrines of mootness and ripeness—is to ensure the resolution of real issues through vigorous litigation, not to engage in academic debate or mere abstract speculation. *Id.* "Standing implicates the constitutional foundations on which our system of government lies. By requiring a party to show a specific injury, the doctrine limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive". *Id.*  Indeed, standing "precludes courts from becoming involved ... too far into the provinces of the other

[23]

branches." Jon Laramore, *Indiana Constitutional Developments*, 37 Ind. L. Rev. 929, 930 (2004).

4.    This Court finds that Hoosier Jews for Choice has standing to raise its claim under Indiana law caselaw and RFRA.

### B.  This matter is ripe for adjudication

5.    The doctrine of ripeness "asks whether [a] claim is sufficiently developed to merit judicial review." *Holcomb v. Bray*, 187 N.E.3d 1268, 1285 (Ind. 2022). "There must exist not merely a theoretical question or controversy but a real or actual controversy, or at least the ripening seeds of such a controversy." *Id.* at 1287 (internal citation omitted). The issues presented in the case must be "based on actual facts rather than abstract possibilities," and there must be an adequately developed record on which such issues might be decided. *Id.*  In *Holcomb v. Bray*, the Indiana Supreme Court specifically held that Governor Holcomb had demonstrated the controversy was ripe for determination by the Court because he questioned the validity of several statutes.  *Id.*

6.    The Plaintiffs in this case are doing as did the Governor in *Holcomb v. Bray* and merely challenging the validity of a statute.

7.    The undisputed evidence demonstrates, based on actual facts, that the Plaintiffs are suffering injury and altering their behavior at the current time solely because of S.E.A. 1.  Anons. 1, 4, and 5 are currently not attempting to become pregnant when—absent the statute—they would. Anon. 3 is currently abstinent when she otherwise would not be. And Anon. 2 has severely decreased her sexual intimacy with her husband and has been required to use birth control measures that she otherwise would not. Members of Hoosier Jews for Choice are altering their sexual and reproductive practices due to S.E.A. 1.

8.      The undisputed evidence shows why the Plaintiffs have taken these measures because their only alternative is the unacceptable risk of needing a termination of a pregnancy that would be required by their religious beliefs but prohibited by Indiana law under S.E.A. 1.

9.      The Plaintiffs will change their behavior if a preliminary injunction is granted.

10.     The Plaintiffs are all experiencing actual and present harm. The Court finds Indiana law does not require the Plaintiffs to become pregnant before they may challenge the law, and this matter is sufficiently ripe for review.

### C.  The preliminary injunction standard

11.     To obtain a preliminary injunction, the moving party must demonstrate by the greater weight of the evidence that: (1) its remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) there exists a reasonable likelihood of success at trial; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved.  If the movant fails to prove any of these requirements, the trial court should deny a request for a preliminary injunction. *B&S of Fort Wayne, Inc. v. City of Fort Wayne*, 159 N.E.3d 67, 73 (Ind. Ct. App. 2020) (internal citations omitted). A preliminary injunction is "an extraordinary equitable remedy that should be granted in rare instances" only. *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011) (internal quotation marks omitted).

### D.  The plaintiffs have established a likelihood of success on the merits

12.     In order to meet their burden to show a likelihood of success on the merits of their claim, Plaintiffs must "establish[] a prima facie case." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 911 (Ind. Ct. App. 2011). Plaintiffs are not required to show that they

are entitled to relief as a matter of law in order to obtain preliminary injunctive relief.

*Abercrombie & Fitch Stores, Inc. v. Simon Prop. Grp., L.P.*, 160 N.E.3d 1103, 1109 (Ind.

Ct. App. 2020).

### i. RFRA

13.     Indiana's RFRA provides that:

(a)     Except as provided in subsection (b), a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability.

(b)     A governmental entity may substantially burden a person's exercise of religion only if the governmental entity demonstrates that application of the burden to the person:

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

Indiana Code § 34-13-9-8. (enacted in 2015).

14.     This statute "applies to all governmental entity statutes, ordinances, resolutions, executive or administrative orders, regulations, customs, and usages, including the implementation or application thereof." Ind. Code § 34-13-9-1. "Governmental entity" includes the whole or part of any department, agency, official, or other persons acting under color of state law as part of state government, political subdivision, or other instrumentalities of government. Ind. Code § 34-13-9-6.

15.     The "exercise of religion" that falls within the statute's ambit "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Ind. Code § 34-13-9-5. Under Ind. Code § 34-13-9-9, RFRA provides both a defense and private right of action for relief: "[a] person whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, by a violation of this statute may assert the violation or impending violation as a claim or defense in a judicial or administrative proceeding[.]"   If a violation is found, Indiana's RFRA allows for

[26]

injunctive and declaratory relief as well as damages and attorneys' fees. Ind. Code § 34-13-9-10.

16.     The parties agree that there are few reported Indiana cases that have been decided under, or even discuss, Indiana's RFRA. See *Blattert v. State*, 190 N.E.3d 417 (Ind. Ct. App. 2022); *Indiana Family Institute, Inc. v. City of Carmel*, 155 N.E.3d 1209 (Ind. Ct. App. 2020); *House of Prayer Ministries, Inc. v. Rush County Bd. of Zoning Appeals*, 91 N.E.3d 1053 (Ind. Ct. App. 2018), *trans. denied*; *Doe 1 v. Boone Co. Prosecutor*, 85 N.E.3d 902 (Ind. Ct. App. 2017); *Tyms-Bey v. State*, 69 N.E.3d 488, 490-92 (Ind. Ct. App. 2017), *trans. denied*.

17.     It should be noted that "[t]he relevant statutory language in Indiana's RFRA largely tracks the language in the federal RFRA statute, so federal caselaw provides some useful guidance. See 42 U.S.C.A. § 2000bb-1." *Blattert,* 190 N.E.3d at 421 n.1. And the text of the federal RFRA, 42 U.S.C. § 2000bb-1, *et seq.*, is "nearly identical" to that of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*, so that cases decided under the two federal statutes are used interchangeably. *Lindh v. Warden*, 2013 WL 139699, *8 (S.D. Ind. Jan. 11, 2013) ("Because of their substantial similarity, both RFRA and RLUIPA cases are relied on by the Court interchangeably.*").

18.     Given the similarity of all three statutes, the Indiana Court of Appeals has freely cited cases applying both RLUIPA and the federal RFRA in interpreting Indiana's RFRA. *See Blattert*, 190 N.E.3d at 421-23 (citing federal RFRA cases *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *U.S. v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011), and

[27]

RLUIPA cases, *Holt v. Hobbs*, 574 U.S. 352 (2015); *Smith v. Owens*, 13 F.4th 1319 (11th Cir. 2021); *Fowler v. Crawford*, 524 F.3d 931 (8th Cir. 2008)); *see also House of Prayer Ministries,* 91 N.E.3d at 1064 (noting the similarity between Indiana's RFRA and RLUIPA in interpreting the Indiana law in light of the United States Supreme Court's decision in *Hobby Lobby*).

### i.  S.E.A. 1 imposes a substantial burden on plaintiffs' religious exercise

19.    Religious exercise is substantially burdened if the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rv. Bd. of Ind. Emp. Security Division*, 450 U.S. 707, 718 (1981).  Under Indiana's RFRA, "a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless it "demonstrates that application of the burden to the person" is: (1) "in furtherance of a compelling governmental interest" and (2) "the least restrictive means of furthering that compelling governmental interest."  *Blattert*, 190 N.E.3d at 421, Ind. Code § 34-13-9-8. RFRA does not exempt criminal statutes, so defendants may raise a RFRA defense in criminal prosecutions. *Blattert*, 190 N.E.3d at 421.

20.    The Indiana Court of Appeals held in *Blattert* that "A party establishes a prima facie RFRA defense by showing the disputed governmental action substantially burdens a sincerely held religious belief. *Id., citing Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 705, 134 S. Ct. 751, 189 L. Ed. 675 (2014).   Then the burden shifts to the government to establish that a compelling governmental interest is "satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Blattert*, 190 N.E.3d at 421; *citing*

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006). The government must also establish that the substantial burden is the least restrictive means of furthering that interest.  *Blattert*, 190 N.E.3d at 421, Ind. Code § 34-13-9-8; *see Hobby Lobby*, 573 U.S. at 728, 134 S. Ct. 2751.

21.     Under Ind. Code § 34-13-9-10(a), if the party asserting RFRA meets its prima facie burden, and the government does not meet its burden, then "the court ... shall allow a defense ... and shall grant appropriate relief against the governmental entity."

22.     This Court finds that the Plaintiffs have satisfied their prima facie burden that they have a defense under RFRA.

23.     The State's primary argument as to substantial burden is that the Plaintiffs' religious exercise is not substantially burdened because abortion is not a religious practice, "but a secular means to a religious end." (See State's Br. at 30). The State also argues that in light of the U.S. Supreme Court's holding in *Dobbs* "returning to [t]he people and their elected representatives the right to regulate abortion", *Dobbs*, 142 S. Ct. 2285, and that because the State has a compelling interest in protecting the unborn that this deprives the Plaintiffs of their rights under RFRA.

24.     This Court finds that the State's arguments are nearly identical to those already rejected by the U.S. Supreme Court in *Hobby Lobby*. 573 U.S. 682.  In that case, the Supreme Court held that requiring closely-held for-profit corporations to pay for employees' health coverage, which could include payment for contraceptives that the plaintiffs considered to be abortion-inducing, compelled the owners of the company to engage in conduct that violated their religious beliefs. 573 U.S. at 720.  This was so even

[29]

though the only activity engaged in by the plaintiffs was the payment of money, rejecting the government's characterization of this behavior as too attenuated to constitute a religious practice.  *Id.* at 725.

25.    The Plaintiffs argue that a variety of activities, including those that may be "secular" to some, constitute religious practices, and that the Plaintiffs' practices are as well.  (See Plaintiffs' Reply Br. at 13-18). The Supreme Court has detailed many activities that—while they may not have religious significance to some people—are religious practices for those who believe.  The same is true for the Plaintiffs in this case. *See Holt v. Hobbs*, 574 U.S. 352, 369 (2015) (growth of facial hair); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525, 547 (1993) (ritual slaughter of animals); *Wisconsin v. Yoder*, 406 U.S. 205, 210-12, 234 (1972) (compulsory education beyond the eighth grade).

26.    This Court finds that the Plaintiffs practices regarding abortion are religious in nature: they have established that, under circumstances that would be prohibited by S.E.A. 1, their religious beliefs would compel them to have abortions.

27.    The State further contends that even if the Plaintiffs have a religious obligation to obtain an abortion, S.E.A. 1 nonetheless does not burden them, because Plaintiffs are taking steps to prevent the possibility of becoming pregnant.

28.    The Court also rejects this argument, as did the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398 (1963), *abrogation on other grounds recognized in Holt*, 574 U.S. at 357. There, the plaintiff's employment was terminated because she was unwilling to work on Saturday, her religion's Sabbath.  She was unable to find substitute employment due to her religious obligation, as the other available jobs would have required Saturday work. *Id.* at 401. The State denied her unemployment benefits as a result of her "fail[ing,]

[30]

without good cause, to accept suitable work when offered." *Id.* at 401. There, the Court held that the "pressure upon her to forego" her religious practice was unmistakeable," and that the State was forcing her "to choose between following the precepts of her religion" and receiving unemployment. *Id.* at 404. "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship." *Id.*

29.     Anons. 1, 4, and 5 are avoiding becoming pregnant, even though they would like to have children. Anon. 1 has ceased having sexual intercourse with her husband, and Anon. 2 has severely curtailed sexual activity with her husband. And Anon. 3 has become abstinent. Members of Hoosier Jews for Choice are also altering their sexual and reproductive practices. It is undisputed that all of these actions have been taken solely due to S.E.A. 1, and they are actions that the Plaintiffs do not want to take. They have adopted these practices solely to avoid placing themselves in circumstances that would require them to exercise their religious belief, but where that exercise would be prohibited by S.E.A. 1. The government's pressure upon them to abandon their religious beliefs is clear.

30.     This Court finds that the Plaintiffs have made a prima facie showing that they have a likelihood of success on the merits that S.E.A. 1 imposes a substantial burden on Plaintiffs' religious exercise.

### ii.   The State has not established a compelling interest in enforcing S.E.A. 1 against the plaintiffs

31.     RFRA requires that once a plaintiff demonstrates that the "disputed governmental action substantially burdens a sincerely held religious belief . . . the burden shifts to the government to establish that a compelling governmental interest is 'satisfied through the

application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Blattert,* 190 N.E.2d at 421 (quoting *O Centro*, 546 U.S. at 420). The government may not simply enunciate a general reason for the statute, as RFRA requires a "more focused inquiry." *Id.* RFRA demands that there be a "case-by-case consideration of religious exemptions to generally applicable rules." *Id.* at 436.

32.     The State first argues that the interest in preventing abortion is compelling. The State argues that abortion at any gestational age beginning at fertilization "ends the life of an innocent human being" (State's Br. at 32), and that it has a compelling interest in protecting this class of "vulnerable human beings" from being killed. (*Id.* at 33).  The State's interest is based entirely on the legislative determination that "human physical life" begins when sperm meets egg. Ind. Code § 16-34-2-1.1(a)(1)(E). The State presents as a statement of fact that "it is a simple scientific observation" that "the human fetus is a human being" (State's Br. at 6), as are zygotes and embryos, (*Id.* at 35).

33.     Of course, it is not disputed that human zygotes, embryos, and fetuses are of the human species. In making these factual assertions, the State is therefore attempting to establish as a factual matter when a human comes into being—the "being" part of the phrase "human being." In so doing, the State seeks to establish (1) that the question of when life begins has been definitively answered by science and medicine, and therefore that any theological opinions regarding this question are either wrong or are rendered irrelevant; and (2) it has a compelling interest in prohibiting the termination of pregnancy from the moment of fertilization forward.

34.     The Supreme Court already recognized in *Hobby Lobby* that the question of when life begins is a religious one that the State may not answer legislatively or as a factual matter. 573 U.S. at 720 (taking as the starting point that "the [plaintiffs] have a sincere religious belief that life begins at conception").  The nature of this enduring question and the dispute surrounding it are illustrated by the very fact of the competing affidavits filed by both sides.

35.     This Court finds that the question of when life begins is a theological one not a factual question for this Court.   The U.S. Supreme Court has held that "the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general" and government may not act "to benefit religion or particular religions." *Lukumi Babalu Aye*, 508 U.S. at 532. "The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

36.     In addition, the State may not dictate the parameters of what constitutes a question of religion. As the Supreme Court made clear in the context of the government's attempt to define religion as necessarily involving belief in a "Supreme Being," the State may not construct the confines of religious belief and place some things—such as when life begins—outside of it.  *United States v. Seeger*, 380 U.S. 163, 183-84 (1965).

37.     While the State may question the sincerity of a plaintiff's religious belief, it may not question the belief's veracity. The State ignores the fact that "courts have no business addressing whether the religious belief asserted in a RFRA case is reasonable." *Hobby Lobby*, 573 U.S. at 724. To do so would place a court as the arbiter of the reasonableness and propriety of religious beliefs and would violate the First Amendment. *United States v.*

*Ballard*, 322 U.S. 78, 86 (1944) (noting that the Free Exercise Clause "embraces the right to maintain theories of life and death and of the hereafter which are rank heresy to followers of the orthodox faiths. . . . Men may believe what they cannot prove . . . . The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position.").

38.     This Court finds that Indiana, in its own statutes, does not endow zygotes, embryos, and pre-viability fetuses with the legal status of human being.

39.     Indiana's health code does not define a "human being," but it defines a human embryo as "a human egg cell with a full genetic composition capable of differentiating and maturing into a complete human being." Ind. Code § 16-18-2-183.5.

40.     Indiana's criminal code defines "human being" as "an individual who has been born and is alive." Ind. Code § 35-31.5-2-160. For purposes of an action for wrongful death or injury, a "child" is defined as either a child born alive or a fetus after it has attained viability. Ind. Code § 34-23-2-1(b).   The Court of Appeals has noted that there is an inherent distinction between a child born alive and a fetus as "the child who has been born has an independent existence outside the mother's body, and the unborn fetus lives within her body." *McVey v. Sargent*, 855 N.E.2d 324, 328 (Ind. Ct. App. 2006).   In *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 255 (Ind. 2003), while the State argued that it had a "valid and compelling" interest in protecting fetal life, the Court concluded that this interest was not strong enough to allow the State to refuse to fund certain abortions.

41.     The State relies primarily on *Cheaney v. State*, 285 N.E.2d 265 (Ind. 1972) to support its position that the State has a compelling interest. The *Cheaney* case does not support the State's statement that life begins at fertilization. First, *Cheaney* was decided

prior to *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, –U.S.–, 142 S. Ct. 2228 (2022), in which the Supreme Court recognized that a state has an "important and legitimate interest in potential life" that becomes "compelling" at viability. *Id.* at 163. And in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), *overruled by Dobbs*, the Court emphasized that the state's interests are not compelling prior to fetal viability. 505 U.S. at 846. While *Dobbs* determined that the Constitution does not protect a fundamental liberty interest in abortion, *Dobbs* said nothing to suggest that the nature of the State's interest has somehow changed. Moreover, no subsequent Indiana case has relied on *Cheaney*'s compelling interest language including *Humphreys*, which cited the State's reliance on *Cheaney.* In 1972, the Indiana Supreme Court held "that a State interest in what is, at the very least, from the moment of conception a living being and potential human life, is both valid and compelling. *Cheaney*, 285 N.E.2d at 270. However, this Court and other Courts cannot select different theological or religions definitions of conception as such is prohibited under RFRA. For example, Anon. Plaintiffs 1, 4, and 5 practicing the Jewish faith have a sincerely held religious belief that conception begins a birth.

42.     This Court must look at the application of the statute to those whose "exercise of religion is being substantially burdened," *O Centro*, 546 U.S. at 430-31, has led courts applying RLUIPA and the federal RFRA to exempt persons from coverage of otherwise valid laws to allow the persons' religious beliefs to be accommodated. For example, the Supreme Court held that exemptions should be provided so that plaintiffs could ingest otherwise-prohibited controlled substances, *O Centro*, 546 U.S. at 425-27, 439, or grow a beard that was otherwise prohibited in the prison setting, *Holt*, 574 U.S. at 369-70.

43.     The undisputed evidence establishes that the Plaintiffs do not share the State's belief that life begins at fertilization or that abortion constitutes the intentional taking of a human life. To the contrary, they have different religious beliefs about when life begins, and they believe that under certain circumstances not permitted by S.E.A. 1, they would be required to receive abortions.  Under the law, the Court finds these are sincere religious beliefs.

44.     The State has not asserted a compelling interest in refusing to provide an exception to the Plaintiffs if the law were otherwise enforceable. Indiana has no interest in violating the sincere religious beliefs and exercise of the Plaintiffs, particularly as the Plaintiffs take no issue with the manner in which their religious exercise was accommodated under Indiana's prior abortion law.

45.     This Court find that the defendants have failed to satisfy their burden under RFRA to demonstrate a compelling governmental interest, either in general or as applied specifically to Plaintiffs.

### iii.   The State has not established that S.E.A. 1 is the least restrictive means to achieve its stated interest

46.     The Court further finds that if there were a compelling interest which there is not that the Defendants must demonstrate that S.E.A. 1 "is the least restrictive means of furthering [its] compelling governmental interest." Ind. Code § 34-13-9-8(b)(2). "The least-restrictive-means standard is exceptionally demanding and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt*, 574 U.S. at 364-65 (internal quotation and citation omitted).

47.     The State's position is that a human life begins at fertilization and that, as a result, it has in interest in preventing the "killing of an innocent human being."(State's Br. at 33).

48.     A statute is not narrowly tailored if it is underinclusive in scope. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020) (referring to First Amendment analysis). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011) (referring to First Amendment analysis). Therefore, "[u]nderinclusiveness can . . . reveal that a law does not actually advance a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (referring to First Amendment analysis).

49.     The Plaintiffs argue that S.E.A. 1 is not narrowly tailored and is underinclusive, in that it provides exceptions for some abortions—though not religious exceptions—in circumstances that directly contravene the State's purported interest.

50.     The State argues that abortion, regardless of gestational age of the zygote, embryo, or fetus, is the killing of an innocent human being, and its interest is in preventing that killing. (State's Br. at 33).

51.     However, the statute explicitly allows abortions in circumstances that the State acknowledges constitute the "killing" of an "innocent human being": for example, where the pregnancy is the result of rape or incest and where the fetus is viable but will not live beyond three months after birth.

52.     The State raises several arguments in response to the Plaintiffs' claims of underinclusiveness.   First, the State contends that "[p]ermitting these Plaintiffs—or anyone else—to abort their children in the future would necessarily require the State to forgo its interest entirely." (State's Br. at 37).  The law explicitly allows some persons to

[37]

seek abortions, as the State itself recognizes, "where there is a compelling interest on the other side." (State's Br. at 35-36). The State is willing in these instances to "forgo" its interest where it deems the countervailing interest "compelling," but not where a religious mandate rests on the other side of the balance.

53.     The State's argues to narrowly tailor a religious exemption for the Plaintiffs would "turn entirely on the subjective preferences of individual women who may wish to choose abortion for a wide variety of reasons connected to physical or mental health or even self-actualization.  Such a broad exception has no limiting principle and would blow a hole in Indiana's abortion prohibition." (State's Br. at 40).

54.     This Court finds that there is a limiting principle, as there is in any case involving religious discrimination: the Plaintiffs' sincerely held religious beliefs provide the limits.

55.     In this case, the State's arguments unfairly criticize the Plaintiffs' Religious practices as subjective and minimize the importance of the Plaintiffs' religious beliefs which are permitted under RFRA.  The Plaintiffs' religious beliefs are no more or less subjective than believing that a human being comes into existence at the moment that a sperm meets an egg or at the moment of birth. In *O Centro*, in refusing to allow the government to prohibit a religious sect from gaining access to a hallucinogen that was otherwise prohibited as a Schedule I substance by the Controlled Substances Act, the Court did not criticize the "subjective preferences" of the members of this small sect. 546 U.S. at 434. Instead, the Court noted that given that there was an exception in the Act for the use of peyote by recognized Indian Tribes, there was no reason to restrict its use to the plaintiffs who had sincere religious needs for the hallucinogen: "if any Schedule I substance is always highly dangerous in any amount no matter how used, what about the

[38]

unique relationship with the Tribes justifies allowing their use of peyote?" *Id.* (Court's emphasis). Similarly, if an abortion always kills a human being, there is no reason not to extend the exceptions in S.E.A. 1 to persons whose sincere religious beliefs compel them to obtain abortions in light of the current exception in S.E.A. 1.

56.    Finally, the State argues that the exceptions allowed under S.E.A. 1 do not "reveal sinister treatment of religion" and the law cannot be deemed to be underinclusive because it does not indicate invidious discrimination against religion. (State's Br. at 36-37). The State does not cite any legal authority for its claim that there must be a "sinister" motive, and this Court finds no legal requirement that the State must have "sinister" motive. It is enough that the State has allowed exceptions to the law in some situations, but not in the religiously mandated situations presented by Plaintiffs. This is invidious discrimination against the religious beliefs to which the State does not subscribe but that the Plaintiffs hold. *See, e.g., Schwartz v. Bhd. of Maint. of Way Employees*, 264 F.3d 1181, 1186 (10th Cir. 2001) ("Discrimination is invidious if based upon impermissible or immutable classification such as race or other constitutionally protected categories, or arises from prejudice or animus.") (internal quotation and citation omitted).

57.    This Court does not find that S.E.A. 1 is the least restrictive means for the government to achieve that interest in light of the Plaintiffs' sincerely held religious beliefs.

58.    This Court further finds that the Plaintiffs are likely to prevail on the merits of their claims that S.E.A. 1, as applied to them, violates RFRA.

## E.  The other requirements for a preliminary injunction are met

### i.    Because the State's actions violate RFRA, the plaintiffs need not show irreparable harm or a balance of hardships in their favor

59.     As the Court of Appeals has held, "When a motion seeks to enjoin an action that would violate a law or statute, however,  the act is considered to case *per se* irreparable harm. when the acts sought to be enjoined are unlawful, the plaintiff need not make a showing of irreparable harm or a balance of the hardship in his favor." *Short On Cash.Net of New Castle, Inc. v. Department of Financial Institutions*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004).  Should the Court find that the nonmovant has committed such an unlawful act, Indiana law deems the public interest in stopping the activity so great that "the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. *Id*  at 823. In other words, where a Court finds that denying a preliminary injunction would permit the nonmovant to continue committing unlawful conduct, the Court need not consider the remaining preliminary injunction factors and instead must issue the relief sought by the movant.

60.     In sum, the Plaintiffs maintain that Defendants have violated RFRA with the enactment of S.E.A. 1and that this  "unlawful act[s]" which "constitute[] *per se* irreparable harm for purposes of the preliminary injunction analysis",  *Clay Twp. of Hamilton Cnty. ex rel. Hagan v. Clay Twp. Reg'l Waste Dist.*, 838 N.E.2d 1054, 1063 (Ind. Ct. App. 2005) (quoting *Short On Cash.Net of New Castle, Inc. v. Dep't of Fin. Insts.*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004)), and thus should be found to have committed irreparable harm *per se*  against them.

61.     Since this Court has found that the State's violation of Plaintiffs' rights under RFRA occurred with the enactment of S.E.A 1, the Plaintiffs have suffered *per se* irreparable harm and that the balance of harms favors the Plaintiffs. Even though this Court has

concluded that the Plaintiffs are reasonably likely to prevail on their claims that S.E.A. 1 violates RFRA and that per se irreparable harm exists, this Court will address the additional factors necessary to grant a preliminary injunction even though caselaw does not require it.

> ### ii.   In the absence of an injunction, the plaintiffs will suffer irreparable harm for which there is no adequate remedy at law

62.    Just as in the First Amendment, federal RFRA, and RLUIPA context, the loss of religious freedoms guaranteed by Indiana's RFRA constitutes irreparable harm for which damages are an inadequate remedy. *See, e.g., Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (further citations omitted); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (referring to the federal RFRA); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (same, citing *Jolly*).

63.    The Court has concluded that the plaintiffs' religious exercise is being substantially burdened, that they are suffering irreparable harm, and that they would receive relief by the issuance of a preliminary injunction.  The State argues that the Plaintiffs would need to bring their claim once they are pregnant and wish to terminate the pregnancy based on their sincere religious beliefs. For the same reasons that this Court concluded that the Plaintiffs' claims are ripe for review, the Court rejects the State's contention that any harm to the Plaintiffs is merely speculative.   The Court finds that the Plaintiffs have established irreparable harm as S.E.A. 1 violates their sincerely held religious beliefs.

### iii.   The balance of harms favors the issuance of a preliminary injunction

64.     "Preliminary injunctions are generally used to preserve the status quo as it existed before a controversy, pending a full determination on the merits of the dispute." *Stoffel v. Daniels*, 908 N.E.2d 1260, 1272 (Ind. Ct. App. 2009) (citation omitted).

65.     An injunction will prevent the violation of Plaintiffs' rights under RFRA while maintaining the status quo that has existed in Indiana for decades regarding abortion.

66.     Given that plaintiffs have established that they are likely to succeed on the merits of their claim, "no substantial harm to others can be said to inhere in" granting the injunction. *Déjà vu of Nashville, Inc., v. Metro Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (referring to a demonstration that a law violates the First Amendment). Instead, an injunction will only force the Defendants to conform their conduct to what is required by RFRA to protect Plaintiffs' religious rights.  The balance of harms favors the Plaintiffs.

### iv.   The public interest favors the grant of a preliminary injunction

67.     When a statute is violated "the public interest is so great that the injunction should issue" regardless of the balance of harms between the parties and the existence of independent irreparable harm. *Short on Cash.Net*, 811 N.E.2d at 823.

68.     It is in the public interest to enforce RFRA, and it is in the public interest to do so here.  *See Opulent Life Church*, 697 F.3d at 298 (RLUIPA).

### v.   The preliminary injunction will issue without bond

69.     The Defendants do not dispute that no bond should be required, and as there is no evidence that the injunction will cause any monetary damages or injury, no bond is required here.  See *Kennedy v. Kennedy*, 616 N.E.2d 39, 44 (Ind. Ct. App. 1993) (internal

citation omitted); *see also, Crossman Communities, Inc. v. Dean*, 767 N.E.2d 1035, 1043 (Ind. Ct. App. 2002) (same).

### V.  Order

For all of the reasons discussed in this Order, the Court finds that S.E.A. 1 substantially burdens the religious exercise of the Plaintiffs and that S.E.A. 1 is not the least restrictive means to achieve a compelling governmental interest.  The Court finds that the Plaintiffs have demonstrated by the greater weight of the evidence that the Plaintiffs have a prima facie likelihood of success on the merits of their claims, the Plaintiffs will suffer irreparable harm, the balance of harms is in favor of the Plaintiffs and the public interest will not be disserved by granting the Plaintiffs' Motion for Preliminary Injunction to maintain the status quo.  The preliminary injunction shall issue without bond.

**THEREFORE**, the Court **GRANTS** the plaintiffs' Motion for Preliminary Injunction, and hereby **ENJOINS** the Defendants and their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs.

December 2, 2022
_____                    *Heather A. Welch*_____
Date                                            Judge, Marion Superior Court

CC:   Counsel of record

[43]