**EXHIBIT E**

(Slip Opinion)

# Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions

Section 1461 of title 18 of the U.S. Code does not prohibit the mailing of certain drugs that can be used to perform abortions where the sender lacks the intent that the recipient of the drugs will use them unlawfully. Because there are manifold ways in which recipients in every state may lawfully use such drugs, including to produce an abortion, the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully.

December 23, 2022

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
UNITED STATES POSTAL SERVICE

In the wake of the United States Supreme Court's recent decision overruling *Roe v. Wade*, 410 U.S. 113 (1973),[1] you have asked for this Office's view on whether section 1461 of title 18 of the United States Code prohibits the mailing of mifepristone and misoprostol, two prescription drugs that are commonly used to produce abortions,[2] among other purposes. Memorandum for Christopher Schroeder, Assistant Attorney General, Office of Legal Counsel, from Thomas J. Marshall, General Counsel, United States Postal Service, *Re: Request for an Interpretation of 18 U.S.C. § 1461*, at 1 (July 1, 2022) ("USPS Request"). Originally enacted as part of the Comstock Act of 1873, section 1461 currently declares "[e]very article or thing designed, adapted, or intended for producing abortion," as well as "[e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion," to be "nonmailable matter" that the United States Postal Service ("USPS") may not lawfully deliver. 18 U.S.C. § 1461.

We conclude that section 1461 does not prohibit the mailing, or the delivery or receipt by mail, of mifepristone or misoprostol where the sender

---

[1] *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

[2] *See* Ctrs. for Disease Control & Prevention, U.S. Dep't of Health & Hum. Servs., *Abortion Surveillance—United States, 2019*, 70 MMWR Surveillance Summaries, Nov. 26, 2019, at 8, https://www.cdc.gov/mmwr/volumes/70/ss/ss7009a1.htm.

46 Op. O.L.C. __ (Dec. 23, 2022)

lacks the intent that the recipient of the drugs will use them unlawfully.[3] This conclusion is based upon a longstanding judicial construction of the Comstock Act, which Congress ratified and USPS itself accepted. Federal law does not prohibit the use of mifepristone and misoprostol. Indeed, the U.S. Food and Drug Administration ("FDA") has determined the use of mifepristone in a regimen with misoprostol to be safe and effective for the medical termination of early pregnancy.[4] Moreover, there are manifold ways in which recipients in every state may use these drugs, including to produce an abortion, without violating state law. Therefore, the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully.[5]

---

[3] A cognate provision, 18 U.S.C. § 1462, imposes similar abortion-related prohibitions on using an express company or other common carrier for "carriage" of such items. Our analysis in this memorandum is applicable to that provision as well.

Sections 1461 and 1462 refer not only to persons who transmit such items by mail or by common carrier—the senders—but also to individuals who "knowingly cause[]" such items to be mailed, *id.* § 1461; "knowingly take[]" any such items from the mail for the purpose of circulating or disposing of them, *id.*; or "knowingly take[] or receive[]" such items from an express company or common carrier, *id.* § 1462. In the different contexts of obscenity and child pornography, courts of appeals have held that section 1461 applies to the act of the recipient who orders the nonmailable material and thereby "causes" it to be mailed. *See, e.g.*, *United States v. Carmack*, 910 F.2d 748, 748 (11th Cir. 1990); *United States v. Johnson*, 855 F.2d 299, 305–06 (6th Cir. 1988). *But see Johnson*, 855 F.2d at 307–11 (Merritt, J., dissenting); *United States v. Sidelko*, 248 F. Supp. 813, 815 (M.D. Pa. 1965). As far as we know, however, these provisions have never been applied to prosecute the recipients of abortion- and contraception-related materials. Moreover, the court of appeals decisions we discuss below construed the relevant provisions of the Comstock Act to turn on the nature of the sender's intent, not that of the recipient. Consistent with this practice, we focus on the sender throughout this memorandum. To the extent a recipient might be covered, however, our analysis herein would apply and therefore section 1461 would not prohibit that person from ordering or receiving the drugs if she does not intend that they be used unlawfully.

[4] *See Mifeprex (Mifepristone) Tablets*, U.S. Food & Drug Admin. 2 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf (mifepristone label); *see also Mifeprex (Mifepristone) Information*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information (last updated Dec. 16, 2021).

[5] For purposes of this opinion, we assume but do not decide that section 1461 could be constitutionally applied to the mailing of drugs intended to produce abortions. We also assume without deciding that state law, as well as federal, is relevant to the application of section 1461. In addition, we do not address here whether and under what circumstances the mailing of mifepristone or misoprostol might violate other federal laws. Finally, as

2

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

## I.

The Comstock Act has a long and complex history. The original 1873 law was the handiwork of Anthony Comstock—"a prominent anti-vice crusader who believed that anything remotely touching upon sex was . . . obscene"—who successfully lobbied Congress and state legislatures in the nineteenth century to enact expansive laws "to prevent the mails from being used to corrupt the public morals." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 70 n.19 (1983) (omission in original) (quotation marks and citations omitted); *see also* Priscilla J. Smith, *Contraceptive Comstockery: Reasoning from Immorality to Illness in the Twenty-First Century*, 47 Conn. L. Rev. 971, 982–84 (2015). Originally entitled "An Act for the Suppression of Trade in, and Circulation of, obscene Literature and Articles of immoral Use," Act of Mar. 3, 1873, ch. 258, 17 Stat. 598 ("1873 Act"), the Act is perhaps best known for having prohibited the distribution of a wide range of writings until courts and the Executive Branch determined that the Free Speech Clause of the First Amendment significantly limited the permissible reach of the law, *see, e.g.*, *Bolger*, 463 U.S. at 69–75. In addition, the Act also included several restrictions on the conveyance of things designed to prevent conception or to produce abortion.[6] Congress largely repealed the references to contraceptives in

---

you note, USPS Request at 3, some states have independently enacted laws to restrict the mailing of these drugs for abortion purposes within their jurisdiction. *See, e.g.*, Tex. Health & Safety Code § 171.063(b-1). We do not here assess the possible effect of federal law on such state restrictions, other than to note our agreement with your view that the doctrine of intergovernmental immunity would preclude application of such state laws against USPS employees who are complying with their duties under federal law. *See Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *1–5, *10 (Sept. 21, 2022).

[6] The original 1873 Act consisted of five sections, three of which are relevant to this opinion. Section 1 of the Act prohibited, *inter alia*, the sale, distribution, or possession, in the District of Columbia and federal territories, of "any drug or medicine, or any article whatever, for the prevention of conception, or for causing *unlawful* abortion," along with advertisements for contraceptives and abortion services and information about how to obtain them. 1873 Act § 1, 17 Stat. at 598–99 (emphasis added). Congress chose not to include that prohibition when it comprehensively enacted title 18 into positive law in 1948. *See* Pub. L. No. 80-772, § 21, 62 Stat. 683, 864 (1948) (repealing, *inter alia*, 18 U.S.C. § 512 (1946)).

Section 2 of the Act, which eventually became codified as section 1461, criminalized the mailing of, *inter alia*, "obscene, lewd, or lascivious" writings; "any article or thing

46 Op. O.L.C. __ (Dec. 23, 2022)

1971. *See* Pub. L. No. 91-662, 84 Stat. 1973 (1971) (discussed *infra* Part I.C).

   In its current form, section 1461, which is derived from section 2 of the 1873 Act, begins by declaring "[e]very obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance" to be "nonmailable matter" that "shall not be conveyed in the mails or delivered from any post office or by any letter carrier." 18 U.S.C. § 1461. The next clauses declare nonmailable "[e]very article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and [e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose." *Id.*; *see also* 39 U.S.C. § 3001(a) (likewise declaring such matter to be "nonmailable"). Section 1461 further makes it a felony to "knowingly use[] the mails for the mailing, carriage in the mails, or delivery" of any such things, or to "knowingly cause[]" them "to be delivered by mail according to the direction thereon." 18 U.S.C. § 1461. In addition, 18 U.S.C. § 1462 imposes two other, related prohibitions: it makes it unlawful to bring those same things "into the United States, or any place subject to the jurisdiction thereof," and it prohibits the knowing use of "any

---

intended or adapted for any indecent or immoral use or nature"; and "any article or thing designed or intended for the prevention of conception or procuring of abortion." 1873 Act § 2, 17 Stat. at 599. Before Congress enacted title 18 into positive law in 1948, the provision that is now section 1461 was codified at 18 U.S.C. § 334 (1925–1926).

   Section 3 of the 1873 Act prohibited all persons "from importing into the United States" any of the "hereinbefore-mentioned articles or things"—referring to the items prohibited by sections 1 and 2. 1873 Act § 3, 17 Stat. at 599. One year later, *see* Act of June 20, 1874, ch. 333, 18 Stat. pt. 3, at 113–14, Congress codified section 3 of the Comstock Act as section 2491 of the Revised Statutes and, in doing so, replaced the section's reference to the "hereinbefore-mentioned articles or things" with a list of articles and things pulled from the other provisions of the Comstock Act, *see* Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460; *see also* Rev. Stat. § 2491 (2d ed. 1878), 18 Stat. pt. 1, at 457. In supplying content to these words, Congress prohibited the importation of articles or things "for causing unlawful abortion," reflecting the language of section 1 of the original Comstock Act. Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460. Congress consistently retained the words "unlawful abortion" in follow-on versions of this restriction, including in subsequent Tariff Acts through 1930, after which the provision was codified at 19 U.S.C. § 1305.

4

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

express company or other common carrier or interactive computer ser-
vice" for "carriage" of such items "in interstate or foreign commerce."[7]

Over the course of the last century, the Judiciary, Congress, and USPS
have all settled upon an understanding of the reach of section 1461 and
the related provisions of the Comstock Act that is narrower than a literal
reading might suggest. This construction occurred long before the Su-
preme Court's decisions in *Griswold v. Connecticut*, 381 U.S. 479 (1965),
and *Roe* and thus was not dependent upon the Court's recognition of
constitutional rights regarding the prevention or termination of pregnancy.
Beginning early in the twentieth century, federal courts construed the
provisions not to prohibit all mailing or other conveyance of items that
can be used to prevent or terminate pregnancy. By the middle of the
century, the well-established, consensus interpretation was that none of
the Comstock Act provisions, including section 1461, prohibits a sender
from conveying such items where the sender does not intend that they be
used unlawfully. USPS accepted that construction and informed Congress
of it. On several occasions, Congress reenacted and amended the Com-
stock Act against the backdrop of the judicial precedent in a manner that
ratified the federal courts' narrowing construction.

## A.

Since early in the twentieth century, federal courts have agreed that
section 1461 and related Comstock Act provisions do not categorically
prohibit the mailing or other conveyance of items designed, adapted, or
intended for preventing or terminating pregnancy.

In 1915, in *Bours v. United States*, 229 F. 960 (7th Cir. 1915), the U.S.
Court of Appeals for the Seventh Circuit reversed the conviction of a
doctor who had mailed a letter addressing how a woman might procure an
"operation" from him. The court noted that Congress enacted the provi-
sion that is now section 1461 pursuant to its "national power of control-
ling the mails" and held that, "[i]n applying the national statute to an
alleged offensive use of the mails at a named place, it is immaterial what

---

[7] The importation prohibition—along with 19 U.S.C. § 1305 (prohibiting the importa-
tion into the United States of "any drug or medicine or any article whatever for causing
unlawful abortion")—derives from section 3 of the original 1873 Act, *see* § 3, 17 Stat. at
599. The common-carrier prohibitions derive from an 1897 law extending the mailing
prohibitions of the original Comstock Act to common carriers. *See* Act of Feb. 8, 1897,
ch. 172, 29 Stat. 512.

46 Op. O.L.C. __ (Dec. 23, 2022)

the local statutory definition of abortion is, what acts of abortion are included, or what excluded." *Id.* at 964. The court further held that "[t]hough the letter of the statute would cover all acts of abortion," under a "reasonable construction," the statute should not be read to prohibit the mailing of advertisements for a procedure a doctor would perform in order "to save [the] life" of the woman. *Id.* Because the indictment had not drawn this distinction, the defendant had no opportunity to explain whether he had intended to perform the operation "only under such circumstances as would make it the duty of any reputable physician to perform the act." *Id.* at 965. Therefore, the court reversed the judgment and remanded the case. *Id.* at 966.

Fifteen years later, in *Youngs Rubber Corp. v. C.I. Lee & Co.*, 45 F.2d 103 (2d Cir. 1930), the U.S. Court of Appeals for the Second Circuit also reasoned in dicta that the statute could not be construed as expansively as its language might suggest. *Youngs Rubber* was a trademark infringement suit in which the defendants argued that the plaintiff's business was unlawful because it involved sending Trojan condoms to druggists for retail sale via the mail and common carriage, a practice that—according to the defendant—violated the Comstock Act. *Id.* at 108. "Taken literally," the appeals court wrote, the Comstock Act's "language would seem to forbid the transportation by mail or common carriage of anything 'adapted,' in the sense of being suitable or fitted, for preventing conception or for any indecent or immoral purpose, even though the article might also be capable of legitimate uses and the sender in good faith supposed that it would be used only legitimately." *Id.* "Such a construction," the court cautioned, "would prevent mailing to or by a physician of any drug or mechanical device 'adapted' for contraceptive or abortifacient uses, although the physician desired to use or to prescribe it for proper medical purposes." *Id.* The court observed that New York law did not prohibit supplying such articles to physicians "or by their direction or prescription." *Id.* at 109 (quotation marks omitted). Reasoning that "[t]he intention to prevent a proper medical use of drugs or other articles merely because they are capable of illegal uses is not lightly to be ascribed to Congress," the court construed the statute's contraception and abortion prohibitions to "requir[e] an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion." *Id.* at 108.

In 1933, the U.S. Court of Appeals for the Sixth Circuit embraced the same limiting construction of the Comstock Act. *Davis v. United States*,

6

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

62 F.2d 473 (6th Cir. 1933), involved a defendant who was convicted of, among other things, the sale of "rubber sundries" to druggists that were delivered by common carrier. *Id.* at 474. Invoking the "rule of reasonable construction," *id.* at 475, the *Davis* court reversed the conviction because the district court did not permit the admission of evidence that the defendant had sent the items intending that they be used for "treatment and prevention of disease" rather than to prevent conception, *id.* at 474. The court quoted with approval *Youngs Rubber*'s view that the statute should be read to "requir[e] an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes," *id.*, and noted that the "soundness of its reasoning commends itself to us," *id.* at 475. The court accordingly rejected the district court's conclusion that the statute "brings within the condemnation of each section articles or things that are capable of being used for the specified purposes without respect to their having a legitimate use, and without regard to the intent of the persons mailing [them]," *id.* at 474, holding instead that "intent that the articles . . . shipped in interstate commerce were to be used for condemned purposes is a prerequisite to conviction," *id.* at 475.

   Three years later, the Second Circuit revisited the issue and adopted *Youngs Rubber*'s dicta as a holding in *United States v. One Package*, 86 F.2d 737 (2d Cir. 1936). In that case, a New York gynecologist had imported vaginal pessaries from a Japanese sender who had asked the doctor to use them in her practice to assess whether they were useful for contraceptive purposes. *Id.* at 738. At the time, New York law prohibited the sale or provision of articles for the prevention of conception, but it included an exception for the provision of such things to physicians "who may in good faith prescribe their use for the cure or prevention of disease." *Id.* (citing N.Y. Penal Law § 1145 (Consol. Laws, c. 40)). The doctor testified that she prescribed the items only where her patient had a health-related reason such that "it would not be desirable for a patient to undertake a pregnancy," which the court of appeals apparently understood to fall within the exception under New York law that permitted physicians to provide patients with contraceptives for particular purposes. *Id.*[8] The court quoted favorably, and at length, from the dicta in *Youngs Rubber*, and noted the accord of the Sixth Circuit in *Davis*. *Id.* at 738–39. It then

_____

[8] The court of appeals noted that the accuracy and good faith of the doctor's testimony was "not questioned." *One Package*, 86 F.2d at 738.

46 Op. O.L.C. __ (Dec. 23, 2022)

dismissed the case because none of the relevant provisions should be read to prohibit the mailing or importation of items to prevent or terminate pregnancy with the intent that they be used for lawful purposes. *Id.* at 739–40. The court reasoned that it was appropriate to, in effect, imply the insertion of the adjective "unlawful," which expressly modified the word "abortion" in some provisions of the Comstock Act, to modify the terms "prevention of conception" and "abortion" throughout the various provisions that derived from the Act. *Id.* [9] The court elaborated:

> [W]e are satisfied that this statute, as well as all the acts we have referred to, embraced only such articles as Congress would have denounced as immoral if it had understood all the conditions under which they were to be used. Its design, in our opinion, was not to prevent the importation, sale, or carriage by mail of things which might intelligently be employed by conscientious and competent physicians for the purpose of saving life or promoting the well being of their patients. The word "unlawful" would make this clear as to

---

[9] The case involved the "prevention of conception" prong of the Tariff Act of 1930—a descendent provision of the original Comstock Act—which prohibited importing articles "for the prevention of conception or for causing *unlawful* abortion." *One Package*, 86 F.2d at 738 (emphasis added) (quoting 19 U.S.C. § 1305(a) (1934)); *see also supra* note 6. The court noted that the original 1873 Comstock Act likewise used the adjective "unlawful" to modify "abortion" in one of its provisions (section 1—involving the sale and possession of abortifacients in federal territories) but not in others, and not as to articles for preventing conception. *One Package*, 86 F.2d at 739. The court reasoned that Congress could not reasonably have had the design to make the "unlawful" nature of the intended use an element of the offense under some of the abortion-related prohibitions but not others, or as to the importation of items used for abortion but not those used for contraception. *See id.* ("[I]n the Comstock Act, . . . the word 'unlawful' was sometimes inserted to qualify the word 'abortion,' and sometimes omitted. It seems hard to suppose that under the second and third sections articles intended for use in procuring abortions were prohibited in all cases while, under the first section, they were only prohibited when intended for use in an 'unlawful abortion.'"). Instead, the court reasoned, the adjective "unlawful" must in effect be read to modify all of the prohibitions. *Id.*; *see also id.* at 740 (Learned Hand, J., concurring) ("[I]t is of considerable importance that the law as to importations should be the same as that as to the mails; we ought not impute differences of intention upon slight distinctions in expression."). The *One Package* court's analysis that the adjective "unlawful" should be read to modify all of the provisions of the Comstock Act is bolstered by the 1874 Congress's understanding of the term "hereinbefore-mentioned articles" in section 3 of the Comstock Act to prohibit the import only of articles, drugs, or medicines "for causing unlawful abortion." *See supra* note 6; Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460.

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

articles for producing abortion, and the courts have read an exemption into the act covering such articles even where the word "unlawful" is not used. The same exception should apply to articles for preventing conception. . . . It seems unreasonable to suppose that the national scheme of legislation involves such inconsistencies and requires the complete suppression of articles, the use of which in many cases is advocated by such a weight of authority in the medical world.

*Id.*

The Second Circuit again reaffirmed this construction of the statute shortly thereafter in *United States v. Nicholas*, 97 F.2d 510 (2d Cir. 1938), which involved the Comstock Act's prohibition on mailing information about contraception. Citing *Youngs Rubber* and *One Package*, the court in *Nicholas* noted: "We have twice decided that contraceptive articles may have lawful uses and that statutes prohibiting them should be read as forbidding them only when unlawfully employed." *Id*. at 512.[10] Applying this reading, the court held that USPS was required to deliver a magazine containing contraception-related information to a magazine editor who might then distribute it to persons such as physicians who could use the information lawfully. *Id.* The court further held that USPS should detain a book containing such information when it was addressed to an individual "about whom nothing" was known "except that he was not a physician," *id.* at 511, but allowed for the recipient to "prove whether he is among the privileged classes" whose possession of the book "would be lawful," *id.* at 512.

---

[10] Although *Nicholas* described the relevant inquiry as being whether the articles were "unlawfully employed," rather than whether the sender *intended* that they be used unlawfully—the touchstone the court had adopted in *Youngs Rubber* and *One Package*—this difference in phrasing does not reflect a departure relevant to our analysis. The court's invocation of those two earlier decisions without qualification, as well as its further citation to *Davis*, indicates that it did not intend to deviate from the interpretation of the Act that the court had adopted in those decisions. Both the Historical and Revision Note to section 1461 and subsequent federal decisions understood *Nicholas* similarly. *See* 18 U.S.C. § 1461 (Historical and Revision Note) (observing that *Nicholas* followed "[t]he same rule" as *Davis*, which held that "the *intent* of the person" that a mailing "be used for condemned purposes was necessary for a conviction" (emphasis added)); *United States v. Gentile*, 211 F. Supp. 383, 385 n.5 (D. Md. 1962) (citing, *inter alia*, *Nicholas* for the proposition that "contraceptive devices [must be] shipped and received with intent that they be used for *illegal* contraception or abortion").

9

In 1944, the U.S. Court of Appeals for the D.C. Circuit also narrowly construed the statute in the context of a report about contraceptive materials that a consumer group had published and mailed to individuals who submitted a signed certificate attesting, "I am married and use prophylactic materials on the advice of a physician." *Consumers Union of United States, Inc. v. Walker*, 145 F.2d 33, 33 (D.C. Cir. 1944). The appeals court explained that it was "inclined to follow the interpretation [of the Comstock Act] which has been adopted in other circuits," citing to *Nicholas*, *Davis*, *Youngs Rubber*, and *One Package*. *Id.* at 35 & n.11. It therefore concluded that "Congress did not intend to exclude from the mails properly prepared information intended for properly qualified people," and held that the report "was proper in character within the meaning of those decisions." *Id.* at 35.

Subsequent judicial discussions of the relevant Comstock Act provisions recognized the narrowing construction upon which the courts of appeals had converged. *See, e.g.*, *United States v. Gentile*, 211 F. Supp. 383, 385 n.5 (D. Md. 1962) ("It seems clear under the authorities that in order to make out an offense under this paragraph the Government should be required to allege and prove that contraceptive devices are shipped and received with intent that they be used for *illegal* contraception or abortion or for indecent or immoral purposes." (citing *Youngs Rubber*, *Davis*, and *Nicholas*)); *United States v. H.L. Blake Co.*, 189 F. Supp. 930, 934–35 (W.D. Ark. 1960) ("It would seem reasonable to give the word 'adapted' a more limited meaning than that above suggested and to construe the whole phrase 'designed, adapted or intended' as requiring an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes." (quoting *Youngs Rubber*, 45 F.2d at 108)); *United States v. 31 Photographs*, 156 F. Supp. 350, 357 (S.D.N.Y. 1957) (characterizing the appellate court decisions as "upholding importation of contraceptives and books dealing with contraception when sought to be brought into the country for purposes of scientific and medical research," such that "only contraceptives intended for 'unlawful' use were banned" (citing, *inter alia*, *One Package*, *Nicholas*, *Davis*, and *Walker*)); *see also Poe v. Ullman*, 367 U.S. 497, 546 n.12 (1961) (Harlan, J., dissenting) ("[B]y judicial interpretation . . . the absolute prohibitions of the [Comstock] law were qualified to exclude professional medical use." (citing *Youngs Rubber*, *Davis*, and *One Package*)).

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

As the court in one of those later cases noted, the analysis in *Youngs Rubber* "has been cited many times and has become the law to be applied to the facts where the question of a violation of the statute . . . is before the court." *H.L. Blake Co.*, 189 F. Supp. at 934. Under that "law to be applied," the court explained, "it is well established that the defendants should not be convicted unless it is established beyond a reasonable doubt that at the time they mailed the sample packages of prophylactics . . . they intended them to 'be used for illegal contraception.'" *Id.* at 935 (quoting *Youngs Rubber*, 45 F.2d at 108).[11]

## B.

Congress has amended the Comstock Act's provisions numerous times since the federal courts' decisions in *Bours*, *Youngs Rubber*, *Davis*, *One Package*, *Nicholas*, and *Walker*, each time perpetuating the wording of the Act's abortion-related provisions. Moreover, as we explain in greater detail below, USPS accepted the courts' narrowing construction of the Act in administrative rulings, and it informed Congress of the agency's acceptance of that construction in connection with Congress's amendment of the contraception-related provisions of the Comstock Act.

We conclude that Congress's repeated actions, taken "[a]gainst this background understanding in the legal and regulatory system," *Texas Dep't of Housing & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 536 (2015), ratified the Judiciary's settled narrowing construction. *See id.* ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." (omissions in original) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpre-

---

[11] The leading cases that established this accepted construction—*Youngs Rubber*, *One Package*, and *Davis*—each involved items that could be used to prevent conception rather than to produce abortion. Nevertheless, the canonical passage from *Youngs Rubber*, repeated in each of the cases and in others thereafter, referred both to items designed to prevent conception and to those designed to induce abortions. Moreover, the court in *One Package* went to lengths to explain that all of the relevant Comstock Act prohibitions should be read consistently to require proof of a sender's intent to facilitate unlawful downstream use. *See supra* note 9; *see also Bours*, 229 F. 960 (construing narrowly the prohibition on mailing of information about how to obtain abortions). We therefore agree with your assessment that "there is no apparent reason why the case-law principles applicable to contraceptive articles (formerly) under Section 1461 would not also apply to abortion-inducing articles under the same provision." USPS Request at 3 n.3.

11

tation of Legal Texts 322 (2012))); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244 n.11 (2009) (holding that when Congress amended the Individuals with Disabilities Education Act without altering the text of a provision that the Supreme Court had previously interpreted, Congress "implicitly adopted [the Court's] construction of the statute").

The conclusion that Congress ratified the longstanding judicial view of the Comstock Act is strongly reinforced by the Historical and Revision Note that was included in the 1945 report of the House Committee on the Revision of the Laws[12] when Congress enacted title 18 of the U.S. Code into positive law.[13] That Note subsequently was appended to the official U.S. Code entries for sections 1461 and 1462. *See* 18 U.S.C. § 1461 (Historical and Revision Note).[14] It specifically "invited" the "attention of Congress" to the courts of appeals' decisions in *Youngs Rubber*, *Davis*, *Nicholas*, and *One Package*, and quoted at length from *Youngs Rubber*, including its conclusion that the relevant provisions of the statute should be construed to require "an intent on the part of the sender that the article

---

[12] *See* H.R. Rep. No. 79-152, at A96–97 (1945).

[13] *See* Pub. L. No. 80-772, 62 Stat. at 768.

[14] The Historical and Revision Notes were written by a staff of experts hired by Congress to revise the U.S. Code in the 1940s, including the editorial staffs of the West and Thompson publishing companies, the former Chief of the Appellate Section of the Department of Justice Criminal Division, and other contributors from both inside and outside of government. *See* H.R. Rep. No. 79-152, at 1–7 (1945) (describing in detail this revision process and noting that "[t]he [House] Committee on Revision of the Laws has exercised close and constant supervision over this work through its general counsel . . . and its special counsel"). The Supreme Court has discussed or relied on Historical and Revision Notes numerous times, most frequently during the middle of the twentieth century. *See, e.g.*, *Ex parte Collett*, 337 U.S. 55, 65–71 (1949) (discussing a revision note to 28 U.S.C. § 1404 and concluding that the revision note was highly significant in determining the meaning of section 1404(a)); *W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 345 U.S. 247, 254–55 (1953); *Muniz v. Hoffman*, 422 U.S. 454, 471–73 (1975).

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

mailed or shipped by common carrier be used for illegal contraception or abortion." *Id.* [15]

Congress subsequently amended the Comstock Act four times (in 1955, 1958, 1971, and 1994) without changing the language in any respect that suggested disagreement with the well-established narrowing interpretation that the Historical and Revision Note had specifically brought to its attention. Congress made the third of these amendments in 1971—removing the Act's references to contraceptives—after being informed by the Post-

---

[15] The Note's complete discussion of the court of appeals decisions is as follows:

The attention of Congress is invited to the following decisions of the Federal courts construing this section and section 1462 of this title.

In *Youngs Rubber Corporation, Inc. v. C. I. Lee & Co., Inc.*, C.C.A. 1930, 45 F. 2d 103, it was said that the word "adapted" as used in this section and in section 1462 of this title, the latter relating to importation and transportation of obscene matter, is not to be construed literally, the more reasonable interpretation being to construe the whole phrase "designed, adapted or intended" as requiring "an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes." The court pointed out that, taken literally, the language of these sections would seem to forbid the transportation by mail or common carrier of anything "adapted," in the sense of being suitable or fitted, for preventing conception or for any indecent or immoral purpose, "even though the article might also be capable of legitimate uses and the sender in good faith supposed that it would be used only legitimately. Such a construction would prevent mailing to or by a physician of any drug or mechanical device 'adapted' for contraceptive or abortifacient uses, although the physician desired to use or to prescribe it for proper medical purposes. The intention to prevent a proper medical use of drugs or other articles merely because they are capable of illegal uses is not lightly to be ascribed to Congress. Section 334 [this section] forbids also the mailing of obscene books and writings; yet it has never been thought to bar from the mails medical writings sent to or by physicians for proper purposes, though of a character which would render them highly indecent if sent broadcast to all classes of persons." In *United States v. Nicholas*, C.C.A. 1938, 97 F. 2d 510, ruling directly on this point, it was held that the importation or sending through the mails of contraceptive articles or publications is not forbidden absolutely, but only when such articles or publications are unlawfully employed. The same rule was followed in *Davis v. United States*, C.C.A. 1933, 62 F. 2d 473, quoting the obiter opinion from *Youngs Rubber Corporation v. C. I. Lee & Co.*, *supra*, and holding that the intent of the person mailing a circular conveying information for preventing conception that the article described therein should be used for condemned purposes was necessary for a conviction; also that this section must be given a reasonable construction. (See also *United States v. One Package*, C.C.A. 1936, 86 F. 2d 737.)

18 U.S.C. § 1461 (Historical and Revision Note).

13

46 Op. O.L.C. __ (Dec. 23, 2022)

master General that both the federal courts and USPS had adopted this narrowing interpretation. *See* H.R. Rep. No. 91-1105, at 3–4 (1970).[16] Moreover, we have found no evidence that Congress disapproved of the interpretation.[17] Indeed, in 2007 Congress legislated regarding the FDA's treatment of mifepristone in a manner consistent with the understanding that the Comstock Act does not categorically prohibit the covered modes of conveying abortion-inducing drugs.[18]

Congress's several actions "perpetuating the wording" of the Comstock Act's abortion provisions against the backdrop of a well-established, settled judicial construction that was brought to Congress's attention

---

[16] *See supra* note 11 (explaining that the courts of appeals' rationales applied equally to conveyance of items to prevent conception and to produce abortion).

[17] The House report stated at the outset of its discussion that "[e]xisting statutes completely prohibit the importation, interstate transportation, and mailing of contraceptive materials, or the mailing of advertisement or information concerning how or where such contraceptives may be obtained or how conception may be prevented." H.R. Rep. No. 91-1105, at 2. That introductory remark, however, plainly was a reference to the literal text of the provisions, as opposed to their settled meaning. The report proceeded to convey the Postmaster General's description of the settled judicial and administrative narrowing construction of the statute, noting that it was in tension with the text of the contraception provisions, and neither the report nor any evidence in the legislative record of which we are aware expresses the committee's disagreement with that construction.

[18] In approving a mifepristone product for certain abortions in 2000, the FDA imposed certain restrictions on distribution as a condition of approval, pursuant to its regulatory authority. *See* Letter for Sandra P. Arnold, Vice President, Population Council, from Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., *Re: NDA 20-687* (Sept. 28, 2000). In the Food and Drug Administration Amendments Act of 2007 ("FDAAA"), Congress provided that any such restrictions, identified in the FDAAA as "elements to assure safe use," were deemed to be a "Risk Evaluation and Mitigation Strategy" that would continue to be required under the new statutory regime unless and until the FDA determined that modifications were necessary. *See* Pub. L. No. 110-85, tit. IX, § 909(b), 121 Stat. 823, 950–51 (2007). In the debate preceding this amendment, critics of the FDA's 2000 approval of mifepristone for abortion purposes acknowledged that the legislation would apply to that mifepristone approval. *See* 153 Cong. Rec. S5765 (daily ed. May 9, 2007) (statement of Sen. Coburn); 153 Cong. Rec. S5469–70 (daily ed. May 2, 2007) (statement of Sen. DeMint). Yet neither those critics nor anyone else in the congressional debate mentioned the Comstock Act, even though it would have been natural to assume that the FDA's 2000 approval had resulted in the distribution of mifepristone to certified physicians through the mail or by common carrier. Congress's decision to carry forward the FDA's regulatory conditions for mifepristone without addressing such modes of distribution suggests that Congress did not understand the Comstock Act to invariably prohibit the conveyance by mail or common carrier of drugs intended to induce abortions.

14

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

establishes Congress's acceptance of that narrowing construction. *Inclusive Cmtys. Project*, 576 U.S. at 536. That construction, as noted, does not prohibit the mailing of an item that is designed, adapted, or intended for producing abortion in the absence of an intent by the sender that the item will be used unlawfully.

## C.

USPS has accepted the settled judicial construction of the Comstock Act—and reported as much to Congress.

In 1951, the Solicitor of the Post Office Department, Roy C. Frank, wrote to an Arizona postmaster concerning a Planned Parenthood clinic's mailing of diaphragms and vaginal jellies to its patients "for medicinal purposes." *Contraceptive Matter—Mailings—Physicians*, 9 Op. Sol. P.O.D. 47 (1951) (No. 40). Citing "the decisions of the Federal courts," Frank opined that a "mailing of contraceptives by a physician to a patient would not be regarded as a violation" of the Comstock Act. *Id.* Similarly, in 1963, when the St. Louis Postmaster detained 490 "contraceptive devices and substances," the USPS General Counsel informed him that he should "dispatch" those items because "there is no available evidence that the items in each of these parcels were being distributed for unlawful purposes." Letter for Harriet F. Pilpel, Greenbaum, Wolff & Ernst, from Louis J. Doyle, General Counsel, Post Office Department (Oct. 24, 1963) (on file with the Smith College Libraries). In a letter to the sender Emko Company's counsel, the USPS General Counsel added that "should we obtain evidence in the future that [Emko] is distributing contraceptive devices and substances for unlawful purposes we will again look into the matter." *Id.*

Of particular importance, when Congress was considering amendments to the Comstock Act in 1970, USPS brought to Congress's attention its acceptance of the Judiciary's narrowing construction. The Postmaster General submitted a statement to Congress about his agency's understanding that "the delivery by mail of contraceptive information or materials has by court decisions, and administrative rulings based on such decisions, been considered proper in cases where a lawful and permissive purpose is present." *See* H.R. Rep. No. 91-1105, at 3–4 (1970). As a result, "[t]he lawful mailing . . . of contraceptive articles . . . is dependent on the interpretation given to the intended purpose." *Id.* at 4. The Postmaster General noted that "[w]hat is a lawful purpose within the meaning

46 Op. O.L.C. __ (Dec. 23, 2022)

of the interpretations given, though vaguely identifiable, has with the passage of time also been considerably broadened" and that "many States . . . have adopted positive legislation to authorize or encourage public family planning services." *Id*. As a result, by the time the Postmaster General wrote to Congress in 1970—after the Court's *Griswold* decision holding unconstitutional a state prohibition on the use of contraception— "it [was] quite clear that the cited law as presently written [was] unenforceable." *Id*.

The House Ways and Means Committee included the Postmaster General's statement in its report on the draft amendment and noted that "[i]n view of" that statement—along with statements supporting the draft amendment by the Departments of Labor and of Health, Education, and Welfare—the Committee on Ways and Means was "unanimous in recommending enactment of H.R. 4605." *Id.* Congress then amended the Comstock Act to repeal most of the Act's applications to contraceptives. *See* Pub. L. No. 91-662, 84 Stat. at 1973–74.[19]

\* \* \* \* \*

Thus, before the Court's recognition of a constitutional right to contraception in *Griswold* and to abortion in *Roe*, the Judiciary, Congress, and USPS itself all understood section 1461 and the related provisions of the Comstock Act not to prohibit the conveyance of articles intended for preventing conception or producing an abortion where the sender lacks the intent that those items should be used unlawfully. We further note that, shortly after Congress amended the Comstock Act in 1971 to eliminate the restrictions on contraceptives, the Supreme Court's decision in *Roe* effectively rendered unenforceable the restrictions on articles "designed, adapted, or intended for producing abortion." For the past half century, courts have not had the occasion to elaborate further on the meaning of the Comstock Act as it relates to abortion, including regarding

_____

[19] Although the 1971 Congress eliminated the preexisting broad prohibitions on sending contraception-related articles and information using the mails or common carriage, it added a narrower prohibition designed to prevent the mailing of unsolicited contraceptive items and advertising to private homes. *See* 39 U.S.C. § 3001(e); *see also* 18 U.S.C. § 1461 (making it a crime to knowingly use the mails to mail anything deemed "nonmailable" in section 3001(e)). In *Bolger*, the Supreme Court held that the ban on unsolicited advertisements of contraceptives violates the First Amendment. 463 U.S. at 61.

16

the sources of law that inform whether an abortion would be "unlawful" for purposes of the established construction of the Act.

## II.

In Part I we demonstrated that, in accord with the prevailing judicial construction Congress ratified, section 1461 does not prohibit the mailing of articles that can be used to produce abortion, including mifepristone and misoprostol, where the sender lacks the intent that those items should be used unlawfully.[20] We turn now to address the many circumstances in which a sender of these drugs typically will lack an intent that they be used unlawfully.

Federal law does not prohibit the use of mifepristone and misoprostol for producing abortions. Indeed, the FDA has determined the use of mifepristone in a regimen with misoprostol to be safe and effective for the medical termination of early pregnancy. And, to the extent relevant, these drugs can serve important medical purposes and recipients in every state can use them lawfully in some circumstances. This is true even when the drugs would be delivered to an address in a jurisdiction with restrictive abortion laws, because women who receive the drugs in all fifty states may, at least in some circumstances, lawfully use mifepristone and misoprostol to induce an abortion.

We note that those sending or delivering mifepristone and misoprostol typically will lack complete knowledge of how the recipients intend to use them and whether that use is unlawful under relevant law. Therefore, even when a sender or deliverer of mifepristone or misoprostol, including USPS, knows that a package contains such drugs—or indeed that they will be used to facilitate an abortion—such knowledge alone is not a sufficient basis for concluding that section 1461 has been violated. We also recognize that USPS may have reason to consider adopting uniform policies or practices regarding the mailing of mifepristone or misoprostol. *Cf. Smith v. United States*, 431 U.S. 291, 304 n.10 (1977) ("[T]he nation-wide character of the postal system argues in favor of a nationally uniform construction of [section] 1461.").

----

[20] *See supra* note 3 (noting that the same test would apply to section 1462 and to recipients of the drugs to the extent those persons might be amenable to prosecution).

We have not undertaken the challenging task of a detailed review of state abortion laws, but we can offer some illustrative uses for mifepristone and misoprostol that the law of a given state would not prohibit:

- First, in most states—where a majority of the U.S. population lives—abortion continues to be lawful until at least twenty weeks' gestation. It is very unlikely that someone sending validly prescribed mifepristone or misoprostol into such states will intend for them to be used unlawfully.

- Second, even some states that in recent months have enacted or begun to enforce more restrictive abortion laws continue to allow abortion for at least some number of weeks of pregnancy. Use of mifepristone and misoprostol to terminate a pregnancy that falls within that period would be lawful.

- Third, thus far, no state that has enacted or newly begun to enforce restrictions on abortion in the wake of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), prohibits abortions that are necessary to preserve the life of the woman.[21] Many medical conditions that make pregnancy potentially life-threatening—for instance, certain heart conditions, pulmonary hypertension, or Marfan Syndrome[22]—are known in the first trimester, when women most commonly use mifepristone and misoprostol to induce an abortion. Such a use of these drugs to terminate a life-threatening pregnancy would be lawful.

- Fourth, some state abortion restrictions also include exceptions for cases of rape or incest, to protect the health of the woman, or where there are severe fetal anomalies. The use of mifepristone or miso-

---

[21] *See Dobbs*, 142 S. Ct. at 2305 n.2 (Kavanaugh, J., concurring) ("Abortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother."); *see also Roe*, 410 U.S. at 173 (Rehnquist, J., dissenting) ("[I]f [a state] statute were to prohibit an abortion even where the mother's life is in jeopardy, I have little doubt that such a statute would lack a rational relation to a valid state objective . . . .").

[22] *See, e.g.*, Inst. of Med., Clinical Prevention Services for Women: Closing the Gaps 103–04 (2011); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 737 (2014) (Kennedy, J., concurring) (noting that "[t]here are many medical conditions for which pregnancy is contraindicated").

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

prostol to produce an abortion in such cases would therefore be lawful.

- Fifth, some states that regulate the conduct of certain actors involved in abortions do not make it unlawful for the woman herself to abort her pregnancy. In those contexts, section 1461 might not prohibit the mailing of mifepristone and misoprostol to a woman in a state with restrictions on abortion, even if the sender does so with the intent that the woman use the drugs to produce an abortion.

- Sixth, even if a state prohibits a pregnant person from ingesting mifepristone or misoprostol for the purpose of inducing an abortion, such an individual has a constitutional right to travel to another state that has not prohibited that activity and to ingest the drugs there.[23] Someone sending a woman these drugs is unlikely to know where she will use them, which might be in a state in which such use is lawful.

- Seventh, federal agencies provide abortion services in some circumstances without regard to contrary state law.[24] Mailings of abortion

---

[23] *See Dobbs*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring) ("[M]ay a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel."); *id.* (referring to the question as "not especially difficult"); *see also Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (explaining that Virginia could not "prevent its residents from traveling to New York to obtain [abortion] services or . . . prosecute them for going there" (citing *United States v. Guest*, 383 U.S. 745, 757–59 (1966))).

[24] The Department of Veterans Affairs ("VA"), for example, recently has begun providing abortions to veterans and certain other VA beneficiaries without regard to state law when the life or health of the woman would be endangered if the pregnancy were carried to term or the pregnancy is the result of an act of rape or incest. *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,288 (Sept. 9, 2022). "[S]tates may not restrict VA and its employees acting within the scope of their federal authority from providing abortion services as authorized by federal law, including VA's rule." *Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *10; *see also* 87 Fed. Reg. at 55,294 (noting that state and local laws, including criminal laws, that "restrict[], limit[], or otherwise impede[] a VA professional's provision of care permitted by" this new rule "would be preempted" (citing 38 C.F.R. § 17.419(b))). Also, the Department of Defense ("DoD") has for many years provided service members, dependents, and other beneficiaries of DoD health care services with abortion services when a pregnancy is the result of rape or incest or when continuing the pregnancy would endanger the woman's life, and DoD has indicated it will continue to do so without regard to contrary state laws. *See*

46 Op. O.L.C. __ (Dec. 23, 2022)

medications intended to be used pursuant to these federal authorities would be lawful under section 1461, because contrary state law could not constitutionally be applied.

- Finally, individuals use mifepristone and misoprostol for medical purposes other than to induce abortions and the legality of those uses would remain unaffected by state restrictions on abortion. For instance, the same dosages of mifepristone and misoprostol that are used for medication abortion can be used to treat a miscarriage,[25] and misoprostol is commonly prescribed for the prevention and treatment of gastric ulcers.[26]

Thus, no matter where the drugs are delivered, a variety of uses of mifepristone and misoprostol serve important medical purposes and are lawful under federal and state law. Accordingly, USPS could not reasonably assume that the drugs are nonmailable simply because they are being sent into a jurisdiction that significantly restricts abortion. Nor would such an assumption based solely on the recipient's address be reasonable even if it is apparent that some women in a particular state are using the drugs in question in violation of state law. *Cf. Youngs Rubber*, 45 F.2d at 110 (although the volume of the plaintiff's sales nationwide justified an inference that the drug stores to which the condoms were being delivered must have been selling at least some of them for purposes that were prohibited under state law—"and that plaintiff must know this"—that was insufficient to conclude that the company intended such illegal conduct by the recipients).

In conclusion, section 1461 does not prohibit the mailing of mifepristone or misoprostol where the sender lacks the intent that the recipient will use them unlawfully. And in light of the many lawful uses of mifepristone and misoprostol, the fact that these drugs are being mailed to a

---

Memorandum for Senior Pentagon Leadership from Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Re: Ensuring Access to Essential Women's Health Care Services for Service Members, Dependents, Beneficiaries, and Department of Defense Civilian Employees* (June 28, 2022).

[25] *See, e.g.*, Honor Macnaughton, Melissa Nothnagle & Jessica Early, *Mifepristone and Misoprostol for Early Pregnancy Loss and Medication Abortion*, 103 Am. Fam. Physician 473, 475 (Apr. 15, 2021).

[26] *See Cytotec Misoprostol Tablets*, U.S. Food & Drug Admin. 5–6 (Aug. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/019268s051lbl.pdf (misoprostol label).

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

jurisdiction that significantly restricts abortion is not a sufficient basis for concluding that the mailing violates section 1461.[27]

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[27] While this request was pending, we received a similar request from the Department of Health and Human Services ("HHS") regarding the Comstock Act in connection with the Food and Drug Administration's Risk Evaluation and Mitigation Strategy for mifepristone. We conveyed our conclusions by e-mail to HHS on December 19, 2022, and we noted there that this memorandum was forthcoming. E-mail for Samuel Bagenstos, General Counsel, HHS, from Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Advice Regarding Comstock* (Dec. 19, 2022, 8:31 PM).